

**SEALED**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UPHEALTH HOLDINGS, INC., et al.[1] | Case No. 23-11476 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: March 26, 2024 at 3:00pm (ET)**<br>**Objection Deadline: March 7, 2024 at 4:00pm (ET)** |

**PLAINTIFF PILLDRILL INC.'S OPPOSITION TO MOTION OF THE DEBTOR
UPHEALTH HOLDINGS, INC. FOR ENTRY OF AN ORDER PURSUANT TO
SECTIONS 502(C) AND 105(A) OF THE BANKRUPTCY CODE ESTIMATING THE
LITIGATION CLAIMS OF PILLDRILL, INC.**

PillDrill, Inc. ("PillDrill"), by and through its undersigned counsel, hereby objects to the

Motion (the "Motion to Estimate" or "Motion") of the debtor, UpHealth Holdings, Inc. (the

"Debtor" or "Holdings") to estimate the litigation claims of PillDrill (the "PillDrill Claim") [D.I.

358], at zero dollars for all purposes.  In support thereof, PillDrill respectfully states as follows:

### PRELIMINARY STATEMENT

1.      By the Motion to Estimate, Holdings seeks to estimate the PillDrill Claim

purportedly because it "needs to know what amount will need to be reserved" for the PillDrill

Claim in its plan to conclude the Chapter 11 cases.  The Motion to Estimate should be denied,

however, because the PillDrill Claim can and should be speedily resolved in Illinois state court,

and Holdings does not need to know the exact value of the PillDrill Claim to formulate its plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, are as follows: UpHealth Holdings, Inc. (6328); Thrasys, Inc. (7413);
Comprehensive Care Alliance LLC (6965); Behavioral Health Services LLC (8110); BHS
Pharmacy LLC (2475); Psych Care Consultants LLC (8822); and Reimbursement Solutions LLC
(6388). The Debtors' headquarters and the mailing address for the Debtors is 14000 S. Military
Trail Suite 202, Delray Beach, FL 33484.

2.      The Motion to Estimate must establish that liquidation of the PillDrill Claim will unduly delay these bankruptcy proceedings. As the moving party, Holdings has the burden to establish specifics regarding not only why liquidation would delay these proceedings, but why such delay would be "undue." Holdings does not even attempt to make this showing.

3.      The Motion to Estimate provides no evidence regarding the status of PillDrill's Illinois action or the supposed undue delay it will entail. The Motion to Estimate does not even attempt to provide any legal argument or analysis as to why the PillDrill Claim would unduly delay this action. Holdings does not establish that any specific item or task is being delayed in this proceeding and certainly does not provide any argument as to why such a delay constitutes "undue delay."   Bankruptcy law favors liquidation over estimation, so absent any showing of undue delay, the PillDrill Claim should be returned to Illinois.

4.      Holdings makes no showing regarding undue delay because it cannot. There will be no undue delay. Holdings merely seeks to use the 502(c) estimation procedure as a tool in attempting to avoid, or at least lower, PillDrill's valid Claim. The Motion to Estimate seeks to lower the PillDrill Claim by arguing that it is "meritless" and should therefore be valued at zero. This is the same claim for which, in Illinois, PillDrill has offered a comprehensive report from valuation and damages expert George S. Hickey that PillDrill's damages range from $14.5 million for expectation damages to $17.14 to $17.91 million for reliance damages. In the same breath that the Motion to Estimate argues that the PillDrill Claim is so obviously deficient it should be estimated at zero, it *also* assumes that if the PillDrill Claim is allowed to proceed in Illinois, the already-pending Illinois Motion for Summary Judgment ("UpHealth MSJ") will be denied and liquidation will require a trial. The UpHealth MSJ has already been filed and could be heard just weeks after the Illinois action resumes. If PillDrill's Claim were truly meritless,

Docket No. 426
Date Filed: 3/7/2024

then it would be rapidly liquidated at zero by the Illinois court. This obvious contradiction between the Motion to Estimate's two primary themes lays bare UpHealth's true intent – to avoid a thorough weighing of evidence and credibility at a trial on the merits in the Illinois court that has presided over this dispute for years, and which has already made significant legal rulings affirming the validity of the PillDrill Claim.

5.     UpHealth particularly wishes to avoid a situation where the Illinois Court (or any court) has an opportunity to make determinations about witness credibility and demeanor. UpHealth and PillDrill have two fundamentally different accounts of the events leading to PillDrill's Claim. Even though the record is replete with conflicts in witness testimony and other evidence, the Motion to Estimate proposes that estimation be determined on the paper record. A fair estimation would require a fulsome review of the evidence by the trier of fact, including live witness testimony. Without such review, it is difficult to truly understand the depth of credibility issues presented by UpHealth's witnesses. This briefing attempts to provide examples of just how poorly these witnesses fared at deposition, but these are just examples.

6.     Allowing the PillDrill Claim to be adjudicated by the Illinois state court is the most logical, expeditious and judicially economical method of determining the PillDrill Claim, and it is the most fair for all parties.  The proceedings in Illinois state court were extensively litigated and had progressed to an advanced stage before it was stayed – indeed, fact discovery had been completed, PillDrill had served its expert report, and UpHealth had filed its motion for summary judgment in accordance with an already set briefing schedule.  This Court should deny the requested relief and, instead, allow the Illinois action to proceed.  Doing so will permit the trial court proceedings to be moved to the active calendar within 1 to 2 weeks, with completion of the summary judgment motion and trial by the Fall of 2024.  By contrast, estimating the

PillDrill Claim in this Court would require immense (and needless) duplication of judicial effort, with no guarantee of a speedier or better result, and would potentially prejudice PillDrill. PillDrill has set forth a baseline amount of its claim, and Holdings should be able to formulate a plan with different ranges for the PillDrill Claim taking the amount of that claim into account (regardless of the final allowance and amount of that claim).

7.      Contrary to Holdings' assertions in the Motion to Estimate, PillDrill has a strong and compelling contract case against Services and Holdings. A full and fair review of the evidence leads to the inescapable conclusion that Services and Holdings have substantial liability to PillDrill. To the extent this Court believes it is appropriate to estimate the PillDrill Claim, the PillDrill Claim should be estimated at $14.5 million to $17.91 million dollars plus prejudgment interest, consistent with the detailed expert report prepared by PillDrill's damages expert in the Illinois proceeding.

## BACKGROUND[2]

### A.    Factual Background

8.      PillDrill's founder and CEO, Peter Havas ("Havas"), founded PillDrill in 2013 and assembled a world-class team of Silicon Valley-trained leaders, engineers and technologists with professional backgrounds at leading technology companies, including Apple and Amazon.

9.      The first three years of PillDrill's existence as an early-stage startup were devoted to developing its flagship product and its intellectual property.  PillDrill's flagship product, "PillDrill," was an internet-connected medication tracking system that reminded customers of when their medication was due, tracked that customers had taken their medication, and notified

---

[2] Insofar as Holdings has presented *its* view of the relevant background, PillDrill provides a counter-statement of the facts to provide the Court additional context and a full understanding of the genesis of the dispute.

4

loved ones and health professionals of whether medication is being timely-taken. (Declaration of Dhaivat H. Shah ("Shah Decl."), Ex. A at 5:24-7:17.) PillDrill's intuitive patient-facing data capture tools not only served the immediate needs of consumer medication management and medical adherence but were also critical components of any comprehensive suite of remote or tele-medicine offerings.

10.    Havas founded PillDrill with the intention of creating a medical adherence device company that held significant strategic acquisition value to a larger player in the healthcare industry. To help demonstrate its strategic value, after product and IP development, PillDrill put itself in a position to showcase a consumer use case to potential acquirors by launching its product to the public in 2016. PillDrill's direct-to-consumer launch of product sales through its own website and through the CVS Pharmacy website showed consumer interest and resulted in over $125,000 per year in revenue in some years. (*Id*. at 43:16-44:20.) PillDrill was named a 2017 Innovation Award Honoree in the "Tech for a Better World" category by the prestigious Consumer Electronics Show in Las Vegas. (Declaration of Peter Havas ("Havas Decl.") ¶ 3.)

11.    In addition to its consumer use case through direct-to-consumer sales, PillDrill participated successfully in clinical trials for new treatments and addiction treatment therapies, including with Pfizer. (Shah Decl., Ex. A at 44:14-20; Ex. B at 42:3-7.) PillDrill also worked with Procter & Gamble to explore use of the PillDrill product's scanning capability for non-medication purposes. (*Id*., Ex. B at 43:18-7.)

12.    Debtor's Motion To Estimate is dismissive of PillDrill's value, labeling it an unprofitable and money-losing enterprise that depended on external fundraising and investment to operate. This is both reductive and absurd. UpHealth itself was dependent on external fundraising to fund its acquisitions. (*See, e.g.*, *id.*, Ex. B at 38:12-39:12.) And it has little

5

standing to smear any other company's profitability given that Debtor itself recently filed for bankruptcy.  Moreover, successful early-stage technology companies are all dependent on external fundraising and investment, often for extended periods of time.  The entire Venture Capital industry is built on such companies.  For instance, Tesla was founded in 2003 but only became profitable in 2020.  Yet Tesla had a market capitalization in 2019 of over 75 billion dollars.  Uber was founded in 2009 and became profitable in 2023.  Yet it had a market capitalization in 2022 of nearly 50 billion dollars.  A company does not need to be profitable to be valuable.  Not all early-stage technology companies ultimately succeed, but they are all, at one time, unprofitable and dependent on external funding to fuel their operations.  The successful ones either eventually become profitable or, alternatively, represent accretive value to another company and are acquired before they ever turn a profit.  PillDrill's sales on its own website and the CVS website were only a consumer use study in furtherance of its approach of presenting itself as an attractive strategic acquisition target.  In other words, it was never the plan that PillDrill would become profitable by selling medical devices on the Internet.  (*Id.*, Ex. A at 43:16-44:20; Ex. C at 13:17-16:5, 92:15-93:4.)  As is further discussed below, PillDrill's independent expert has opined that PillDrill's value as a strategic acquisition in 2021 was between $17.14 million and $17.91 million.  (*See* Declaration of Andrew Hays ("Hays Decl."), Ex. L.)

13.     By August or September 2019, Havas determined that PillDrill, through its product and IP development, consumer use studies, and clinical trial participation, represented significant strategic acquisition value.  (Shah Decl., Ex. C at 92:15-93:4.)

14.     Accordingly, PillDrill engaged the investment banking firm Sikich Corporate Finance LLC ("Sikich") to explore potential merger or acquisition transactions.  Susan Tomilo

("Tomilo"), a managing director of Sikich, and Mariya Pylypiv ("Pylypiv"), a Sikich associate

were the personnel Sikich assigned to assist PillDrill in finding an acquiror.  (*Id*., Ex. A at 33:4-

10.)

15.     Havas and PillDrill board member Judi Grupp ("Grupp") reached out to a number

of companies between fall 2019 and spring 2020 through their personal networks.  (*Id*., Ex. B

39:23-45:6.)

16.     Sikich, through Tomilo, also purportedly reached out to numerous companies but

could find no immediate acquisition interest in PillDrill.  (*Id.*, Ex. B 39:23-45:18.)  Supposedly,

the only interested party Tomilo was able to locate was UpHealth Services, Inc. ("Services" and

together with Holdings, "UpHealth"), which she introduced to Havas in early-April 2020.  (*Id.* at

46:8-47:1.)

17.     Tomilo is worthy of – and should be viewed with – skepticism.  Debtor's Motion

to Estimate misleadingly labels Tomilo as PillDrill's investment banker.  But the reality is that

Sikich and its personnel, including Tomilo, were hopelessly conflicted and beholden to Services

and then to its successor, Holdings.  Sikich and Services/Holdings were, and are, deeply

intertwined.  Services was co-founded by Pylypiv, and Pylypiv served as the Vice Chairperson of

Services' Board.  (Shah Decl., Ex. D at 11:14-24, 17:4-13.)  Pylypiv then went on to serve senior

executive positions at Holdings.  (*Id*. at 18:7-19:7.)  Martin Beck ("Beck"), another senior

executive of Services and Holdings, was also a Sikich managing director.  (Shah Decl., Ex. E at

16:5-17:7, 19:24-21:11.)  Moreover, Services and later Holdings were current Sikich clients

during the entire period that Sikich provided services to PillDrill.  (*Id*., Ex. B at 73:14-25.)  In

addition to purportedly representing PillDrill, Sikich also represented Holdings in connection

with the SPAC transaction detailed below and was paid $500,000 by Holdings as a success fee

upon the closing of the SPAC transaction.  (*Id.*, Ex. B at 73:14-25; Ex. F at 5.23.23 149:8-

150:15.)  Sikich also arranged the financing Holdings needed to complete the acquisition of one

of the portfolio companies in connection with the SPAC transaction and was paid $90,000 for

that engagement.  (*Id.*, Ex. F at 125:20-127:9.)  Sikich terminated PillDrill as soon as Sikich

realized that PillDrill intended to take legal action against Services and Holdings but continued

representing Services and Holdings.  (*Id.*, Ex. B at 224:15-226:12.)

18.     Sikich acknowledged that it was conflicted and even obtained a conflict waiver

from PillDrill at the outset of the engagement.  (*Id.*, Ex. A at 36:8-37:14.)  Because Havas knew

that Sikich had a relationship with Services and Holdings, he put greater credence in Tomilo's

representations and assessments regarding Services and Holdings than he would have had

Tomilo been interacting with a potential acquiror that was a stranger to her.  (Havas Decl. ¶ 4.)

19.     Sikich's bias continued to demonstrate itself in Tomilo's testimony and conduct

during the Illinois lawsuit.  In mid-2023, Tomilo refused to comply with a subpoena for her

deposition that was noticed to occur near the fact discovery cut-off in the Illinois action in a

move transparently calculated to disadvantage PillDrill.  PillDrill was forced to bring an

emergency motion to compel Tomilo to appear for a deposition, which the trial court granted.

When Tomilo finally appeared for deposition, she revealed that UpHealth's counsel had assisted

Sikich's counsel in preparing her for her deposition.  Both Sikich's counsel and UpHealth's

counsel instructed her not to answer any questions on how UpHealth's counsel had coached her

on the ground that any communications between UpHealth's counsel and Tomilo were privileged

under the common interest doctrine.  (*See, e.g.*, Shah Decl., Ex. B at 18:1-20:19.)  Sikich's

counsel later disclosed that Sikich and UpHealth had entered into a written common interest

agreement when PillDrill first sued UpHealth.  (Shah Decl. ¶ 15 & Ex. L.)

20.     Sikich's and UpHealth's financial relationship also continued throughout the litigation.  Though Sikich terminated PillDrill when PillDrill sued UpHealth, Sikich continued providing services to UpHealth.  (*Id.*, Ex. B at 224:15-226:12.)  Indeed, during Services and Holdings' founder and chairman Chirinjeev Kathuria's ("Kathuria") deposition in early 2023, he testified that he had spoken with Tomilo earlier that same day on unrelated services Sikich was providing Holdings.  (*Id.*, Ex. G at 93:10-95:15.)

21.     On April 7, 2020, Tomilo arranged to have Havas participate in a video meeting with Tomilo, Pylypiv, Kathuria and Al Gatmaitan ("Gatmaitan").  (*Id.*, Ex. A at 47:12-48:14.) Kathuria was introduced as the Chairman of "UpHealth," and Gatmaitan as the CEO.  During that meeting, Kathuria told Havas that "UpHealth" was interested in acquiring PillDrill as part of a rollup transaction with 7 other healthcare companies, as a prelude to the combined entity becoming publicly-listed.  (*Id.*, Ex. A at 68:4-13, 69:17-70:10.)

22.     Kathuria explained that the overall transaction would occur in two phases.  In Phase 1, Services would acquire all 8 healthcare companies, including PillDrill, by June 2020. In Phase 2, the combined entity would go public by December 2020.  (*Id.*, Ex. A at 68:4-13, 69:17-70:10.)

23.     Kathuria represented that Services had a $350 million pre-money valuation. According to Kathuria, the value would triple, however, in December 2020 as soon as they were public, because the combined entity would be then worth $1B+.  Kathuria stated that the $1B+ valuation was not simply his opinion but an estimate provided by Service's financial advisor, the accounting firm KPMG.  (*Id.*, Ex. A at 70:3-17.)  Kathuria therefore stated that whatever dollar value of Services stock that was offered to PillDrill at the current $350 million valuation should be seen as worth 3 times as much by December 2020.  Tomilo corroborated Havas's recollection

Docket No. 426
Date Filed: 3/7/2024

of Kathuria's statements during the April 2020 meeting regarding Service's purported valuation and the purported value of the equity being offered to PillDrill.  (*Id.*, Ex. B at 64:11-65:17.)

24.    The Services representatives at that meeting – Pylypiv, Gatmaitan and Kathuria – purported not to recall what was said or even participating in the meeting.  (*Id.*, Ex. D at 41:1-17; Ex. H at 63:19-64:9; Ex. G at 38:3-40:19.)

25.    Notwithstanding his more recent memory gaps, Gatmaitan sent a follow up email to Pylypiv on April 14, 2020, in which he confirmed that he had reviewed a "Synergy Deck" in which PillDrill had explained how an acquisition of PillDrill provided strategic value and synergies with the other 7 healthcare companies in the rollup transaction, and that he agreed with most of it.  Gatmaitan further wrote to Pylypiv that he saw strategic acquisition value in PillDrill that was not measured in profit margins alone:  "Not sure it will ever on its own generate large margins but it will be highly valued by providers that take financial risk for payments and be a great customer experience satisfier creating a deep bond with UpHealth.  Its tangible nature will seem as if UpHealth is a valuable friend in the home."  Gatmaitan urged Pylipiv to land PillDrill:  "I trust you will negotiate a hard bargain but not too hard as I think we will regret not having it. I am pleased Peter wants to join us as I would think he has options such as selling to a CVS or Walmart."  (*Id.*, Ex. H at Ex. 1.)

26.    Services sent PillDrill a draft term sheet in which it offered PillDrill $5 million in Services equity.  PillDrill countered at $7 million in Services equity.  The parties finally agreed that Services would acquire PillDrill for $6 million in Services equity.  (*Id.*, Ex. A at 52:15-53:4.)  PillDrill believed that $6 million was significantly less than it was worth.  But it accepted Kathuria's representations that Services' $350m valuation would rise to $1B+ by the time it went

public in December 2020, making the value of the equity PillDrill received at over $18m. (Havas Decl. ¶ 5.)

27.     PillDrill entered into a term sheet with Services on April 17, 2020, in which it agreed to lockup restrictions on its ability to enter into an M&A transaction with any other company.  (Shah Decl., Ex. A at Ex. 3.)  Notably, PillDrill had been in late-stage negotiations with Medisafe regarding an acquisition but terminated the discussions due to the lockup restrictions.  (*Id.*, Ex. A at 107:9-20, 114:7-115:5.)

28.     Following execution of the term sheet, Services performed due diligence on PillDrill, with which PillDrill cooperated fully.  (*Id.*, Ex. B at 70:12-71:24.)

29.     From April to August 2020, PillDrill received regular feedback from Services, either directly or through Tomilo, that everything was on track, albeit with some delays in closing Phase 1 of the transaction.  Tomilo told Pylypiv, Gatmaitan, Services CFO Martin Beck ("Beck") and Kathuria that she was providing these updates to PillDrill.  (*See, e.g.*, *id.*, Ex. B at Ex. 7.)

30.     In response to a July 2020 email from Tomilo asking to arrange a call between Havas and Beck to answer some of Havas's questions, Services arranged the meeting.  (*Id.*, Ex. B at 84:15-85:25; Ex. E at Ex. 2.)  Beck memorialized the discussions in a positive email to Havas and Tomilo stating that he would "set up a call with MedQuest" and "talk with our team at Transformations and get that dialogue ramped up" to integrate PillDrill with the other rollup companies.  (Shah Decl., Ex. E at Ex. 2.)

31.     Havas informed PillDrill's board on July 31, 2020, that he "had the meeting with Martin Beck, CFO of UpHealth.  It went well.  All the principals are excited about the role PillDrill will play in the UpHealth roll-up."  (*Id.*, Ex. A at Ex. 4.)  Havas further informed the

board that he had scheduled a call with Kathuria for August 4, 2020, "to get the best possible handle on timing [of the PillDrill acquisition] that I can." (*Id.*)

32.     The August 4, 2020, videoconference was attended by Kathuria, Havas, Tomilo and Pylypiv.  Kathuria informed Havas that Services could no longer complete the transaction described in the April 2020 term sheet.  Kathuria explained that Services was still conducting a rollup transaction, but that it was only acquiring the 5 largest healthcare companies and would not be acquiring PillDrill.  Kathuria stated that after Services completed the rollup transaction, it would proceed to become a publicly-listed company through merger with a special purpose acquisition company ("SPAC").  As such, Kathuria told PillDrill that PillDrill would no longer be acquired in the time frame contemplated in the parties' earlier discussions and would no longer receive Services' private equity as payment for the acquisition.  (Shah Decl., Ex. A at 68:4-13, 70:11-17, 79:23; Ex. I at Ex. 1.)

33.     Also during the August 4, 2020, videoconference, however, Kathuria stated that UpHealth would acquire PillDrill immediately after its planned merger with a SPAC entity.  Kathuria reiterated how important PillDrill was to UpHealth's long-term plan because UpHealth would be operating in four divisions and he believed that PillDrill had an important role to play in working with each of these divisions.  (Shah Decl., Ex. C at 81:14-85:4, 100:16-102:20; Ex. I at Ex. 1.)

34.     Havas took detailed contemporaneous notes regarding the promises made by Kathuria during the August 2020 meeting and informed the PillDrill team and the PillDrill board of Kathuria's promises.  (Shah Decl., Ex. I at Exs. 1, 4; Ex. C 103:12-105:1.)  Pylypiv testified she had no recollection of participating in this meeting, though she purportedly believed someone may have had a call and relayed information to her.  (Shah Decl., Ex. D at 58:18-

12

61:24.)  Kathuria claimed not to recall the meeting.  (*Id*., Ex. G at 48:9-52:20, 62:4-11.)  Tomilo

also purported to not recall this meeting.  (*Id*., Ex. B at 97:15-100:12.)  The meeting was in fact

held, as a screenshot of all Zoom meeting participants demonstrates.  (*Id*., Ex. G at Ex. 4; Havas

Decl. ¶ 6 & Ex. A.)

35.     On August 12, 2020, just one week after the call, Havas sent Pylypiv and

Kathuria an email with his comments on the August version of the "UpHealth Deck" – the

presentation Services was sharing with potential investors regarding the rollup transaction – that

Services had recently shared with him.  (Shah Decl., Ex. D at Ex. 6.)  Havas ended his email by

stating, "The PillDrill team and I are really looking forward to the deal getting done and to doing

our part to help turn the vision into reality."  (*Id*.)  Tomilo reviewed and approved Havas's email

before he sent it.  (Shah Decl., Ex. B at Ex. 9.)  In response, Pylypiv wrote:  "We are also

looking forward to a deal closing and PillDrill becoming a part of UpHealth team!"  (*Id*., Ex. D

at Ex. 7.)  Pylypiv also copied Kathuria on this email to Havas, but Kathuria made no effort to

correct her statement.

36.     On October 7, 2020, Havas sent an email to Kathuria, Pylypiv, Gatmaitan and

Beck asking for a meeting to re-engage and discuss "the modifications of the terms in our term

sheet to reflect the new plan as well as talk about closing timelines and the like."  (*Id*., Ex. D at

Ex. 9.)  Tomilo had reviewed the email before Havas sent it and revised the text to include the

statement, "The term sheet we executed in April has expired and the structure of the current

planned funding is different."  (*Id*., Ex. B at Ex. 11.)  The call was scheduled for October 14,

2020.

37.     Kathuria, Havas, Tomilo, Pylypiv and Gatmaitan participated in the

videoconference on October 14, 2020.  During this call, Services and PillDrill entered into a

definitive oral agreement that "UpHealth" would acquire PillDrill shortly after "UpHealth's" planned merger with a SPAC entity, which would lead "UpHealth" shares to be publicly traded. Because this was an important meeting, Havas again took detailed contemporaneous notes. Kathuria informed Havas that audits on the initial 5 companies had to be completed by November 10, that the S-4 would be filed by Christmas, and that the SEC required the company to start trading in the 30-day window between January 15, 2021, and February 15, 2021. Kathuria further stated that within 30 days of trading commencing, the acquisition of S-Squared, Umedex and PillDrill would be announced and consummated. (*Id.*, Ex. A at 67:10-69:8; Ex. I at Ex. 2.)

38.     Havas raised concerns, however, that this was a substantially different transaction than the one they had discussed in April 2020. In particular, rather than receiving $6 million worth of private shares of Services at a $350 million valuation that would benefit from a 3X increase in value once the company became publicly traded at an estimated $1 billion value, PillDrill would now be receiving publicly-traded shares from a publicly-traded entity on a much later timeline. In other words, it was no longer receiving the benefit that the existing private equity holders of a company would receive once it goes public. Kathuria acknowledged this concern and for this new deal proposed PillDrill be granted 1.7% of the shares issued to shareholders of the entities acquired by or merged into the public UpHealth entity net of any interest held by SPAC holders or PIPE holders. Havas accepted Kathuria's offer for the public UpHealth entity to acquire PillDrill for 1.7% of the public UpHealth entity's shares and thereby formed and binding oral agreement. (Shah Decl., Ex. A at 70:3-71:18; Ex. I at Ex. 2.)

39.     It was reasonable to PillDrill that this agreement would be entered into orally, with boilerplate closing documents coming later to consummate the transaction. Leading into the

videoconference, Havas made it clear to Kathuria and Services that PillDrill could not continue to wait indefinitely for Services to make a definitive commitment to consummate an acquisition of PillDrill. (Havas Decl. ¶ 7.) If Services could not commit to the acquisition, Havas explained that PillDrill would have to pursue other opportunities. (*Id.*)

40.    Havas raised another concern.  The timing of this transaction, which Kathuria said would occur in February 2021, was much later than the June 2020 acquisition timeline that was originally discussed and which had continued to be pushed back over the year.  In the meantime, PillDrill needed funding to maintain operations until the agreed-upon transaction closed.  Havas asked whether UpHealth would execute a new term sheet so that PillDrill would be able to show the term sheet to potential investors as a fundraising tool.  Kathuria acknowledged the urgency of PillDrill's need for bridge funding, agreed to execute a new term sheet so Havas could leverage it to raise funds, and said Pylypiv and Beck would prepare it.  The execution of the term sheet was not a condition precedent to the formation of the oral contract but intended solely for PillDrill's fundraising needs.  (Shah Decl., Ex. A at 70:18-72:8.)

41.    No participant in the meeting has credibly disputed Havas's recollection of the statements made by Havas or the offer and promises made by Kathuria during the meeting.  The UpHealth personnel again all disclaim any recollection of what was said during the meeting. Pylypiv again claimed no recollection of the meeting or having participated in it.  (*Id.*, Ex. D at 79:1-80:4.)  Kathuria similarly purported to have no recollection of the meeting or anything he may have said.[3]  (*Id.*, Ex. G at 74:13-75:8.)  Gatmaitan recalled participating in an October 14,

---

[3] Kathuria's testimony throughout his deposition was particularly unbelievable.  He had plainly been coached to say that he did not remember anything other than that he had a non-binding term sheet with PillDrill, an instruction he so slavishly heeded that it led to extraordinary testimony. Though he founded and led both Services and Holdings and led the discussions regarding the rollup, he purports to not even recall a ballpark range of companies being considered, when

2020, meeting with Havas, the general subject matter, and a discussion of the terms and a potentially different valuation but purportedly cannot recall any details of what anyone said. (*Id.*, Ex. H at 81:9-84:3.)  Tomilo testified that she recalled that a meeting occurred in that time frame and that Havas stated to Kathuria that because UpHealth was now offering to acquire PillDrill with publicly-traded stock rather than private shares and PillDrill would no longer benefit from a 3x uptick in the purchase price, a percentage should be agreed.  (*Id.*, Ex. B at 110:5-112:12.)  But consistent with her common interest agreement, she went to great lengths to defend Kathuria, explaining that Kathuria's promises on the call were "ambiguous." (*Id.*)

42.    Tomilo continued denying that Kathuria had made these promises even after shown her own email of November 10, 2020, in which she wrote to Kathuria, Pylypiv and Beck: "As Chirinjeev suggested, we just used the implied percentage of the original term sheet to simplify the changes driven by the SPAC transaction." (Shah Decl., Ex. B at Ex. 12.)  Tomilo testified, incredibly, that she put this statement in her email because "we wanted to confirm that what we hoped he said was correct, if that makes sense." (*Id.*, Ex. B at 113:7-16.)  It does not, in fact, make any sense at all.  Tomilo admitted that at no time did Kathuria or any of the other recipients respond to her email to correct or clarify that her statement was incorrect or that this term was not agreed at the prior meeting.  (*Id.*, Ex. B at 114:13-114:19.)  Beck, testifying as the corporate representative of Holdings, admitted that the offer to change the terms to an implied percentage came from Kathuria to PillDrill.  (*Id.*, Ex. F at 89:14-91:7.)

---

major events relating to the transactions occurred (not even by year), or whether Services ever developed products or only acquired companies, among many other highly questionable claims of lack of recollection.  (*See, e.g.*, Shah Decl., Ex. G at 20:4-24:7, 28:4-19, 33:24-35:13, 39:15-40:19, 48:18-52:21.)

43.     The offer and acceptance and the promises made during the October 14, 2020, meeting were memorialized by Havas in the contemporaneous notes he took during that meeting (*id.*, Ex. I at Ex. 2), the notes he took on his follow-up call with Tomilo immediately after the meeting (*id.*, Ex. I at 29:19-31:2 & Ex. 2), and emails and statements made by Tomilo and UpHealth personnel.  On the follow-up call Havas had with Tomilo, Tomilo affirmed the parties had reached a binding oral agreement by stating "you guys are in."  (*Id.*, Ex. I at 25:2-31:2 & Ex. 2; Ex. C at 43:10-14.)  Tomilo never told Havas that she had any doubts or questions or concerns about the promises made by Kathuria on the call or that she considered Kathuria's statements ambiguous.  (Havas Decl. ¶ 8.)  All of her actions after the call were consistent with the understanding that the parties had definitively agreed to the terms of an acquisition of PillDrill on the October 14 call.

44.     Pylypiv and Beck did not prepare the term sheet as Kathuria had promised, purportedly because they were too busy.  (*Id.*, Ex. F at 92:2-25.)  Instead, on November 6, 2020, Pylypiv sent a Word version of the original term sheet to Tomilo so that PillDrill could prepare it.  (*Id.*, Ex. D at Ex. 11.)  Pylypiv, however, now purports to have no recollection of why she did so, though she admits she was likely instructed by Kathuria to work with PillDrill to prepare the updated term sheet.  (*Id.*, Ex. D at 87:3-88:12.)

45.     PillDrill ultimately revised the term sheet to reflect the 1.7% equity percentage agreed on October 14, 2020.  Tomilo sent the revised term sheet to Kathuria, Pylypiv and Beck on November 10, 2020.  (*Id.*, Ex. B at Ex. 12.)  Again, no one responded to this email to clarify or correct that the 1.7% equity percentage was not agreed or that this proposal did not come from Kathuria.  (*Id.*, Ex. B at 114:13-19.)

46.     On or around November 13, 2020, Pylypiv contacted Tomilo and asked her to convey to Havas that Holdings personnel were too busy to review the term sheet because they were working on SEC compliance issues but would review it as soon as possible.  (Havas Decl. ¶ 9.)

47.     On October 26, 2020, Kathuria organized Holdings to consummate the rollup and merger with the SPAC because Services' corporate structure limited its ability to take certain actions.  (Shah Decl., Ex. K at 22:18-24:12.)  In a Unanimous Written Consent ("UWC") dated October 26, 2020, the Holdings board ratified and affirmed all acts taken on behalf of Holdings by the incorporator (i.e. Kathuria) as authorized acts of Holdings in all respects.  (*Id.*, Ex. J at Ex. 3.)  Beck, testifying as the corporate representative for Holdings, confirmed that the UWC was intended to and did ratify all of the pre-incorporation acts taken by Kathuria, including any statements he made on calls with PillDrill, including the October 14, 2020, call.  (*Id.*, Ex. J at 14:14-16:25.)

48.     On or about November 20, 2020, Holdings entered into a business combination agreement with a SPAC named GigCapital2, Inc. ("GigCapital"), and with CloudBreak Health, LLC ("CloudBreak").  The announcement stated that after the combination, the combined entity would continue to operate under the name UpHealth, Inc.  As part of the November 20, 2020, business combination agreement, UpHealth Holdings contractually agreed not to enter into any subsequent agreements to acquire any company.  Yet Holdings personnel, including Kathuria, continued making promises and representations to PillDrill through April 2021 consistent with a definitive oral agreement to acquire PillDrill and other promises made during the October 14 call.

18

49.     On November 23, 2020, Tomilo re-sent the draft term sheet to Beck (copying
Pylypiv and Kathuria), congratulated Beck on the business combination agreement, and
informed him that "Peter feels he needs to lock something down to support his internal bridge
funding to enable to company to make it to spring" (i.e. when Kathuria said the PillDrill
acquisition would be completed).  (Shah Decl., Ex. E at 98:11-99:11 & Ex. 7; Ex. B at 124:11-
127:17.)  Neither Beck, Pylypiv nor Kathuria responded to this email or expressed any concern,
confusion or disagreement to Tomilo.  In fact, on December 4, 2020, Tomilo informed Havas
that "Mariya reiterated that they have every intention of moving forward with you but just don't
have the bandwith to address an update [sic] term sheet." (*Id*., Ex. B at Ex. 16.)

50.     On December 18, 2020, Beck sent an email to Kathuria, Gatmaitan and Pylypiv
stating that Tomilo had called and was "keen to see if we could redraft the term sheet with Peter
to help him raise interim capital to find [sic] his burn until we can close a deal."  (Shah Decl., Ex.
E at Ex. 8.)  Neither Kathuria, Gatmaitan nor Pylypiv responded to this email or questioned
Beck's reference to "clos[ing] a deal" with "Peter."  The next communication appears to be a
further email from Beck to the group stating that Tomilo had called him again. (*Id*.)  Beck
purportedly does not recall the call from Tomilo.  (Shah Decl., Ex. E 104:6-14.)

51.     On December 22, 2020, Tomilo emailed Kathuria (copying Pylypiv, Gatmaitan
and Beck) and stated that "Peter really needs additional funding to bridge him to a close
(hopefully in late 1Q or early 2Q)" and that she believed he could secure the funding from his
investors if he had an updated term sheet.  She attached the revised term sheet and noted the only
change was to the consideration offered to reflect the 3X uptick PillDrill would no longer
receive.  She noted that Beck had confirmed there was no disclosure risk to Holdings signing the

term sheet.  (*Id.*, Ex. B at Ex. 17.)  Tomilo received no written response to this email.  (*Id.*, Ex. H
at 99:13-21.)

52.     Instead, at some point after December 22, 2020, either Kathuria or Beck informed
Pylypiv that Holdings purportedly could not sign the term sheet because the SPAC transaction
had entered into a sensitive phase but that Holdings would help PillDrill in other ways.  (*Id.*, Ex.
B at 136:11-138:7.)  Tomilo did not inform PillDrill that Holdings had expressed any concern or
disagreement with the financial terms included in the draft term sheet or any statements she had
made in any of her emails regarding the closing of a deal with PillDrill.  (Havas Decl. ¶ 10.)

53.     On December 31, 2020, Tomilo emailed Kathuria, Pylypiv, Beck and Gatmaitan
to summarize a "Strategic Partnership" between PillDrill and "UpHealth" that she and Kathuria
had discussed and proposed a meeting to scope out the most impactful initiatives which "could
potentially be included in the merger announcement" and would "enable PillDrill to hit the
ground running once it is part of UpHealth."  Notably, the language was definitive, not
conditional - she did not state that it would enable PillDrill to hit the ground running "*if*" PillDrill
becomes part of UpHealth.  She further stated she "want[ed] to lock down the scope so that a
formal partnership agreement can be signed post the call."  (*Id.*, Ex. B at 140:20-142:24 & Ex.
18; Ex. A at 97:14-98:8.)  The strategic partnership was Kathuria's idea.  (Shah Decl., Ex. B at
142:14-24.)  Again, none of the email recipients questioned or corrected Tomilo's reference to
"the merger announcement" or the expectation that a formal partnership agreement would be
signed after the call.

54.     Instead, they scheduled a call for January 7, 2021, to discuss a strategic
partnership agreement ("SPA").  The videoconference was attended by Havas, Grupp, Tomilo,
Pylypiv, Kathuria and Gatmaitan, as well as individuals from two Holdings portfolio companies.

Docket No. 426
Date Filed: 3/7/2024

(*Id.*, Ex. I at Ex. 3.)  The participants agreed to base the SPA on a project in the behavioral health space that PillDrill had already commenced with Transformations, another Holdings portfolio company, several months prior.  Holdings agreed to draft the SPA.  (*Id.*; Havas Decl. ¶¶ 11.)

55.     Though Holdings did not draft the SPA as promised, PillDrill continued working with the Transformations team as agreed on the call.  PillDrill ultimately drafted its own SPA and sent it to Holdings through Tomilo on February 25, 2021.  (Shah Decl,, Ex. B at Ex. 21.) The first page of the SPA states, "UpHealth intends to acquire PillDrill to support direct and pervasive engagement with the consumer and is seeking to establish a strategic partnership…." (*Id.*)  Tomilo reviewed the draft SPA before sending it to Kathuria and Beck and did not make any revisions to the language.  (Shah Decl., Ex. B at 151:8-152:9.)  Beck reviewed the draft SPA and discussed it with Kathuria but never communicated any concerns he may have had about it to Havas.  (*Id.*, Ex. E at 115:13-121:5 & Ex. 12.)  Beck purportedly told Tomilo the compensation terms were "way out of whack" (*id.* 119:4-9), but Tomilo never communicated anything along those lines to Havas.  According to Tomilo, all she was told about the draft SPA was that Holdings could not sign it because of "public markets" or disclosure issues.  (Shah Decl., Ex. B at 136:11-139:7.)  And all Tomilo ever told Havas about the SPA was that Pylypiv had told her that Holdings was too busy to review it.  (Havas Decl. ¶ 12.)

56.     This draft SPA was just the last in a series of adoptive admissions by Beck, Kathuria, Pylipiv and Gatmaitan.  PillDrill, consistent with the oral agreement formed during the October 14, 2020, meeting, was expressing its understanding that UpHealth had agreed to acquire PillDrill:  "UpHealth intends to acquire PillDrill to support direct and pervasive engagement with the consumer and is seeking to establish a strategic partnership…."  (Shah Decl., Ex. B at Ex. 21.)  If PillDrill had misstated this, Holdings executives would have

21

responded to these writings to correct the record.  The only inference to be drawn from these

many adoptive admissions is that Holdings personnel could not contradict PillDrill's statements

because they did, in fact, accurately reflect what was agreed in October 2020.

57.     Shortly thereafter in early March 2021, Tomilo told Havas that Beck had

communicated to her that PillDrill should expect the acquisition to close in April 2021, and that

Holdings would acquire PillDrill within a week of Holdings trading on the New York Stock

Exchange.  (*Id.*, Ex. A at 98:20-99:21.)

58.     And consistent with the understanding that Holdings had definitively agreed to

acquire PillDrill, Beck asked PillDrill to update its data room on or around April 1, 2021.  (*Id.*,

Ex. E at Ex. 13.)  PillDrill began updating its financials, as requested by Beck.  (*Id.*, Ex. B at Ex.

19.)  As Tomilo explained, the IPO was expected to be completed soon, and it would then be

time to consummate the acquisition of PillDrill.  (*Id.*, Ex. B at 143:19-25.)  Everything was

proceeding as Kathuria had promised and the parties had agreed to on October 14, 2020.

59.     On April 20, 2021, however, Kathuria suddenly revealed that all was not as he

had led PillDrill to believe.  During a call with Tomilo, Kathuria told her that Holdings'

acquisition of PillDrill was not certain and would, in fact, require approval by Holdings' board,

which approval Kathuria was not sure would be forthcoming.  The purported requirement of

board approval was not a part of the October 14, 2020, oral agreement and was never mentioned

in connection with the many assurances from August 2020 until April 20, 2021, that Holdings

definitively intended to acquire PillDrill.  Kathuria also stated that he could not confirm that

Holdings would honor the agreed acquisition terms of the October 14, 2020, meeting, i.e., that

PillDrill would be acquired for 1.7% of the shares issued to shareholders of the entities acquired

Docket No. 426
Date Filed: 3/7/2024

by or merged into the public UpHealth entity net of any interest held by SPAC holders or PIPE

holders.  (Havas Decl. ¶ 13.)

60.     Kathuria then spoke directly with Havas on April 24, 2021, and stated Holdings

would not acquire PillDrill.  (Shah Decl., Ex. I at 39:19-40:9.)

   **B.     Procedural History In Illinois State Court**

61.     This matter has been actively litigated in Illinois state court for over 2.5 years and

is at a late stage.

62.     PillDrill filed its original complaint on May 24, 2021, in Illinois State Court

sitting in Cook County.  The complaint alleged claims against Services and Holdings for breach

of oral contract, promissory estoppel, and declaratory relief.  The complaint also contained

claims against Services, Holdings and Kathuria for negligent misrepresentation and fraud.  (Hays

Decl. ¶ 4.)

63.     On July 30, 2021, UpHealth moved to dismiss PillDrill's original complaint on

the ground that the term sheet that PillDrill and Services executed in April 2020 stated that it was

non-binding and that there would be an agreement only when definitive transaction documents

were agreed and executed.  UpHealth also argued that the October 14, 2020, meeting in which

the parties reached an alleged definitive oral agreement did not result in definitive written

transaction documents and that a second term sheet reflecting the alleged economic terms agreed

during that October 2020 meeting was never executed.  UpHealth also argued that PillDrill's

promissory estoppel claim should be dismissed because PillDrill could not have justifiably relied

on a non-binding term sheet and could not have justifiably relied on any statements made during

the October 14, 2020, meeting because the parties did not execute a subsequent term sheet or

definitive agreement.  (*See* Hays Decl., Exs. A, C.)  These are the same arguments against

Docket No. 426
Date Filed: 3/7/2024

PillDrill's claims for promissory estoppel and breach of oral contract that UpHealth now raises here in this Motion.

64.     PillDrill opposed the motion.  It noted that that it was not attempting to enforce the April 2020 term sheet, but rather a definitive oral contract formed in October 2020.  PillDrill noted that by August 2020, UpHealth allegedly informed PillDrill that the acquisition contemplated by the April 2020 term sheet, i.e., that PillDrill would be acquired by a private company in a rollup transaction with a number of other private healthcare companies within a 120-day exclusivity period, paid with $6 million in shares of a private company at a $350 million valuation, would not occur and that the rollup was happening without PillDrill.  Rather, the oral contract in October 2020 was a distinct transaction, one in which PillDrill would be acquired by a public company and paid with 1.7% of the publicly-traded shares of that company, on an entirely different time frame.  PillDrill also noted that the definitive oral agreement reached on October 14, 2020, was not conditioned on the execution of a subsequent written agreement.  (*See id.*, Ex. B.)

65.     The court denied UpHealth's motion in part and granted it in part.  The court held that, as a matter of law, the language of the April 2020 term sheet that it would be non-binding until the parties subsequently executed definitive transaction documents did not foreclose PillDrill and Services from entering into a binding oral contract on October 14, 2020.  The court also held that PillDrill could have reasonably relied on UpHealth's promises and had therefore alleged a claim for promissory estoppel against Services.  (*See id.* ¶ 6 & Ex. D.)

66.     The court held, however, that the complaint inadequately alleged a basis for liability on the part of Holdings because Holdings had been formed two weeks after the October

2020 meeting and therefore dismissed the claims against Holdings with leave to amend.  The court also dismissed PillDrill's claim for fraud with leave to amend.[4]  (*Id.*)

67.     PillDrill filed its First Amended Complaint on December 21, 2021.  UpHealth again moved to dismiss.  On March 25, 2022, the court dismissed the claim for fraud, and all claims against Holdings, and granted PillDrill further leave to amend.  (*See* Hays Decl. ¶ 7 & Ex. E.)

68.     PillDrill filed its operative Second Amended Complaint ("SAC") on April 14, 2022.  (*See id.* ¶ 8 & Ex. F.)  Defendants again moved to dismiss, arguing that:  1) PillDrill could not plead a claim against Holdings because it had been formed subsequent to the October 14, 2020, meeting; and 2) PillDrill had not stated a claim for fraud.

69.     On August 9, 2022, the court granted in part and denied in part defendants' motion.  The court held that the SAC insufficiently alleged fraud and denied that claim as to all defendants without leave to amend.  Critically, however, the court also held that PillDrill sufficiently alleged claims for breach of oral contract and promissory estoppel against Holdings because it alleged facts showing that Holdings was a continuation of Services.[5]  (*See id.* ¶ 9 & Ex. G.)

70.     Thus, UpHealth raised precisely the same legal arguments against the breach of oral contract and promissory estoppel claims that Holdings most emphasizes here, and the Illinois court ruled that PillDrill had valid claims against both UpHealth entities.

---

[4] The court also dismissed PillDrill's claims for negligent misrepresentation, as not recognized under Illinois law, and declaratory relief, as superfluous of other claims, both without leave to amend.  (*See* Hays Decl., Ex. D.)

[5] The August 9, 2022, contained a typographical error and stated in one part that the court was dismissing the promissory estoppel claim.  The court subsequently corrected this typographical error and confirmed that the promissory estoppel claim was well-pled by order dated September 14, 2022.  (*See* Hays Decl. at n.1.)

Docket No. 426
Date Filed: 3/7/2024

71.     Given that all pleading challenges had been resolved, on September 14, 2022, the court issued its first scheduling order.  It ordered a fact discovery cut-off deadline of March 1, 2023.  It also ordered that plaintiff complete its expert disclosure and serve any expert reports no later than March 3, 2023.  Defendants were ordered to serve their expert disclosures and reports within 30 days of PillDrill's expert disclosure.  (*See id*. ¶ 10 & Ex. H.)

72.     Starting in September 2022, the parties initiated extensive written interrogatories and document requests consistent with the court's scheduling order and March 2023 fact discovery cut-off.  Disagreements on written discovery began to arise.  Accordingly, the parties filed a joint motion for a 60-day extension on fact discovery so that these issues could be resolved prior to depositions.  Within this same time frame, the parties began noticing numerous party depositions and serving third-party subpoenas for depositions and documents.  (*Id*. ¶¶ 12-13.)

73.     On February 1, 2023, the court issued an order setting the new fact discovery cut-off deadline of May 1, 2023. PillDrill was ordered to disclose its experts and serve reports by May 3, 2023.  Defendants were ordered to disclose their experts and serve reports by June 2, 2023.  The court also set August 14, 2023, as the date for commencement of the PillDrill Trial. (*Id*. ¶ 14 & Ex. I.)

74.     As the parties approached PillDrill's May 3, 2023, expert disclosure deadline, the court had multiple pending discovery motions to resolve and some of the discovery sought would have impacted PillDrill's expert report.  Accordingly, by stipulated order dated April 12, 2023, PillDrill's expert disclosure deadline was moved to a period of several weeks after the court ruled on the outstanding motions and any court-ordered document productions were completed.

Docket No. 426
Date Filed: 3/7/2024

Defendants' expert disclosure and report deadline was set at 30 days from the date of PillDrill's disclosure.  (*Id*. ¶ 15 & Ex. J.)

75.     Consistent with the May 1, 2023, fact discovery deadline, the parties took 11 depositions (Peter Havas, Judy Grupp, Dr. Chirinjeev Kathuria, Dr. Mariya Pylipiv, Martin Beck, Al Gamaitan, Susan Tomilo, Neil Iyer, PillDrill corporate designee, Services corporate designee and Holdings Corporate designee).[6]  (*Id*. ¶ 16.)

76.     By order dated June 5, 2023, the court ruled on certain outstanding discovery disputes and ordered defendants to produce certain additional categories of documents.  Given that PillDrill's expert disclosure deadline had been set to 3 weeks from the production of documents, the court vacated the August 2023 trial date and scheduled a status conference to occur in August.  (*Id*. ¶ 17 & Ex. K.)

77.     On July 21, 2023, PillDrill served to defendants its expert disclosure and report of its damages expert, George S. Hickey.  (*Id*. ¶ 18 & Ex. L.) Mr. Hickey, an expert with over 25 years' of experience with damages and valuation analysis in m&a transactions, opined that PillDrill's expectation damages were $14.5 million.  (*Id.*, Ex. L ¶¶ 39-50.) Mr. Hickey also opined that PillDrill's reliance damages were between $17.14 million and $17.91 million.  (*Id.*, Ex. L ¶¶ 51-65.)

78.     At a status hearing on August 21, 2023, the parties discussed with the court that fact discovery was closed and that the only matters that remained were defendants' expert disclosures, summary judgment, and trial.  Defendants indicated that they wished to file a motion

---

[6] The court extended the fact discovery deadline for the limited purpose of compelling the deposition of Susan Tomilo, who refused to comply with PillDrill's subpoena.  Also, the corporate designee depositions occurred after the cut-off by agreement of the parties.  (Hays Decl. at n.2.)

for summary judgment on issues of liability only and asked that any deadline to disclose their experts and serve expert reports be deferred until after their summary judgment motion was heard.  The court granted the request and set the following schedule for summary judgment: 1) Defendants' summary judgment motion due on September 18, 2023; 2) PillDrill's opposition motion due October 23, 2023; and 3) Defendants' reply brief due November 13, 2023.  (*Id*. ¶ 19 & Ex. M.)

79.     Defendants filed their motion for summary judgment on September 18, 2023.  *Id*. ¶ 20.  The following day, Holdings filed for Chapter 11 bankruptcy and the Illinois state court action was stayed.  (*Id*. ¶¶ 21-22 & Ex. N.)

## **ARGUMENT**

### A.     **The Court Should Deny The Motion To Estimate Because Efficiency And Fairness Dictate That This Claim Should Be Resolved In Illinois State Court**

80.     The bankruptcy code requires estimation of a contingent or unliquidated claim only when a failure to do so would "unduly delay the administration" of the bankruptcy case. 11 U.S.C. § 502(c)(1). Holdings does not – indeed, cannot – meet its burden to show that liquidation of PillDrill's claims would unduly delay these proceedings. Here, there is no risk that PillDrill's claims will cause undue delay. In fact, Holdings' strategically-timed filing of this bankruptcy *has delayed liquidation of the PillDrill Claim*. Absent the bankruptcy stay, the PillDrill Claim would likely have already been tried and determined in Illinois State Court (the "PillDrill Trial").

### 1.     **Liquidation Of The Claim Will Not "Unduly Delay The Administration" Of This Case**

81.     Holdings urges estimation of PillDrill's claim, not because it would delay administration of this bankruptcy, but because Holdings wishes to avoid the PillDrill Trial and instead have its liability to PillDrill decided on as little information and evidence as possible. Contrary to representations in their motion papers, Holdings knows that PillDrill has strong

Docket No. 426
Date Filed: 3/7/2024

evidence against it, and so seeks estimation under section 502(c) on the assumption that this strategic maneuver will lead to a better outcome than a full trial on the merits in Illinois.

82.     It is Holdings' burden to show that liquidation will cause undue delay. *See In re Dow Corning Corp.*, 211 B.R. 545, 573–74 (Bankr. E.D. Mich. 1997) ("[T]he party moving for estimation must show that the normal mode of liquidating the claim would create undue delay in the bankruptcy process."). The Motion to Estimate barely even *attempts* to meet that burden, noting only that a motion for summary judgment is pending and that the parties may engage in expert discovery. Motion, ¶¶ 59-62.  The reality is that there is no need for estimation of PillDrill's claim because (a) these bankruptcy cases only recently commenced and can continue to move forward while the PillDrill Claim is resolved in Illinois state court, and (b) the PillDrill Claim is close to liquidation and can be resolved before causing any significant delay to these bankruptcy proceedings, let alone "unduly" delaying them.

### a.     Holdings Fails To Meet Its Burden To Show Undue Delay

83.     Holdings' arguments in favor of estimating PillDrill's claims ring hollow because there has been no showing that estimation is required to avoid undue delay in this bankruptcy case. "When dealing with a motion for estimation, a court starts with a baseline knowledge of what is involved with liquidating a claim. Therefore, the party moving for estimation must show that the normal mode of liquidating the claim would create undue delay in the bankruptcy process. A court usually has a feel for when delay in a case becomes 'undue.' ***It is therefore incumbent upon the movant(s) to establish particulars as to why the delay which would be engendered by a typical liquidation would be undue in a particular instance.***" *Dow*, 211 B.R. at 573–74 (emphasis added).

29

84.    Holdings has made no showing of *any* delay, much less undue delay. Absent such a showing by the moving party, "bankruptcy law's general rule is to liquidate, not to estimate." *Id.* at 563.

85.    The Motion to Estimate attempts to paint the case status (which is actually on the doorstep of trial) as requiring significant work prior to liquidation and makes the unsupported assertion that this is "precisely the type of situation that cries out for estimation . . . to avoid undue delay[.]"  Motion, ¶ 59.

86.    Yet Holdings cites *no evidence* and provides *no legal analysis* as to how the facts show that the PillDrill Trial could "unduly delay" this proceeding. Motion, ¶¶ 59-62 (lacking any statement of the standards used to determine undue delay or evidentiary citations regarding the likely speed of resolution in Illinois). It doesn't because it can't. Absent the bankruptcy stay, the PillDrill Trial would go forward in a matter of months. There is no indication that this Court could complete a fair estimation process prior to that date. Regardless, even if liquidation were to take somewhat longer than estimation (it appears highly unlikely that it would), that still would not render delay "undue." *Dow*, 211 B.R. at 563. In fact, the title of the Motion to Estimate section dedicated to undue delay speaks only to the "risk of undue delay." Motion, p. 22, Header "B". Even Holdings *itself* hesitates to definitively claim that this action *will* be unduly delayed – pointing instead to some unexplained hypothetical "risk." If merely using the magic words "risk of undue delay" with no evidence whatsoever was sufficient to meet the standard to override the "general rule . . . to liquidate, not to estimate," (*Dow*, 211 B.R. at 563) every contingent claim would be subject to mandatory estimation. That is not how the Bankruptcy Code works.

87.    Further, Holdings paradoxically argues both (a) that the Illinois action will unduly delay resolution of this bankruptcy because there must still both be a hearing on Services and

Holdings' already-pending motion for summary judgment *and* then a trial on the merits, and (b) that estimation in this Court will be simple and expedient because PillDrill's claims are entirely meritless. Motion, ¶¶ 1, 6, 23, 58, 63. If PillDrill's claims were truly meritless, then they would not survive Services and Holdings' pending summary judgment motion in Illinois.  The path to liquidation would run only as long as it took to schedule another hearing on Services and Holdings' pending motion.  Yet Holdings assumes that it will lose summary judgment, and trial will be necessary, when purporting to describe the long path to liquidation.  PillDrill agrees with Holdings' implicit concession that its summary judgment motion will fail and that PillDrill's meritorious claims raise triable issues.  But as is further described below, the path to liquidation through trial is not nearly as long as Holdings implies.

88.     Finally, Holdings' argument that an appeal of a final decision in the PillDrill Trial could cause undue delay is unavailing. If the prospect of appeals were sufficient to establish undue delay, then liquidation of *any* pending claim would *always* be found to unduly delay a bankruptcy proceeding. Holdings' argument is purely theoretical, and *in theory* any claim at any stage of any trial court could ultimately be appealed, for years, all the way to the Supreme Court. It also ignores the reality that any decision of this Court may *also* be subject to an appeal that would take additional time.

89.     Holdings' argument essentially suggests that – since the case was not yet *currently in trial* at the time of the bankruptcy stay – completion of the case in Illinois will unduly delay these proceedings. Were that the standard, it would be essentially impossible to avoid estimation of *any* unliquidated claim. But, of course, Holdings provides no evidence or any analysis of the standards in support of its argument for undue delay. Under such circumstances, the Court should refuse to estimate PillDrill's claims. *See In re RNI Wind Down Corp.*, 369 B.R.

31

174, 191 (Bankr. D. Del. 2007) (refusing to estimate claims where plan administrator provided

no evidence that allowing liquidation would unduly delay the administration of the case).

> **b.** **The PillDrill Trial Can Reach Judgment In A Matter Of Months**

90.    There are almost no steps left to liquidate PillDrill's claim except hold the

PillDrill Trial itself. Fact discovery is complete, PillDrill has completed expert disclosures, and –

absent the bankruptcy stay – the Illinois court could issue a decision liquidating PillDrill's claims

in a matter of months. As recently as June, 2023, the PillDrill Trial was set to go forward on

August 14, 2023. (Hays Decl. ¶ 14 & Ex. I.) This was delayed – likely by approximately six

months – to resolve a discovery dispute and for UpHealth's motion for summary judgment. (*Id*.

¶ 17 & Ex. K.) Soon after that, the case was stayed entirely when Holdings filed for bankruptcy.

(*Id*. ¶¶ 21-22.)

91.    Putting aside the Motion's misleading narrative as to the procedural status of the

Illinois proceedings, the Motion is devoid of evidence as to how long this matter would take to

get to trial. This is unsurprising for two reasons.

92.    First, if the Motion had explained to the Court the advanced status of the case and

the likelihood of the Illinois trial happening in a few months, it would lay bare that there is

nothing happening in these bankruptcy proceedings over the next few months that would, in any

way, be impacted by the status of the PillDrill Claim.  Nor is there any reason why there cannot

be a simple reserve for the PillDrill Claim while it is liquidated in Illinois.

93.    Second, we do not have to randomly guess the likely timeline for trial – the

history of the case tells us what is likely to happen in a way that makes the relief sought in the

Motion frivolous. The history of this case shows that the PillDrill trial in Illinois would likely

occur in mid-summer or fall 2024.

94.     The Illinois court's February 1, 2023, scheduling order set deadlines for completion of fact discovery on May 1, 2023, for plaintiff's expert disclosures on May 3, 2023, for defendants' expert disclosures on June 2, 2023, and for trial on August 14, 2023.  (Hays Decl., Ex. I.) The timing for conclusion of expert disclosures mirrors that from the initial scheduling order, which required that defendants disclose their experts "within 30 days" of plaintiff's disclosure. (*Id*., Ex. H.) Although Holdings' attempts to hide critical documents pushed back the discovery cutoff and expert disclosure deadlines by a few weeks, this basic schedule – defendants' expert disclosures coming approximately one month after the fact discovery cutoff and plaintiff's expert disclosures – remained in place. (*Id*., Ex. J.) On June 5, 2023, the Illinois court ordered defendants to produce additional documents, but vacated the August 14 trial date due to these prior delays and Services and Holdings' proposed motion for summary judgment. (*Id.*, Ex. K.)

95.     Services and Holdings filed the UpHealth MSJ on September 18, 2023, and it was set to be heard on December 14, 2023. (Hays Decl. ¶¶ 19-20.) Fact discovery has closed, and Plaintiff made expert disclosures on July 21, 2023. (*Id*. ¶¶ 17-18). The only pre-trial matters remaining are hearing of the UpHealth MSJ and defendants' expert disclosures. (*Id*. ¶ 19.)

96.     Until Services and Holdings requested to postpone their own expert disclosures until hearing on the UpHealth MSJ, their expert disclosures were consistently due just thirty days after PillDrill's own disclosures. Accordingly, since PillDrill has already made its own disclosures, Services and Holdings' expert disclosures will almost certainly be due no more than thirty days following a decision on the UpHealth MSJ.

97.     But given Holdings' exhortations of urgency, Holdings would presumably agree to default to the normative timeline for its expert disclosure – which would have expert

Docket No. 426
Date Filed: 3/7/2024

disclosures and discovery happening concurrently with summary judgment briefing, not consecutively. In other words, if this Court were to lift the stay at the beginning of April 2024 (or otherwise abstain in favor of the Illinois action), Services and Holdings would submit their expert disclosures within 30 days thereafter. Again, it is Services and Holdings themselves that requested to postpone their expert disclosures until after the UpHealth MSJ – likely knowing by that point that Holdings planned to file for bankruptcy as soon as it filed the UpHealth MSJ.

98.     The February 1, 2023, order setting the original August 14, 2023, trial date, had trial scheduled to begin less than six weeks after defendants' expert disclosures. (Hays Decl., Ex. I).  But for the bankruptcy filing and stay, which was timed to take effect *the day after* the filing of the UpHealth MSJ, the UpHealth MSJ would have been denied on December 14, 2023, Services and Holdings' expert disclosures would have been due no later than mid-January, and the PillDrill Trial would likely be moving forward at this very moment.

99.     If Holdings were truly motivated to get this matter resolved in the proper venue, Illinois state court, it could simply withdraw the UpHealth MSJ and let this matter proceed directly to trial.

100.    Even accounting for the UpHealth MSJ, if one simply extrapolates from the deadlines in the Illinois court's prior scheduling orders, the PillDrill Trial is likely to move forward within six months of the stay being lifted. (Hays Decl. ¶¶ 28-30.) This would put a trial at the beginning of October 2024. It could be even sooner, if the state court has trial date availability. Prior scheduling orders set trial within three months of plaintiff's scheduled expert disclosures and one and one-half months from defendant's expert disclosures. So, this case could even get to trial as soon as July or August 2024 if there is room on the state court's trial calendar. (*Id*.)

101.     Further, if Holdings were correct that PillDrill's claim is "meritless" (Motion, ¶¶ 1, 23, 63), then there would be even less potential for delay – the claim would be dismissed, through granting of Services and Holdings' already-pending motion for summary judgment, within only as much time as it takes to complete briefing and hold a hearing.

c.     **The Relative Timing Of This Bankruptcy Is Such That It Cannot Be Unduly Delayed By The PillDrill Trial - There Is No Proposed Reorganization To Even Be Delayed**

102.     If the Illinois stay is lifted (or this Court abstains), there is almost no possibility of *any* delay in this action stemming from the PillDrill Trial; there is not even a proposed reorganization to be delayed.

103.     Although the standards caselaw provides for assessing "undue delay" tend to make specific reference only to milestones in the underlying liquidation action, not the status of the bankruptcy action itself, the status of the bankruptcy action does have some impact on the overall assessment.

104.     "An estimation proceeding expedites the bankruptcy process so that key steps in a reorganization that depend on the fixing of value may proceed." *In re Stone & Webster, Inc.*, 279 B.R. 748, 810 (Bankr. D. Del. 2002). Here, the bankruptcy action was filed only a few months before Holdings' Motion and there has not been any proposed plan of reorganization to be unduly delayed – either in approval or implementation. Put differently, there are no "key steps in [this] reorganization" that are waiting for a fixed value on the PillDrill Claim before they may proceed. Such steps may arise at some point in the future, but at this moment in time, nothing is being delayed at all by the PillDrill Claim's unliquidated status. Holdings has already filed numerous motions seeking to extend deadlines and has provided no indication that it intends to implement a plan of reorganization in the next few months – even if the Court grants this Motion.

35

105.    Further, Holdings' Motion does not articulate a single specific task that is necessary to resolution of this bankruptcy action but would be impacted by a failure to estimate the PillDrill Claim. The Motion notes that the PillDrill Claim is a relatively large claim (though it is far from the largest claim) and states – without explanation – that "[i]n order for the Debtors to consummate a plan, the Debtors will need to know the amount, if any, to provide for the PillDrill Claim." Motion, ¶ 62. But this supposed delay is not actually necessary. Holdings could leave a reserve for the PillDrill Claim then, if Holdings is correct that the PillDrill Claim is meritless, distribute that reserve among its other creditors as soon as PillDrill's claim was dismissed on summary judgment (or lost at trial soon thereafter) in Illinois.

106.    UpHealth urges an estimation based solely on cherry-picked evidence and/or this Court's reversal of legal issues already decided in favor of PillDrill on the Illinois motions to dismiss. Such a hasty estimation entails severe risk to PillDrill. On the other hand, lifting the stay (or abstaining) and remanding to Illinois now comes with little risk. Even if the Court remands the PillDrill Claim to Illinois at this stage, remand would not bar a future estimation if the Court ultimately later finds that liquidation is unduly delaying this action. *In re New York Med. Grp., P.C.*, 265 B.R. 408, 415 (Bankr. S.D.N.Y. 2001) ("[G]ranting stay relief does not preclude estimation[.]")

**B.    The Court Should Deny The Motion To Estimate Because This Claim Should Be Resolved In Illinois State Court**

107.    Since there is no undue delay, the Court should exercise its discretion to deny the motion to estimate and lift the stay in the Illinois state court. Reasons for favoring liquidation over estimation include the risk that the bankruptcy court's estimate may prove incorrect, the avoidance of the time and expense associated with the estimation process, and recognition that the judge presiding over the non-bankruptcy action may have valuable familiarity and expertise

36

with the case. *See Dow*, 211 B.R. at 563; *In re Apex Oil Co.*, 107 B.R. 189, 193 (Bankr. E.D. Mo. 1989). In contrast, courts have found the supposed advantage of estimation – that it would be speedier – is speculative because "to have any semblance of fairness," estimation proceedings may also require lengthy and protracted hearings. *See Dow*, 211 B.R. at 563.

108.     Plus, if the Court were to determine estimation is warranted (it should not), it would first need to determine an appropriate procedure. "The Code does not provide a roadmap for estimation." *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 123 (D. Del. 2006) (citing *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135 (3d Cir.1982)). "The only requirement is that the value of the claim be determined in accordance with the legal rules that will govern the final amount of the claim, and 'there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code.'" *Armstrong*, 348 B.R. at 123.

109.     As discussed, *infra*, Argument § C, Holdings' suggestion of an estimate based solely on the papers on its Motion to Estimate will not lead to a fair process for resolution of PillDrill's claims.  Simply determining what method *is appropriate* will itself present an additional burden that would be unnecessary if PillDrill's claims are simply remanded to Illinois. Courts have, indeed, noted that litigation over the question of "how to best estimate" claims can itself be "divisive, time consuming and expensive." *Dow*, 211 B.R. 545, 563 n.17.

110.     The Illinois court has handled this case for several years already, all fact discovery has been completed, a motion for summary judgment has been filed and set for hearing, and the PillDrill Trial appeared to be just a few months away when the case was stayed for this bankruptcy proceeding. The Illinois court is extremely familiar with this matter already and is best positioned to evaluate the claims.

Docket No. 426
Date Filed: 3/7/2024

111.    In similar situations, bankruptcy courts have deferred to the pre-existing state court action. *See In re Wandler*, No. 85-05771, 1986 WL 713514 (Bankr. D.N.D. Jan. 15, 1986) (determination favored remand to state court due to considerations of "whether the foreign proceedings have progressed to the point where parties are prepared for trial" and whether "state court resolution serves the interests of judicial economy and the expeditious and economical determination of litigation for the parties"); *In re Ozai*, 34 B.R. 764, 766 (B.A.P. 9th Cir. 1983) (affirming remanding to state court because "[t]he state court can determine the many state law issues," and "judicial economy will be served by [remand]"); *In re Pemberton Pub, Inc.*, 16 B.R. 275, 277 (Bankr. D. Mass. 1981) (where "the state court is apparently ready to proceed with an expeditious determination," the bankruptcy court "should restrain from exercising its jurisdictional power to supercede the state court in the interest, not only of cooperation and comity between the courts, but in the interest of judicial economy and the expeditious and economical determination of litigation for the parties").

112.    In *Wandler*, fact discovery was not yet even closed, and the state court action had been pending for only approximately six months. *In re Wandler*, 1986 WL 713514 at *1. Still, the bankruptcy court found that the state court case was (a) sufficiently established such that seeing it through to completion would serve efficiency, and (b) sufficiently close to trial, that the bankruptcy court should decline to estimate and instead allow the state court claim to proceed to liquidation. *Id.* at *1-2.

113.    The case for remand of the PillDrill Claim is even greater - fact discovery is closed and multiple *years* of litigation have already taken place in the Illinois court, bringing the parties nearly to trial before Holdings' bankruptcy filing and the accompanying stay.

**C.      If The Court Must Estimate, It Cannot Estimate on the Papers Alone**

114.     Holdings does not just argue that this Court should estimate claims that are nearly ready for trial in Illinois.  It takes the stunning position that PillDrill's claims should be estimated at zero without any evidentiary hearing and on the papers alone.

115.     As is further discussed below, PillDrill's claims are legally viable.  Indeed, the Motion to Estimate re-argues positions on the legal impact of language from the April 2020 and November 2020 term sheets that have already been rejected by the Illinois trial court.  Rather, any resolution on the merits will require a thorough weighing of evidence.

116.     PillDrill's account is supported by witness testimony, Havas's contemporaneous notes, and documentary evidence.  UpHealth-affiliated witnesses, including Tomilo, sometimes give testimony that directly conflicts with Havas's testimony.  Other times, they suffer collective amnesia on the contents of key meetings in which they were participants, offer evasive responses when confronted with documents, and otherwise offer testimony that strains credulity.  (*See, e.g.*, Shah Decl., Ex. D at 58:18-61:24, 79:1-80:4; Ex. G at 20:4-24:7, 28:4-19, 33:24-35:13, 39:15-40:19, 48:9-52:20, 62:4-11, 74:13-75:8; Ex. H at 81:9-84:3; Ex. B at 97:15-100:12, 110:5-112:12, 113:7-16, 114:13-114:19.)  Estimating the value of PillDrill's claim will necessarily involve weighing the credibility of these witnesses, something the Court cannot do on the papers alone.  *See In re Dennis Coates*, No. 96 B 32947, 2001 WL 1613748, at *4 (Bankr. N.D.Ill. Dec. 17, 2001) (denying motion for judgment on the pleadings because "[t]he Court cannot make credibility determinations by merely reviewing the affidavits and other papers in the absence of live testimony from the affiants"). The Advisory Committee's Notes to Fed. R. Bankr. P. 9014 (d) also make clear that "Subdivision (d) was added to clarify that if the motion cannot be decided without resolving a disputed material issue of fact, an evidentiary hearing must be held

at which testimony of witnesses is taken in the same manner as testimony is taken in an
adversary proceeding or at a trial in a district court civil case."

117.    Any fair resolution of these conflicting accounts will require a full evidentiary
hearing where the Court may weigh evidence and assess the candor and demeanor of witnesses.

118.    This is particularly true because any weighing of the evidence based on the
current deposition record would necessarily deprive PillDrill of due process.

119.    It may appear that fact discovery having already closed, the deposition record
would provide the parties a full opportunity to put forth witness testimony on the papers alone.
Yet it was the understanding of all parties at the time these depositions were taken that their only
function was to discover information to prepare for trial for witnesses that would be testifying at
trial.  This would have been true in any proceeding where the parties took pre-trial depositions
without any notice that there would be no trial testimony.

120.    But the issue is even worse because of the nature of depositions in Illinois.
Illinois procedure is unique in that it has two distinct kinds of depositions:  (a) evidence
depositions, which "shall be the same as though the deponent were testifying at the trial"; and (b)
discovery depositions, which are limited to three hours. Ill. S. Ct. R. 206. Evidence depositions
are for the purposes of preserving evidence, may be used in lieu of trial testimony, and are
subject to the rules of evidence.  Discovery depositions, by contrast, are limited to 3 hours and
are designed as a free-flowing way to gather information.  Discovery deposition testimony
cannot be used at trial unless the court finds that the witness is unavailable for trial due to "death
or infirmity" and allowing the testimony is required for "substantial justice" between the parties.
Ill. S. Ct. R. 212(a)(5).  Committee comments to Illinois Supreme Court 212(a)(5) make clear
that discovery depositions may be used at trial only in "rare, but compelling circumstances."  *Id.*

Other than the evidence deposition of the two out-of-state witnesses, all other depositions in the case – nine of them – were 3-hour discovery depositions.  (Shah Decl. ¶ 13.)

121.    PillDrill's deposition strategy was necessarily driven by the three-hour time limit for depositions. PillDrill was forced to leave aside certain topics for questioning until trial itself, when the same witnesses would provide live testimony. (Shah Decl. ¶ 14.) At all times, PillDrill's counsel operated with the understanding that there would be time for additional examination at trial.  The Motion to Estimate is asking this Court to weigh conflicting deposition testimony and value PillDrill's claims based on deposition transcripts that were never meant to substitute for live testimony and that would not have been used in Illinois for that purpose.

122.    If the Court chooses to estimate PillDrill's claims rather than allow them to be liquidated in Illinois, fairness demands a bench trial where the Court may consider and weigh live fact witness testimony, expert testimony and a fulsome presentation of the documentary evidence.  *See Dow*, 211 B.R. at 566 ("When determining whether delay to the administration of a case is unjust, a bankruptcy court must consider the rights of all parties in interest[.]").

123.    This raises other fundamental fairness concerns.  Should the Court choose to hold a bench trial or evidentiary hearing, it may not be possible to obtain the trial testimony of most of the witnesses.  Havas will come to Delaware to testify on behalf of PillDrill.  Tomilo and almost all of the Services and Holdings witnesses other than Gatmaitan live in Illinois.  And while Holdings may be compelled to make its employees available to testify in Delaware, nearly all of the former Services and Holdings senior executives that are key witnesses, including Kathuria, Pylypiv and Gatmaitan, are no longer employed by either entity.  And, of course, they may be beyond the subpoena power of this Court.  At a minimum, PillDrill should be allowed to take

Docket No. 426
Date Filed: 3/7/2024

new videotape depositions of these unavailable witnesses, without the 3-hour time limitations and with the understanding that these depositions will be used in lieu of testimony.

124.    These problems do not exist in Illinois, where most of the witnesses live and are subject to the Illinois court's trial subpoena powers.  As a result, estimation proceedings would necessitate reopening fact discovery to allow the parties to further depose those witnesses that would not appear at a bench trial due to jurisdictional issues – pushing this matter further backwards in the resolution process than if this matter were heard in Illinois where reopening fact discovery would be unnecessary.

125.    It is easy to see why Holdings urges estimation of PillDrill's claims on solely the papers for this Motion. If this Court intends to treat PillDrill fairly, then a full evidentiary process must be held in order to estimate PillDrill's claim.  The appropriate sort of evidentiary process in this Court – such as the bench trial PillDrill suggests above, but even some lesser process involving significant evidence – is highly likely to take longer than the Illinois state court would if the case were instead remanded.

126.    But Holdings also seeks estimation of PillDrill's claim as a means of obtaining unfair advantage in resolution of PillDrill's claims.  The core arguments in Holdings' MSJ, which are reiterated here, are directly contrary to prior rulings of the Illinois trial court.  And there are material conflicts in evidence that cannot be resolved by summary judgment.  Having filed for bankruptcy one day after its unwinnable summary judgment motion, Holdings asks this Court to both disregard prior Illinois court rulings and weigh and resolve triable issues of fact that require assessments of demeanor and credibility on the papers.

127.    Specifically, Holdings urges the Court to estimate PillDrill's claim at zero because PillDrill's claim is, supposedly, "meritless." Motion, ¶¶ 1, 23, 63. Were this true, then

Docket No. 426
Date Filed: 3/7/2024

there could not possibly be any undue delay proceeding in Illinois – PillDrill's claims would be dismissed by way of Services and Holdings' pending motion for summary judgment. At the time of the stay, the Motion for Summary Judgment had been filed just a day earlier and was set to be heard in less than three months. Even less time would be required now given that PillDrill has already received the motion and will be prepared to file an opposition once the matter is remanded to Illinois state court. A ruling on the summary judgment motion will take only as long as the time required to schedule a hearing and issue an order. Holdings' contentions regarding the need for estimation assume that its motion for summary judgment will fail, yet it urges this Court to estimate PillDrill's claims as valueless on an even barer record than would be available in the Illinois Motion for Summary Judgment.

128.    Holdings ignores this obvious contradiction in its arguments because confronting the contradiction leads to the inescapable conclusion that Holdings is invoking section 502(c) not to prevent undue delay, but rather simply ***to lower the amount of PillDrill's claim***. This Court has previously made clear that such use of section 502(c) is improper. *See RNI Wind Down Corp.*, 369 B.R. at 191 ("The purpose of section 502(c) is to prevent the administration of the debtor's estate from being held hostage by the fixing or liquidation of an unliquidated or contingent claim. It is not a mechanism for reducing the amount of a debtor's liability.")

129.    Along those lines, if this Court decides estimation is appropriate *at all*, then estimation should be solely for purposes of voting on a plan of reorganization, not to determine the allowed amount for distribution purposes. *See In re Trident Shipworks, Inc.*, 247 B.R. 513, 514-515 (implying that because claims involve "fact intensive disputes," they should not be estimated for purposes of distribution allowance using the abbreviated methods available for quick resolution in the bankruptcy court).

43

130.     The Court should decline to estimate PillDrill's claim altogether, instead

remanding to Illinois for a rapid completion of that state court action. If the Court must estimate,

however, the Court should use a fulsome bench trial or, at very least, the parties and the Court

should confer to discuss appropriate procedures for estimation. If the Court does determine to

estimate for allowance purposes, then whatever procedures it selects *must* be fuller than the bare

bones review of legal arguments and selected deposition transcripts that Holdings hopes will lead

to an uninformed decision dramatically reducing the amount of its liability. *Id.* (implying that

decision based on "documentation to be submitted by the parties" or "limited evidentiary

hearing" unsuitable to estimate for allowance purposes). It appears unlikely that if a sufficient

evidentiary process for allowance estimation is to take place in this Court, that such a process

could be completed as efficiently – let alone more efficiently – than would be the case in the

Illinois trial court. This would, of course, defeat the purpose of estimation. Remand to the Illinois

trial court is the clear choice.

**D.     PillDrill's Claims Are Worth Over $18 Million**

**1.     The Parties Entered Into An Enforceable Oral Agreement On October 14, 2020**

131.     PillDrill and Services entered into an oral contract on October 14, 2020, that the

public UpHealth entity would acquire PillDrill shortly after it merged with a publicly-listed

SPAC entity for 1.7% of the shares issued to shareholders of the entities acquired by or merged

into the public UpHealth entity net of any interest held by SPAC holders or PIPE holders.  This

formed a valid and binding oral agreement between PillDrill and Services, and the relevant law

on this point is well established.[7]  *See Chicago Limousine Serv., Inc. v. City of Chicago*, 335 Ill.

---

[7] Kathuria acted as a pre-incorporation agent of Holdings.  The Holdings Board ratified and affirmed all pre-incorporation acts taken by Kathuria, including any statements, promises or

44

App. 3d 489, 495 (1st Dist. 2002) (noting that a contract forms when there has been an offer, acceptance of that offer, and consideration); *Tindall Corp. v. Mondelez Int'l, Inc.*, 248 F. Supp. 3d 895, 904 (N.D.Ill. 2017) (affirming that oral contracts are subject to the same contract formation requirements as written contracts and are enforceable in Illinois).

132.    Under Illinois law, a contract "'is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do.'" *Midlands Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 314 (1987) (citation omitted). Every feasible contingency that might arise in the future need not be provided for in a contract for the agreement to be enforceable. *See Dato v. Mascarello*, 197 Ill. App. 3d 847, 851 (1989). The discussions at the meeting on October 14, 2020, identified the essential terms of the contract and resulted in a mutual assent to those essential terms. *See Midlands*, 118 Ill.2d at 313-314.

133.    The essential terms of a contract to purchase a business are minimal. The parties need only agree on the purchase price and the interests to be transferred. *See, e.g.*, *Prignano v. Prignano*, 405 Ill. App. 3d 801, 816 (2010) (finding oral agreement to purchase ownership interest in corporation sufficiently definite when purchase price and what was to be purchased were agreed to). Holdings has failed to provide any support for the assertion that the terms left unaddressed by the October 14, 2020, oral agreement were "essential" to the formation of the contract. Motion, ¶ 83. An oral agreement's silence on other issues does not preclude the formation of an enforceable oral agreement. *See, e.g.*, *Jannusch v. Naffziger*, 379 Ill. App. 3d

---

agreements he made during the call with PillDrill on October 14, 2020, as authorized acts of Holdings in all respects. (Shah Decl., Ex. J at 14:14-16:25 & Ex. 3.)

Docket No. 426
Date Filed: 3/7/2024

381, 386 (2008) (finding oral agreement to purchase concession business for agreed upon price sufficiently definite to be enforceable despite silence on "allocating a price for good will, a covenant not to compete, allocating a price for the equipment, how to release liens, what would happen if there was no loan approval, and other issues"); *Haslund v. Simon Property Group*, 378 F.3d 653, 655 (7th Cir. 2004) ("The fact that a contract is incomplete, presents interpretive questions, bristles with unresolved contingencies, and in short has as many holes as a Swiss cheese does not make it unenforceable for indefiniteness."); *Dawson v. Gen. Motors Corp.,* 977 F.2d 369, 373-374 (7th Cir. 1992) (holding an oral promise potentially enforceable where the sole terms were that the plaintiff would exercise the remaining lease options and that the rent would not increase more than three percent per term, which distinguished the matter from cases "where letters make mere vague expressions of warm wishes for a bright future").

134.    On October 14, 2020, Kathuria, as a pre-incorporation agent of Holdings, offered to acquire 100% of the interest in PillDrill (the interest to be acquired) in exchange for 1.7% of the shares issued to shareholders of the entities acquired by or merged into the public UpHealth entity net of any interest held by SPAC holders or PIPE holders (the purchase price).  (Shah Decl., Ex. A at 67:10-71:18; Ex. I at Ex. 2.)  Havas responded to Kathuria's offer by stating that he was going to suggest the same terms, that PillDrill was happy with the offer, and that PillDrill accepted the offer.  (*Id*., Ex. A at 70:3-71:14.)  Havas was unambiguous in his acceptance of the offer.  (*See id.*); *see also Rosenthal v. Battery Partners VI, LLC*, No. 01 C 8528, 2007 WL 2028169, at *8-10 (N.D. Ill. July 10, 2007) (holding a $9.75 million oral agreement during a brief phone call could be enforceable based on the unambiguous language accepting the deal).

135.    At no point during that meeting did anyone state that a written agreement was a condition precedent to the formation of the contract.  The parties discussed the preparation of a

subsequent term sheet reflecting the economic terms of the October 14 agreement solely as a document Havas could use to obtain bridge funding from other sources until Holdings consummated its acquisition of PillDrill. (Shah Decl., Ex. A at 71:13-72:18.)

136.    The Motion to Estimate argues that PillDrill's breach of oral contract claim cannot succeed, as a matter of law, because the April 2020 term sheet between PillDrill and Services precluded the formation of a subsequent oral agreement. *See* Motion, ¶¶ 64-88. The Motion to Estimate notes that the April 2020 term sheet is non-binding and contains language that it "will not impose any obligation or liability on any [] party if the transactions contemplated herein are not consummated." *Id.*, ¶ 29. It further observes that the April 2020 term sheet states that "[a]ny such agreement will only be made if and when definitive Transaction Documents containing such agreements are agreed to and executed." *Id.*, ¶ 66. The Motion to Estimate also argues that the November 2020 term sheet, which contains similar language, was unsigned and therefore shows that the parties intended any agreement must be in writing. [8] Motion, ¶¶ 72-73.

137.    This argument is ***exactly*** the argument that Services and Holdings made before the Illinois trial court and lost. They now ask this Court to show no deference to a prior ruling on this issue in the forum in which it was pending.

138.    In the Illinois trial court, defendants filed a motion to dismiss the breach of contract claim in PillDrill's original complaint. Notably, defendants did not confine themselves

---

[8] For this, and a variety of other factors the Motion to Estimate claims make an oral contract impossible here, the Motion to Estimate cites to *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 144 (1986). These factors are mentioned in *Ceres*, but the *Ceres* case is easily distinguished – there, (a) the court was assessing a trial court decision *in favor of the existence of the oral contract*, and that appears to have been made after trial with a full evidentiary record; and (b) the primary factor vitiating against an oral contract was that this supposed oral contract *was for a 15-year lease of real property*. Unsurprisingly, the *Ceres* court found that the trial court had been wrong to ignore the statute of frauds and definitively find an oral contract for a 15-year lease.

Docket No. 426
Date Filed: 3/7/2024

to the four corners of the complaint but instead asked the court to consider the April 2020 term sheet and November 2020 draft term sheet as extrinsic materials properly considered on a motion to dismiss under Illinois procedure.  They argued, in exactly the terms argued by the Motion to Estimate, that the language of these term sheets foreclosed, as a matter of law, the parties from entering into an oral agreement in October 2020.  (Hays Decl., Ex. A.)

139.    PillDrill's opposition pointed to the glaring problem with defendants' reasoning.  PillDrill's breach of contract claim was not trying to enforce the April 2020 term sheet, or any obligation to consummate any "transaction" "contemplated" by the April 2020 term sheet or the parties at the time.  (Hays Decl., Ex. B at 8-9.)  The April 2020 term sheet describes a transaction in which Services, a privately-held company, would acquire PillDrill for $6 million dollars' worth of Services' privately-held stock based on a $350 million valuation for Services within a June 2020 timeline or at least during the pendency of a 120-day exclusivity period.  PillDrill was supposed to be acquired with 7 other privately-held healthcare companies in a rollup transaction with the combined entity going public as a digital telehealth company by December 2020.  But Services notified PillDrill in August 2020 that the transaction contemplated by the April 2020 term sheet would no longer occur, and that PillDrill was being excluded from the rollup transaction.  (*Id*. at 6-9.)

140.    The definitive oral contract formed during the October 14, 2020, meeting was for a transaction that was not contemplated by the April 2020 term sheet or the parties at the time.  It was an agreement that a post-SPAC merger public entity would acquire PillDrill in or around February 2021, shortly after its shares went public, for 1.7% of the shares issued to shareholders of the entities acquired by or merged into the public UpHealth entity net of any interest held by SPAC holders or PIPE holders.  It was an acquisition by a different entity, with publicly-traded

48

shares rather than private equity, with different consideration, on a different time frame. (*Id*. at 7-8.)

141.    As far as the draft November 2020 term sheet was concerned, PillDrill argued that the draft November 2020 term sheet was never intended to serve as a written agreement, binding or otherwise. Rather, the document was created to help PillDrill obtain bridge funding from third parties until the acquisition could close. (*Id*. at 7, 9.)

142.    The Illinois court reviewed both term sheets and determined as a matter of law that they did not preclude the formation of an oral agreement. As the trial court explained: "The language of the Term Sheets do not constitute a contract. They also do not prevent the Plaintiff and UpHealth from entering into an oral contract." (Hays Decl., Ex. D at 3.) The Illinois court ruled on the legal effect of the language of the term sheets and rejected exactly the argument that the Motion to Estimate makes.

143.    These legal findings by the Illinois court, interpreting Illinois law, are law of the case and, thus, should not be subject to re-argument before this Court. *See, e.g.*, *Prime Energy and Chem., LLC v. Tucker Arensberg, P.C.*, No. 2:18-CV-00345, 2019 WL 3778756, at *7 (W.D. Pa. Aug. 12, 2019) (denying motion to dismiss on the grounds that a different judge's "prior opinion and order as to Defendants' previous motion to dismiss constitutes the law of the case").

144.    That leaves unanswered the question of whether the factual allegations in the pleadings are supported by evidence. They are. In August 2020, Kathuria informed PillDrill that the transaction contemplated in the April 2020 term sheet would not occur as discussed. Kathuria stated, however, that UpHealth would acquire PillDrill immediately after its planned merger with a SPAC entity, i.e. a different transaction than the one contemplated by the now

defunct term sheet.  (Shah Decl., Ex. C at 81:14-85:4, 100:16-102:20; Ex. I at Ex. 1.)  The

different transaction was discussed and agreed to at the October 14, 2020, meeting.  (*Id*., Ex. A at

70:3-71:18; Ex. I at Ex. 2.)

145.    The defunct April 2020 non-binding term sheet did not require that every single

future agreement between the parties on any matter whatsoever be in writing.  That condition

was limited to the specific transaction contemplated by that term sheet that Kathuria stated in

August 2020 would no longer occur.  (*Id*., Ex. A at Ex. 3.)  No participant in the October 14,

2020, meeting conditioned the parties' new oral agreement on the signing of a written agreement.

A new term sheet (ultimately the November 2020 draft term sheet) was discussed solely as a tool

for PillDrill to leverage to obtain funding until the agreed upon acquisition could be

consummated.  (*Id*., Ex. A at 70:18-72:8.)  No information has been revealed during discovery

that would warrant reversal of the trial court's finding.  Indeed, every participant on the October

14, 2020, call took actions between October 2020 and April 2021 that were entirely consistent

with their belief that the parties had reached a definitive oral agreement for the acquisition of

PillDrill by the public UpHealth entity for 1.7% of the shares issued to shareholders of the

entities acquired by or merged into the public UpHealth entity net of any interest held by SPAC

holders or PIPE holders.  Holdings' request that this Court reverse the settled law of the case is

improper.

146.    The Motion to Estimate argues that acquisitions of companies are normally done

through detailed written documents and not through oral agreements.  Motion, ¶¶ 66-67.  But

whether the formation of the oral contract is typical or not is not dispositive.  Parties can – as

they did here – "enter[] into a binding and enforceable contract though no formal contract was

signed or delivered, so long as all the essential terms have been agreed upon."  *Chicago Inv.*

50

*Corp. v. Dolins*, 93 Ill. App. 3d 971, 975 (1st Dist. 1981). In the absence of a formal written document, "the parties' conduct and statements subsequent to the oral agreement may be decisive of the question whether a contract had been made." *Ceres Ill., Inc. v. Ill. Scrap Processing, Inc.,* 114 Ill.2d 133, 144 (1986).

147.    The Motion to Estimate also argues that it is implausible that Services would have made these contractual commitments during the October 14, 2020, meeting because Services could not have been certain it could deliver on its contractual commitments due to contingent future events: 1) Services had not entered into definitive acquisition agreements with any of the other 5 private healthcare companies; 2) there was no guarantee of a merger with GigCapital because Services only had a non-binding Letter of Intent with GigCapital; and 3) it was unclear whether GigCapital or a newly-constituted board would ever approve any commitments Services made to acquire PillDrill. Motion, ¶¶ 87-88, 104.

148.    But the oral contract to acquire PillDrill required payment to PillDrill *of shares in the post-mergers entity*, and was thus contingent on completion of the acquisitions and merger. It is entirely plausible that Services would make this contractual commitment to PillDrill while such contingencies remained, because this is *exactly* what UpHealth did with the other targets it acquired around the time of the GigCapital merger.

149.    On September 29, 2020, Services entered into a <u>non-binding</u> Letter of Intent with GigCapital that stated that Services would subsequently form Holdings, Holdings would acquire 5 healthcare companies, and then GigCapital would merge with Holdings. (Shah Decl., Ex. K at 93:25-94:2, 106:9-107:6 & Ex. 14;.Ex. M.) Services entered into term sheets to acquire the 5 other healthcare companies that included significant cash components as part of the acquisition price. (*Id*., Ex. K at 107:25-110:19.) Holdings subsequently entered into definitive acquisition

51

agreements with these same healthcare companies on the same economic terms. (*Id*.) Though the Motion to Estimate does not disclose when Holdings entered into definitive agreements with all five of the healthcare companies, Exhibit 18 of the McKeever Declaration offered in support of the Motion to Estimate shows that Holdings entered into an agreement with 1 of the healthcare companies, TTC Healthcare, Inc. ("TTC"), on October 30, 2020.[9] Additionally, at least four of the agreements – with TTC, Behavioral Health Services, LLC ("BHS"), Innovations Group Inc. ("IGI"), and Thrasys, Inc. ("Thrasys") – were produced by UpHealth in discovery. (Shah Decl. ¶¶ 17-20 & Exs. N-Q.) The TTC agreement confirms it was entered into as of October 30, 2020, the BHS and IGI agreements were entered into as of November 2, 2020, and the Thrasys agreement was entered into as of November 3, 2020. (Shah Decl., Exs. N-Q.)

150.   So, through Holdings, UpHealth entered each of these binding acquisition agreements soon after forging the oral contract with PillDrill and still *well before* it entered into a binding business combination agreement with GigCapital on November 20, 2020. These agreements obviously weren't implausible – they each had provisions either making the agreement contingent on a SPAC merger or requiring the deal to unwind if the GigCapital merger failed. Similarly, the specific consideration called for by the oral contract with PillDrill was payment of shares *after* all five acquisitions *and* the SPAC merger. The PillDrill contract was thus obviously contingent on completion of these other deals. In that sense, it is identical to

---

[9] This timing also contradicts the Motion to Estimate's argument that "Highlighting just how much uncertainty there was, less than two weeks after PillDrill claims the oral agreement was reached, GigCapital2 walked away from the table and on October 27, 2020, publicly announced in a filing with the U.S. Securities and Exchange Commission (the "SEC") that it had entered into a non-binding letter of intent to acquire a different company . . ." Motion, ¶ 41. Supposedly this October 27, 2020 filing shows an uncertain environment, in which Uphealth could not possibly have made any binding commitments, but *just three days after the filing*, UpHealth began executing other binding acquisition agreements that were also contingent on the SPAC merger.

the TTC, BHS, IGI, and Thrasys deals, each of which were also entered into well before the GigCapital merger, but made explicitly contingent on completion of such a SPAC merger. Had the GigCapital deal fallen apart and PillDrill still attempted to enforce the contract, then the Motion to Estimate would have a point – but that is not what happened. Holdings acquired each of the five targets and then merged with GigCapital. These contingencies *were* met, but Holdings still refused to honor its contract to acquire PillDrill.

151.    That GigCapital supposedly would have had to approve the acquisition of PillDrill does not release Services and Holdings from their obligations under the oral contract. On October 14, 2020, Kathuria had the authority to bind Services and Holdings. Services and Holdings may ultimately have had some disclosure obligations to GigCapital in connection with the later business combination agreement, but their failure to disclose material contracts they had entered into does not vitiate PillDrill's or any other contracting party's rights under those contracts. GigCapital may have their own claims against Kathuria, Services and Holdings for any failures to disclose, but those claims are independent of and cannot extinguish PillDrill's claims against Services and Holdings.

152.    Havas's sworn testimony, corroborated by Havas's contemporaneous notes, establishes that Services did make these definitive and unequivocal contractual commitments. (Shah Decl., Ex. A at 67:10-72:8; Ex. I at Ex. 2.) Services, and Holdings as its successor, were bound by the contractual commitments made.

153.    No participant in that meeting has credibly disputed Havas's account of what was said and agreed to at the meeting. Every communication with Holdings after that meeting was consistent with the participants' understanding that a definitive oral agreement had been reached that day. Tomilo sent Holdings personnel numerous emails between November 2020 and April

53

2021 referencing Kathuria's 1.7% offer and the agreed upon acquisition of PillDrill by the public UpHealth entity.  (*Id.*, Ex. B at Exs. 12, 17, 18, 21; Ex. E at Ex. 7.)  Neither Kathuria, Pylypiv, Beck nor Gatmaitan ever questioned or disputed Tomilo's statements.

154.     Instead, they repeatedly affirmed the agreement to acquire PillDrill, including (1) Beck asking Tomilo to confirm for Havas, just days after the October 14 meeting, that the shares UpHealth agreed to issue PillDrill as consideration would be immediately liquid and could be resold in the public markets without any restrictions on transfer (Shah Decl., Ex. A at 98:20-99:11; Ex. C at 88:24-89:17); (2) Pylypiv telling Tomilo that Holdings "ha[s] every intention of moving forward with you but just [doesn't] have the bandwith to address an update [sic] term sheet" (*id.*, Ex. B at Ex. 16); (3) Beck sending an email to Kathuria, Gatmaitan and Pylypiv on December 18, 2020, stating that Tomilo had called and was "keen to see if we could redraft the term sheet with Peter to help him raise interim capital to find [sic] his burn until we can close a deal" (*id.*, Ex. E at Ex. 8); (4) Holdings portfolio company Transformations working with PillDrill on a strategic partnership as the parties discussed on a January 2021 call (*id.*, Ex. B at Ex. 21); (5) Beck asking Tomilo to convey to PillDrill in early March 2021 that Beck had communicated to her that PillDrill should expect the acquisition to close in April 2021, and that Holdings would acquire PillDrill within a week of Holdings trading on the New York Stock Exchange (*id.*, Ex. A at 99:15-21; Ex. C at 88:24-89:17); and (6) Beck asking PillDrill to update its diligence materials in April 2021 in advance of the planned IPO (*id.*, Ex. E at Ex. 13; Ex. B at 143:19-25 & Ex. 19).  These adoptive admissions and affirmative statements by Holdings personnel are sufficient to support a finding of the requisite assent by Services and Holdings. *See Steinberg v. Chicago Med. School*, 69 Ill. 2d 320, 331 (1977) (noting the conduct of the contracting parties indicating an agreement to the terms of an alleged contract is sufficient to

support the finding of the requisite intent); *Dawson*, 977 F.2d at 374 ("It is particularly noteworthy in this regard that one party's acquiescence in the other's reliance on the preliminary agreement is a factor that supports enforcement.").

### 2.    PillDrill's Promissory Estoppel Claim Is Valid

155.    PillDrill is still entitled to recover for the losses it suffered due to its foreseeable reliance on Services' and Holdings' promises under its claim for promissory estoppel.

156.    The Illinois Supreme Court has adopted the interpretation of promissory estopped articulated in Restatement (Second) of Contracts as a doctrine where equity requires a remedy for reasonable and detrimental reliance on promises:  "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."  *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51 (2009) (quoting and citing with approval Restatement (Second) of Contracts § 90).

157.    The Motion to Estimate argues that claims for promissory estoppel exist only where there are gratuitous promises, i.e., promises made without consideration.  Though that is one context in which promissory estoppel is recognized, it is not the only one.

158.    Claims for promissory estoppel can exist in contexts, other than promises without consideration, where it would be inequitable to deny relief to a party that relied to its detriment on another's promises.  *See Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 698 (1965) (cited with approval by the Illinois Supreme Court in *Newton*, 233 Ill. 2d at 58).  *Hoffman* confirms that a claim for promissory under Restatement (Second) of Contracts does not only apply to promises made without consideration and "does not impose the requirement that the promise giving rise to the cause of action must be so comprehensive in scope as to meet the requirements of an offer that would ripen into a contract if accepted by the promise."  *Hoffman*, 26 Wis. 2d at 698.

55

*Hoffman* also describes the conditions in which equity mandates relief:  "(1) Was the promise one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee?  (2) Did the promise induce such action or forbearance?  (3) Can injustice be avoided only by enforcement of the promise."  *Id*.

159.    *Hoffman*, which the Illinois Supreme Court cited with approval, involved negotiations where defendants made successive promises that they would sell plaintiff a franchise if plaintiff agreed to ever increasing kinds of consideration.  The court held that the parties never agreed on "essential factors" necessary to form a contract but that equity required that plaintiff recover for its reasonable reliance on defendants' promises.  *Id.* at 697.

160.    While the doctrine cannot be used as a "second bite of the apple" when a plaintiff proves the existence of a binding contract but fails to prove its breach, it should apply where there has been a failure of proof in the formation of a contract to avoid an inequitable result. Indeed, the Illinois court presiding over this dispute has already expressly stated this principal of Illinois promissory estoppel law in denying Services and Holdings' motion to dismiss the promissory estoppel claim:  "Where proof of a contract fails, and where refusal to enforce a party's promise would be unjust in light of the promise's detrimental reliance, promissory estoppel becomes the appropriate form of redress."  (Hays Decl., Ex. D at 3.) It appears that Holdings is unsatisfied with the Illinois state court's interpretation of the nature of promissory estoppel claims under Illinois law and is asking this Court to act as a de facto appellate court and overrule the state court's prior interpretation in this case. A Motion to Estimate is not intended to provide debtors a federal forum to seek reconsideration of state court determinations of state law.

161.    The Motion cites to *Matthews v. Chicago Transit Auth*., 51 N.E.3d 753, 779 (Ill. 2016), to justify a narrow reading of Illinois law limiting promissory estoppel to instances of

"gratuitous promises, charitable subscriptions, and certain intrafamily promises." But this notion is belied by the interpretation of *Matthews* given by Illinois state and federal courts.

162.    For example, in *Gherardini v. Carlyle Cmty. Unit Sch. Dist. #1*, No. 5-17—0213, 2018 WL 6266196, at ¶17 (Ill. App. Ct. Nov. 28, 2018), the Appellate Court of Illinois, citing *Matthews*, reversed the trial court and upheld a claim for promissory estoppel. In that case, the plaintiff, a public school teacher, alleged that the defendant school district had made promises to her during the hiring process about maintaining seniority in order to induce her to leave her job and join defendant's district. *See id.* It is self-evident that such promises were not "gratuitous," as the Motion claims is required to uphold a promissory estoppel claim.

163.    In *Carcharadon, LLC v. Ascend Robotics, LLC*, No. 21 C 2890, 2022 WL 3908585 (N.D. Ill. Aug. 29, 2022), the court denied a motion to dismiss a claim for promissory estoppel brought by one joint venture partner against another. The defendant allegedly promised to enter into an IP license agreement with the joint venture that was the basis of the joint venture's potential business activity. *See id.* at *2-3. The court recognized that, in reliance on that promise (that was ultimately not fulfilled), plaintiff provided additional services to the joint venture, to defendant's benefit. *See id.* at *11. Again, this is not an instance of a gratuitous promise.

164.    PillDrill's situation is exactly what the equitable doctrine of promissory estoppel is intended to address.

165.    To prevail on a claim for promissory estoppel, PillDrill need only show that "(1) defendant[] made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendant[], and (4) plaintiff relied on the

promise to its detriment." *Quake Construction, Inc. v. Am. Airlines, Inc.*, 141 Ill.2d 281, 309-310 (1990).  The evidence establishes each of these elements.

166.    Beginning on August 4, 2020, Services and subsequently Holdings unambiguously promised to acquire PillDrill after the UpHealth entity merged with a publicly-listed SPAC.  (*See* Shah Decl., Ex. C at 81:14-85:4, 100:16-102:20; Ex. I at Ex. 1.)  Services repeated the promise on August 12, 2020, when Pylypiv wrote to Havas, "We are also looking forward to a deal closing and Pilldrill becoming a part of UpHealth team!"  (*Id.*, Ex. D at Ex. 7.)  Services made the same promise again during a videoconference on October 14, 2020, when Kathuria informed Havas that "UpHealth" would acquire PillDrill shortly after "UpHealth's" planned merger with a SPAC entity, which would lead UpHealth shares to be publicly-traded. (*Id.*, Ex. A at 67:10-69:8; Ex. I at Ex. 2.)  On or around October 16, 2020, Beck asked Tomilo to convey to Havas that the public UpHealth shares that were paid as consideration for PillDrill would be immediately liquid and could be resold in the public markets without any restrictions on transfer.  (*Id.*, Ex. A at 98:20-99:11; Ex. C at 88:24-89:17.)  Pylypiv subsequently conveyed to Tomilo that Holdings "ha[s] every intention of moving forward with you but just [doesn't] have the bandwidth to address an update [sic] term sheet."  (*Id.*, Ex. B at Ex. 16.)  In early March 2021, Holdings again promised to acquire PillDrill, with Beck asking Tomilo to convey to PillDrill that PillDrill should expect the acquisition to close in April 2021, and that Holdings would acquire PillDrill within a week of Holdings trading on the New York Stock Exchange. (*Id.*, Ex. A at 99:15-21; Ex. C at 88:24-89:17.)  Lastly, in April 2021, Holdings again reaffirmed its promise to acquire PillDrill by asking PillDrill to update its diligence materials in advance of the planned IPO.  (*Id.*, Ex. E at Ex. 13; Ex. B at 143:19-25 & Ex. 19.)

Docket No. 426
Date Filed: 3/7/2024

167. PillDrill relied on Services' and Holdings' repeated unambiguous promises. Because Services and Holdings had promised to acquire PillDrill after the UpHealth entity merged with a publicly-listed SPAC, PillDrill kept itself on the shelf and did not seek other merger or acquisition partners. (*Id.*, Ex. A at 109:10-110:3; Ex. C at 76:17-77:4, 79:7-80:3.)

168. This was the expected and foreseeable result of Services' and Holdings' promises to acquire PillDrill. Holdings' failure to execute the draft term sheet and the SPA did not render PillDrill's reliance unexpected, unforeseeable or unreasonable. Holdings never told PillDrill that it was not executing the draft term sheet or SPA because it did not intend to acquire PillDrill. Instead, it continued to promise PillDrill that the public UpHealth entity would acquire PillDrill immediately following the merger with the SPAC. Services and Holdings were aware that PillDrill was not seeking other merger or acquisition partners in reliance on their promises to acquire PillDrill but was instead trying to obtain bridge funding to sustain itself until the promised acquisition by the public UpHealth entity was consummated, yet they continued making more promises to continue to induce reliance. (*See, e.g.*, *id.*, Ex. A at 67:10-69:8, 98:20-99:21; Ex. I at Exs. 1, 2, 4; Ex. C at 81:14-85:4, 88:24-89:17, 100:16-102:20; Ex. D at Ex. 7; Ex. B at 143:19-25 & Exs. 16, 19); *see also Borg-Warner Corp. v. Anchor Coupling Co.*, 16 Ill.2d 234, 242 (1956) (holding it reasonable for the plaintiff to believe it had a deal when the defendant encouraged it to expend substantial money to facilitate the alleged agreement); *Dawson*, 977 F.2d at 374 ("It is particularly noteworthy in this regard that one party's acquiescence in the other's reliance on the preliminary agreement is a factor that supports enforcement."); *Bercoon, Weiner, CGlick and Brook v. Mfrs. Hanover Trust Co.*, 818 F. Supp. 1152, 1160 (N.D.Ill. 1993) (holding it reasonable for the plaintiff to rely on the alleged oral promise when the defendant encouraged plaintiff to take detrimental steps in furtherance of the

alleged agreement even when the alleged oral promise directly contradicted an executed written agreement).

169.    The Motion to Estimate also argues that it was unreasonable, as a matter of law, for PillDrill to rely on any of defendants' promises because of the language in the non-binding term sheets.  Mot. ¶ 101.  But here, again, the Motion to Estimate is trying to re-argue points of law that the Illinois court already squarely decided in PillDrill's favor.  In its motion to dismiss PillDrill's original complaint, defendants also argued that, as a matter of law, there could be no reasonable reliance because the April and November 2020 term sheets were non-binding.  (*See* Hays Decl., Exs. A-C.)  The Illinois court considered the same argument that Holdings makes here and denied the motion. (*See id*., Ex. D at 4.)

170.    By refraining from shopping the company in reliance on Services' and Holdings' promises to acquire PillDrill, PillDrill missed out on what turned out to be the hottest mergers and acquisitions market in health tech history.  (Shah Decl., Ex. A at 109:10-110:3.)  By the time Kathuria finally revealed to PillDrill in April 2021 that Holdings would not honor its promises, PillDrill had run out of funds and had to lay off its entire team.  Without a team, PillDrill was dead and was no longer a viable M&A target.  (*See* Shah Decl., Ex. C at 130:17-131:11.)  Had Services and Holdings not made promises to acquire PillDrill beginning on August 4, 2020, PillDrill could have sought other partners and saved the company.

171.    PillDrill's damages expert valued the loss PillDrill suffered as a result of its reliance on Services' and Holdings' promises to be between $17.14 million and $17.91 million. (Hays Decl., Ex. L at ¶¶ 51-65.)  PillDrill is entitled to recover that full amount from Services and Holdings plus prejudgment interest.

WHEREFORE, for the foregoing reasons, PillDrill respectfully requests that the Court (i) deny the Motion to Estimate, (ii) terminate the automatic stay (or abstain) and remand the dispute to the Illinois state court to allow for the liquidation of the PillDrill Claim, and (iii) grant such other and further relief as the Court deems just and proper. Alternatively, in the event the Court determines to estimate the PillDrill Claim, PillDrill respectfully requests that the Court convene a status/scheduling conference to address and establish the schedule and procedures that will govern the disposition of the Motion to Estimate.

DATED: March 7, 2024
Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

*/s/ Ricardo Palacio*
Ricardo Palacio (DE Bar No. 3765)
F. Troupe Mickler IV (DE Bar No. 5361)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
Tel: (302) 654-1888
Email: rpalacio@ashbygeddes.com
        tmickler@ashbygeddes.com

-and-

**GRELLAS SHAH LLP**
Dhaivat H. Shah, Esq.
David I. Siegel, Esq.
20400 Stevens Creek Blvd., Suite 280
Cupertino, CA 95014
Tel: (408) 255–6310
Email: ds@grellas.com
        dsiegel@grellas.com

*Counsel to PillDrill, Inc.*

61