# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>UPHEALTH HOLDINGS, INC., *et al.*<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-11476 (LSS)<br><br>(Jointly Administered)<br><br>**Related Docket No. 857**<br>**Hearing: September 5, 2024 at 10:00 a.m. (ET)**<br>**Obj. Deadline: August 26, 2024 at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) STRIKING DOCKET ENTRY NO. 857 (II) IMPOSING SANCTIONS AND (III) GRANTING RELATED RELIEF

The debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases ("Chapter 11 Cases"), by and through their counsel, DLA Piper LLP (US), file this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) striking the *Statement and Reservation of Rights of Glocal Parties* (the "Statement") [D.I. 857] in its entirety, (ii) awarding sanctions against Glocal Healthcare Systems Private Limited ("Glocal"),[2] Dr. Syed Sabahat Azim, Ms. Richa Sana Azim, Mr. Gautam Chowdhury, and Kimberlite Social Infra Private Limited (collectively, the "Arbitration Respondents")[3] and their counsel, and (iii) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: UpHealth Holdings, Inc. (6328); Thrasys, Inc. (7413); Comprehensive Care Alliance LLC (6965); Behavioral Health Services LLC (8110); BHS Pharmacy LLC (2475); Psych Care Consultants LLC (8822); and Reimbursement Solutions LLC (6388). The Debtors' headquarters and the mailing address is 14000 S. Military Trail, Suite 202, Delray Beach, FL 33484.

[2] UpHealth Holdings, Inc. owns 94/81% of the equity of Glocal. Nevertheless, the Arbitration Respondents, other than Glocal, continue to exercise control over Glocal, despite approximately 95% of Glocal and the right to control Glocal constituting property of the UpHealth Holdings estate. Any sanctions sought by the Debtors through this Motion should only be imposed against Glocal in the event the Arbitration Respondents continue to exercise control over Glocal.

[3] Meleveetil Damodaran also was a respondent in the Arbitration (defined below). Although Damodaran is not a party to the Statement or the Adversary Proceeding (defined below), he is a party to the proceedings in India

**PRELIMINARY STATEMENT**

1. Over a period of years, the Arbitration Respondents have initiated and pursued incessant litigation spanning courts, jurisdictions, and continents, to no success, and in violation of the automatic stay. This led the Debtors on April 23, 2024 to file the *Debtors' Motion to (I) Enforce the Automatic Stay, (II) Award Damages for Willful Violations of the Automatic Stay, and (III) Permit the Debtors to Modify the Automatic Stay in Their Sole Discretion to Proceed with Litigation* (the "Automatic Stay Motion") [D.I. 523] against the Arbitration Respondents. After the Automatic Stay Motion was fully briefed, the parties reached an agreement whereby the Debtors agreed to adjourn the Automatic Stay Motion and the Arbitration Respondents agreed they would adjourn certain proceedings in India in light of UpHealth Holdings' pending petition before the U.S. District Court for the Northern District of Illinois to confirm an arbitration award in its favor and against the Arbitration Respondents. *See* D.I.788.

2. Unfortunately, however, the Debtors' attempt to reach a good faith agreement with the Arbitration Respondents did nothing to stem the tide of court filings. Notwithstanding the stipulation *and* that they had already filed proofs of claim in these Chapter 11 Cases, just days after the stipulation was entered, the Glocal Parties filed a Complaint, *Glocal Healthcare Systems Private Limited, et al. v. UpHealth Holdings, Inc., et al.*, Adversary Proceeding No. 24-50092 (LSS) [D.I. 795] (the "Adversary Proceeding"), in this Court. But even that apparently was not enough. Instead of allowing the Court to determine their proofs of claim and the claims asserted in the Adversary Proceeding on the merits through the ordinary judicial processes, the Arbitration Respondents have now filed a so-called "Statement" containing baseless and slanderous allegations in the form of a "reservation of rights," claiming it was intended to "provide much

---

described herein and culpable for the improper conduct in those proceedings, deceit upon the Indian courts, and violations of the automatic stay.

needed context to this Court and parties-in-interest in these Chapter 11 Cases and to correct the record." D.I. 857 at ¶1. Not only is the Statement procedurally improper, but it also serves no legal purpose and is a clear abuse of process. Indeed, it is a transparent attempt to disrupt these proceedings and coerce the Debtors.

3. The Arbitration Respondents have filed no fewer than 24 actions before no fewer than 5 tribunals and counting. Thus far, in these cases, the Arbitration Respondents have filed multiple proofs of claim, the Adversary Proceeding, and now the Statement, all pushing the same propaganda, which no tribunal has yet found credible or factually supported. The Statement, therefore, should be stricken from the docket, and the Arbitration Respondents and their counsel should be sanctioned in order to deter them from continuing to engage in wrongful conduct.

## JURISDICTION AND VENUE

4. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Chapter 11 Cases, the Debtors, property of the Debtors' estates, and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

5. The Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with article III of the United States Constitution.

6. Venue of these cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

7. The statutory bases for the relief requested herein is section 105 of title 11 of the United States Code (the "Bankruptcy Code") and 28 U.S.C. § 1927, Federal Rule of Civil Procedure 12(f), incorporated into certain bankruptcy proceedings pursuant to Bankruptcy Rule 7012(f), to the extent the Statement may be construed as a pleading.

**BACKGROUND**

**A.    General Background**

8.     On September 19, 2023, UpHealth Holdings, Inc. ("UpHealth Holdings") and on October 20, 2023 (with September 19, 2023, the "Petition Dates"), each other Debtor filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code, thereby commencing these Chapter 11 Cases.

9.     The Debtors remain in possession of their properties and continue to operate their business and manage their property as debtors in possession. As of the date hereof, no trustee, or examiner has been appointed in these Chapter 11 Cases. On November 3, 2023, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") [D.I. 99].

10.    Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in the *Declaration of Jay Jennings Adopting Prior Declarations of Martin S. A. Beck* [D.I. 809] (the "Jennings Declaration"), which is incorporated herein by reference.

**B.    The Arbitration and Proceedings in India**

11.    The individual Arbitration Respondents are former shareholders of Glocal, who collectively received directly or indirectly in excess of $78 million pursuant to a Share Purchase Agreement (the "SPA") dated as of October 30, 2020 and entered into between the Arbitration Respondents and UpHealth Holdings.

12.    After UpHealth Holdings and the Arbitration Respondents entered into the SPA, UpHealth Holdings and GigCapital2, Inc. entered into a Business Combination Agreement and, pursuant to that agreement, on June 9, 2021, UpHealth Holdings was acquired by GigCapital2, Inc. and became a public company, which was renamed UpHealth, Inc. UpHealth Holdings became a wholly owned subsidiary of UpHealth, Inc.

13. In July 2022, UpHealth Holdings sent a written request to the Glocal Board of Directors, reminding it of its obligation under the SPA to appoint UpHealth Holdings' nominees to the Glocal Board. The letter was accompanied by a list of potential nominees. (D.I. 35, ¶31.)

14. On August 3, 2022, UpHeath Holdings sent a second request confirming the nominees, and requesting the Glocal Board to make the necessary appointments within 5 days. The Glocal Board did not respond. (*Id.*)

15. On August 15, 2022, UpHealth Holdings requisitioned under Indian law an extraordinary general meeting ("EGM") of the shareholders of Glocal to appoint UpHealth Holdings' designees to the Glocal Board, and to amend Glocal's Articles of Association to provide that its designees would have certain affirmative voting rights on the Glocal Board. (*Id.*) The EGM was scheduled for September 26, 2022. (*Id.*)

16. On September 19, 2022, the Glocal Board filed a civil suit in India against UpHealth Holdings alleging the existence of an oral agreement under which UpHealth Holdings was only meant to be a minority investor with no controlling equity ownership. (*See* Brown Decl., Ex. 1 at pp. 11-12; [4] D.I. 795, ¶¶48-49.)

17. The next day, September 20, 2022, the members of the Glocal Board filed a petition in India before the National Company Law Tribunal ("NCLT") against Glocal and UpHealth Holdings, seeking a stay of the EGM. (*See* Brown Decl., Ex. 2 at p. 105-09.) The NCLT held a hearing on the Glocal Board's petition on September 23, 2022. (D.I. 35, ¶32.) The NCLT refused to stay the EGM, which went forward as scheduled. (*Id.*)

18. At the EGM, Dr. Azim, the chairman of the Glocal Board, put the board appointments of UpHealth Holdings' nominees to a vote by show of hands of the shareholders in

---

[4] References to the exhibits to the accompanying Declaration of Stuart Brown in support of this brief shall be cited as Brown Decl., Ex. __."

attendance rather than a vote by number of shares, in violation of Indian law. (*Id.*, ¶32.) Unsurprisingly, UpHealth Holdings' nominees were not appointed. Contemporaneously, the Glocal Board also failed to provide financial information to UpHealth Holdings, which UpHealth, Inc. needed to file its Form 10-Q with the SEC for the third quarter of 2022. (*Id.*)

19. On October 25, 2022, pursuant to the dispute resolution clause contained in the SPA, UpHealth Holdings submitted an application for emergency arbitration relief to the ICC International Court of Arbitration ("ICC"). On November 16, 2022, the emergency arbitrator issued an order in favor of UpHealth Holdings directing Glocal and the Glocal Board to provide certain requested financial information and restraining them from accessing funds held in a "share account" pending the conclusion of a full arbitration. (*See* Brown Decl., Ex. 3, ¶¶194-202, 214-26; *see also id.*, Ex. 4.)

20. On December 22, 2022, the Calcutta High Court issued an interim order recognizing the emergency arbitration award. Among other things, the High Court determined: "Prima facie, two crucial facts which are unassailable are that (a) The petitioner [UpHealth Holdings] in terms of the SPA has invested a substantial sum of money aggregating to approximately Rs. 2100 crores and (b) ***The petitioner [UpHealth Holdings] is the single largest majority shareholder of the respondent no. 1 holding approximately 94.5% shares in the respondent no. 1 [Glocal],*** whereas, the respondent nos. 2 to 4 being the erstwhile promoters of the respondent no.1 hold a miniscule shareholding in the company." (*See id.*, Ex. 5 at pp. 8-9 (emphasis added).)

21. The Calcutta High Court reiterated this in its August 23, 2023 Final Judgment confirming the emergency arbitration award: "***The petitioner as the single largest shareholder of the respondent no.1 holding approximately 94.5% shares in the respondent no.1 is now being***

*prevented from exercising their rights under the SPA.* The respondent nos. 2 to 4 being the erstwhile promotes of the respondent no. 1 hold a miniscule shareholding in the company and are refusing to perform their remaining obligations under the SPA." (*See id.*, Ex. 6, ¶11 (emphasis added).) The High Court also noted the Arbitration Respondents' recalcitrance and proliferation of litigation in an attempt to avoid the emergency arbitration award: "The respondents have deliberately chosen not to comply with any of the aforesaid directions passed by the Emergency Arbitrator." (*Id.* ¶8.) The High Court continued: "**Prima facie***, having received the entire funds under the SPA, the respondents are now entangling the petitioners before every possible Police Station, Tribunal and Court while refusing to discharge their obligations under the SPA*." (*Id.* ¶12 (emphasis added).)

22. Meanwhile, on November 4, 2022, UpHealth Holdings commenced an arbitration (the "Arbitration") before the ICC against the Arbitration Respondents for breach of the SPA, obstruction of UpHealth Holdings' exercise of rights under Indian law as a super-majority shareholder of Glocal, and misrepresentation. (*Id.*, Ex. 7 at ¶¶45, 272.)

23. The Arbitration Respondents did not formally participate in the Arbitration. Instead, they or others acting on their behalf periodically (and improperly) sent boxes of materials and miscellaneous submissions to the arbitrators, often on an *ex parte* basis. *See id.* ¶117.

24. Rather than participate in the Arbitration, the Arbitration Respondents filed a slew of actions in courts in India. On May 20, 2023, Chowdhury filed a criminal complaint (related to a series of criminal complaints previously filed) against UpHealth Holdings, employees and consultants of UpHealth Holdings, UpHealth, Inc., and several officers of UpHealth, Inc. (*See id.*, Ex. 8.) Additionally, on October 16, 2023, the Glocal Parties filed an application before the District Commercial Court, Rajarhat seeking to enjoin UpHealth Holdings from proceeding with the

Arbitration.[5] (*See id.*, Ex. 9 at pp. 11-14.) And following the bankruptcy petition, the Arbitration Respondents also attempted to cancel UpHealth Holdings' shares in Glocal. Through a letter dated January 17, 2024, UpHealth Holdings informed Glocal that the cancellation of its shares was illegal. (Brown Decl., Ex. 10 at p. 4.) Nevertheless, on January 22, 2024, the Arbitration Respondents filed an application before the NCLT to record the cancellation of shares. (*See id.*, Ex. 11.)

25. The ICC issued a Final Award (the "<u>Award</u>") on March 15, 2024.[6] (*See id.*, Ex. 7.) The arbitration tribunal found the Arbitration Respondents liable for breach of contract and directed them to pay UpHealth Holdings up to approximately $110.2 million in damages, in addition to most of the legal costs and other expenses incurred by UpHealth Holdings in the Arbitration of in excess of $5 million. (*Id.* ¶382.) The tribunal also issued a broad injunction directing the Arbitration Respondents to comply with the terms of the SPA by observing the requests of UpHealth Holdings to fulfill the terms of the SPA. (*Id.* ¶423(g).) As is particularly relevant here, the tribunal declared: ***"It is incontrovertible that the Claimant [UpHealth Holdings] holds 94.81% of the shares in the Company [Glocal]."*** (*Id.* ¶278.) The tribunal also observed that Dr. Azim had admitted as much under oath in a proceeding in Delaware Chancery Court. (*See id.*, Ex. 12 at 91:1-8 ("Q: So you don't remember expressing any opposition to them of UpHealth appointing a director on Glocal's board? A: You cannot have an opposition. It's a legal issue…. ***You have a majority, 95 percent, 94 percent plus shareholding is with UpHealth, and every AGM, you have the right to nominate directors***.") (emphasis added).)

---

[5] Although the Arbitration is now concluded, the application before the District Commercial Court, Rajarhat seeking to enjoin UpHealth Holdings from proceeding with the Arbitration remains pending.

[6] The 8K Report and related exhibits in connection with the Award can be found at the following: https://www.sec.gov/ix?doc=/Archives/edgar/data/1770141/000177014124000028/uph20240318.htm.

26. On March 27, 2024, upon issuance of the Award, UpHealth Holdings filed a petition under Section 9 of the Arbitration and Conciliation Act before the Calcutta High Court seeking an order directing the Respondents to secure the amounts owed under the Award and disclose their assets, among other things (the "<u>Section 9 Petition</u>"). (*See id.*, Ex. 13, ¶56.)

27. The Award, and UpHealth Holdings' efforts to enforce it, spawned even more litigation from the Arbitration Respondents. On April 1, 2024, the Glocal Parties filed an application before the NCLT seeking to enjoin UpHealth Holdings from relying on the Award. (*See id.*, Ex. 14 at pp. 16-17.) Days later, on April 6, 2024, in contempt of the automatic stay protecting UpHealth Holdings' estate and assets of the estate, Dr. Azim filed an interim application before the Calcutta High Court requesting a security deposit from UpHealth Holdings to "secure" anticipated costs in appealing the Section 9 Petition and Award. (*See id.*, Ex. 15, ¶20.)

28. On April 12, 2024, the Calcutta High Court issued an interim order in connection with UpHealth Holdings' Section 9 Petition, directing the Arbitration Respondents to file affidavits of their respective assets as well as liabilities and encumbrances and to disclose all litigation pending against them. (*See id.*, Ex. 16 at pp. 18-20.) The Calcutta High Court stated that "[i]n a contractual matter like this, there is nothing *ex facie* which is violative of public policy in the award. On the contrary, the *ease* of doing business in India with Indians is also a matter of public policy which in the facts of this case has *prima facie* been emasculated by the deliberate acts of the [Arbitration Respondents]." (*Id.* at 15 (emphasis in original).) Further, the Calcutta High Court observed that "*[t]he conduct of the [Arbitration Respondents] to say the least is* **prima facie** ***dishonest and fraudulent. In view of their past conduct and dealings, the respondents would make every attempt to dissipate their assets to render the award* (akin *to the 94.81% shares) absolutely worthless*." (*Id.* at 18 (emphasis added).) The Calcutta High Court also observed that

the Glocal Parties have "all the traits of a defaulter." (*Id.*) On April 18, 2024, Glocal appealed the Section 9 Order, which was rejected by the appellate bench. (*Id.*, Ex. 17 at 3-4.)

### C.    The Commencement of the Bankruptcy Cases

29.    On September 19, 2023, UpHealth Holdings, Inc. commenced its bankruptcy case.

30.    Contrary to the assertions in the Statement, the Arbitration Respondents were aware of UpHealth Holdings's petition. The day after the petition was filed, the Arbitration Respondents submitted a supplementary affidavit before the High Court of Calcutta. (*See id.*, Ex. 18.) In the affidavit, the Arbitration Respondents referenced the Chapter 11 Cases and sought to rely on them for factual support. (*See id.* at ¶4.)

31.    Further, on October 31, 2023, Glocal's counsel in India sent a letter to the U.S. Trustee (as well as Wilmington Trust and the United States Attorney General), notifying the Trustee that Glocal had instituted a Criminal Complaint in India. (Brown Decl., Ex. 19.) The letter specifically references the bankruptcy proceedings. (*See id.* at ¶9.)

32.    UpHealth Holdings also did nothing to hide the bankruptcy petition from the Glocal Parties or the courts in India. Among other things, on December 14, 2023, UpHealth Holdings filed an application before the Commercial Court at Rajarhat, Kolkata, seeking recognition of the worldwide stay under section 362 of the Bankruptcy Code. (*See id.*, Ex. 20.)

### D.    The Automatic Stay Motion, Petition to Confirm the Arbitration Award, and Adversary Proceeding

33.    On April 23, 2024, based on the Arbitration Respondents' brazen actions to commence litigation against the Debtors and exercise control over property of its estate following the commencement of the UpHealth Holdings bankruptcy case in violation of the automatic stay, the Debtors filed the Automatic Stay Motion. (D.I. 523.)

34. UpHealth Holdings also took action to obtain a judgment confirming the Award. On May 8, 2024, UpHealth Holdings filed a Petition to Confirm Foreign Arbitration Award in the U.S. District Court for the Northern District of Illinois (the "Confirmation Petition"). The Arbitration Respondents opposed that motion and filed a cross-motion to vacate the Award.[7] The Confirmation Petition and cross-motion to vacate remain pending. In their motion to vacate, the Arbitration Respondents do not contend that the ICC erred in declaring that UpHealth Holdings owns 94.81% of Glocal. They only contest the tribunal's award of damages. (Brown Decl., Ex. 21.)

35. The Arbitration Respondents each filed proofs of claim against the Debtors on June 17, 2024, and they each filed amended proofs of claim on July 29, 2024. (*See* Claim Nos. 30-34 on the Claims Register.)

36. In discussions between the parties related to the Automatic Stay Motion, the parties appeared to recognize that the District Court's ruling on the Confirmation Petition would impact the Automatic Stay Motion—as well as the other ongoing proceedings between them in India. Accordingly, the parties entered into a Stipulation, pursuant to which they agreed, among other things, to adjourn the Automatic Stay Motion and, consistent with the Arbitration Respondents' representations to the District Court, the Arbitration Respondents agreed to adjourn their NCLT application. (*See* D.I. 788.)

37. However, rather than securing peace while the parties wait for a ruling on the Confirmation Petition, the Stipulation did nothing to stop the Arbitration Respondents from multiplying the proceedings. Just days after this Court entered an Order approving the Stipulation (*see id.*), the Arbitration Respondents filed the Adversary Proceeding, asserting various claims

---

[7] The Confirmation Petition and the Glocal Parties' cross-motion to vacate the Award are set for hearing on September 3, 2024.

(duplicative of their proofs of claim) that could have been—and should have been—resolved in the Arbitration, and repeating various false assertions the Arbitration Respondents have made in their numerous (unsuccessful) efforts to challenge the Arbitration in India. On top of this, the Complaint in the Adversary Proceeding contains numerous demonstrably false allegations, as UpHealth Holdings will show in due course.

38.     As if that were not enough, the Arbitration Respondents have now filed their "Statement," falsely asserting that they were "kept in the dark with respect to these Chapter 11 cases" and threatening to try to litigate in these Chapter 11 Cases the Debtors' ownership stake in Glocal—a matter that has already been litigated multiple times, and in each instance with the finding conclusively and emphatically in favor of UpHealth Holdings. (*See* D.I. 857, ¶¶3, 5-6.) That issue also already is the subject of the Arbitration Respondents' Complaint in the Adversary Proceeding and amended proofs of claim. *See* D.I. 795; Claims Nos. 30-34 on the Claims' Register. The Statement does not request the Court to take any action. It serves no purpose other than to disrupt these proceedings and attempt to give the Arbitration Respondents yet another platform for their propaganda campaign.

## RELIEF REQUESTED

39.     By this Motion, the Debtors seek the entry of an order, pursuant to section 105 of the Bankruptcy Code, striking the Statement in its entirety and sanctioning the Arbitration Respondents and their counsel.

## BASIS FOR RELIEF REQUESTED

**A.    The Statement Should Be Stricken in Its Entirety.**

40.     The Court should strike the Statement in its entirety because it is without legal basis or justification and factually inaccurate. Under Section 105(a) of the Bankruptcy Code, bankruptcy courts have "broad powers to prevent abusive use of the Bankruptcy Code and bankruptcy process"

including statutory and inherent contempt powers. *In re Mondelli*, 2013 WL 1187098, at *5 (Bankr. D.N.J. Mar. 21, 2013); *see also* 11 U.S.C. § 105(a). This includes the authority to strike material that is "wholly irrelevant" or that has "no legitimate purpose." *In re Johnson*, 236 B.R. 510, 520-21 (D.D.C. July 21, 1999); *In re Peregrine Sys.*, 311 B.R. 679, 690 (D. Del. July 12, 2004) ("[I]t is well established that a court has the power and discretion to strike a document in order to protect legitimate interests."). Courts have struck material from the docket when it found that the "accusations were irrelevant, as well as scandalous and unprofessional," and this was "plain on the face of the motion." *In re Johnson*, 236 B.R. at 520-21. *See also* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."); Bankr. R. P. 7012(f).

41. The Statement is devoid of any legal justification or proper purpose. There is nothing in the Rules of Bankruptcy Procedure that allows a claimant to file a statement purporting to "reserve" rights, and the Arbitration Respondents have not identified any rule, statute, or other authority that permits their filing. The Arbitration Respondents have already filed an adversary proceeding, proofs of claim, and amended proofs of claim in this Chapter 11 case (in addition to the litigation they have proliferated in India and issues they have raised in the Illinois District Court). Nothing more is necessary or appropriate for them to "reserve" their supposed "right" to (re)litigate issues. There is nothing the Court can or should do with the Statement, and there is no provision in the rules for any party to respond. Accordingly, the Statement serves absolutely no purpose, is redundant and scandalous, and should be stricken from the docket.

42. The Statement should be stricken for the additional and independent reason that it is rife with irrelevant material and blatant falsehoods. The Arbitration Respondents claim they were "kept in the dark with respect to these Chapter 11 Cases." D.I. 857, ¶3. Yet, *the Arbitration*

***Respondents filed a supplementary affidavit before the Calcutta High Court referencing the Chapter 11 Cases one day after the Petition Date.*** (*See* Brown Decl., Ex. 18 at ¶4.) And the Arbitration Respondents ***sent correspondence directly to the U.S. Trustee referencing this bankruptcy case*** as part of their improper propaganda campaign. (*See* Brown Decl., Ex. 19 at ¶9.) Thus, the Arbitration Respondents clearly were aware of these proceedings and, particularly given that they are represented by competent counsel in India and the United States, able to follow the proceedings to the extent they saw fit.

43. Further, on December 14, 2023, UpHealth Holdings filed an application before the Commercial Court at Rajarhat, Kolkata in an action in which the Arbitration Respondents are parties seeking recognition of the worldwide stay under section 362 of the Bankruptcy Code. (*See* Brown Decl., Ex. 20 at ¶¶1-11.) This too shows that the Arbitration Respondents had notice of these proceedings. Thus, contrary to the Arbitration Respondents' representations that they were "in the dark" and have had to "work[] diligently to get up to speed on these Chapter 11 Cases, protect their rights, and otherwise mitigate the prejudice caused by the Debtors' notice failures," the Arbitration Respondents had ***actual knowledge*** of these proceedings since at least September 20, 2023—the day after the Petition Date. (D.I. 857, ¶3.)

44. The Arbitration Respondents' counsel here cannot attempt to excuse the false statement in their Statement by claiming ignorance of the representations made by their clients in India. Reviewing the filings from their clients' litigation efforts that served as a precursor to the Arbitration Respondents' copycat Complaint in the Adversary Proceeding is exactly the type of basic investigation counsel was required to perform prior to publishing such allegations in a public docket. *See In re Charter Technologies*, 160 B.R. 925, 930-31 (Bankr. W.D. Pa. Nov. 2, 1993) (awarding sanctions against counsel who "failed to make any reasonable inquiry into the

underlying facts before filing the … Complaint" when a review of relevant information "would have shown certain of the allegations to be without merit"). But even if counsel had not performed such an investigation, the Debtors' Automatic Stay Motion attached the Arbitration Respondents' Calcutta High Court application expressly citing to the Debtors' bankruptcy and the "worldwide stay granted to it by the U.S. Court." *See* D.I. 523, ¶2 & Ex. E.

45.    Moreover, the Statement does not describe any supposed "prejudice" the Arbitration Respondents allegedly have suffered from their supposed lack of awareness of the bankruptcy case. Because there is none. Just like every other unsecured creditor in these proceedings, the Arbitration Respondents have been allowed to submit proofs of claim, which will be adjudicated in due course. Indeed, the Debtors did not object to the Arbitration Respondents filing their claims after the Bar Date.

46.    The Arbitration Respondents also proclaim that the Debtors' assertion that UpHealth Holdings owns 94.81% of Glocal's outstanding shares is "simply false" and is an effort to "simply mislead parties-in-interest to believe that [UpHealth Holdings] own[s] over 90% of Glocal." D.I. 875, ¶6. But it is the Arbitration Respondents' contention that UpHealth Holdings does *not* own over 90% of Glocal that is "simply false." The emergency arbitrator, the ICC arbitration tribunal, and courts in India have all recognized that UpHealth Holdings owns 94.81% of Glocal. The Arbitration Respondents even admit that the arbitration Award contains this finding. *See id.* ¶5. The Arbitration Respondents' apparent belief that it is somehow inappropriate for the Debtors to rely on this fact because the Arbitration Respondents have "contested" the Award is spurious. Of all the grounds the Arbitration Respondents have raised in their latest bid to avoid the Award before the Northern District of Illinois, they have not claimed error in the ICC's finding that UpHealth Holdings is a 94.81% owner of Glocal. *See generally* Ex. 21. That the Arbitration

Respondents are unhappy with the outcome of the various legal proceedings does not change the facts—no matter how many times they protest and no matter how many court filings, letters, press releases, and other documents they issue.

47.     Again, the Arbitration Respondents are well aware of these determinations by the emergency arbitrator, the arbitration tribunal, and the courts in India—as is their US counsel. Not only should counsel have investigated the related proceedings, but, most recently, the Debtors attached to their Automatic Stay Motion the Award and the April 12, 2024 order from the Calcutta High Court. *See* D.I. 523, Exs. B & C.

48.     Given the legally improper nature of the filing as well as its demonstrably false representations, the Statement should be stricken from the docket in its entirety.

**B.     The Court Should Impose Sanctions on the Arbitration Respondents and Their Counsel.**

49.     A bankruptcy court may impose sanctions on two alternative bases. First, a bankruptcy court may impose statutory sanctions pursuant to 28 U.S.C. § 1927. *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 105 (3d. Cir. 2008) (finding bankruptcy courts have the authority to impose sanctions under Section 1927). To establish that Section 1927 sanctions are warranted, a moving party must show that "an attorney has (1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct." *Prosser v. Gerber*, 777 F.3d 155, 162 (3d. Cir. 2015) (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 188 (3d. Cir. 2002)). Bad faith can be shown by findings that "the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment." *Prudential*, 278 F.3d at 188 (internal citation omitted).

50. Alternatively, a bankruptcy court may use its inherent power pursuant to Section 105(a) to "take any action that is necessary or appropriate to enforce rules and prevent abuse of the process," including monetary sanctions. *In re NNN 400 Capitol Ctr. 16, LLC*, 2019 WL 5073844, at *2 (Bankr. D. Del. Oct. 9, 2019). "This broad authority vests the Bankruptcy Court with the authority to sanction both attorneys and litigants." *In re Mondelli*, 2013 WL 1187098, at *14 (D.N.J. Mar. 21, 2013). Bankruptcy courts may impose attorneys' fees as a sanction pursuant to their inherent power "when the party against whom sanctions are to be imposed has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *In re Del. Valley Lift Truck Inc.*, 640 B.R. 342, 365-66 (Bankr. E.D. Pa. 2022) (quoting *Chamber v. Nasco, Inc.*, 501 U.S. 32, 45-46 (1991)). Bankruptcy courts have awarded attorneys' fees where, as here, parties have inappropriately filed documents that they had "no legal basis to file." *See In re Elizabeth Service*, 2021 WL 1342190, at *5 (Bankr. D.V.I. Apr. 7, 2021). Sanctions also may be imposed to deter the improper conduct. *See In re NNN 400 Capitol Ctr. 16, LLC*, 2019 WL 5073844, at *4 ("The main purpose of sanctions under Rule 9011 and section 105, including fee-shifting sanctions, is to deter conduct that amounts to abuse of the bankruptcy process"); *In re Goodheart*, 2006 WL 2583077, at *8 (Bankr. D.N.J. Sept. 6, 2006) ("A particular sanction is 'appropriate' when it is the minimum required to deter the offending behavior.")

51. Here, the Arbitration Respondents and their counsel's actions warrant sanctions conduct under either standard. The Statement was filed without legal basis, for an improper purpose, and contains false assertions meant to unfairly disparage the Debtors. Instead of pursuing a procedurally proper method for resolution of their claims, the Arbitration Respondents chose a procedurally improper method that imposed unnecessary burdens on this Court and the Debtors. This expansion of the Arbitration Respondents' propaganda campaign and duplication of the same

propaganda included in their Adversary Complaint and proofs of claim is indicative of bad faith on the part of both the Arbitration Respondents and their counsel.

52. The timing of the filing further supports a determination of bad faith. The Statement was filed just days after the Arbitration Respondents filed their amended proofs of claim, less than a month after they filed their Adversary Proceeding, and with UpHealth Holdings' Confirmation Petition fully briefed and pending before the District Court for the Northern District of Illinois. Further, the Statement is just the latest filing in an onslaught of frivolous litigation that the Debtors have faced at the hands of the Arbitration Respondents. With this latest improper and baseless filing, it is clear that the Arbitration Respondents' goal is not to litigate sincerely held claims, but to weaponize the judicial process at the expense of the Debtors.

53. Indeed, the Arbitration Respondents' actions here constitute an abuse of process. Under Delaware law, an abuse of process occurs where a party has "(1) an ulterior purpose, and (2) a willful act in the use of the process not proper in the regular conduct of the proceedings." *Allscripts Healthcare, LLC v. Andor Health, LLC*, 2021 WL 7209358, at *1 (D. Del. Dec. 13, 2021). The second prong requires a "definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process." *Id.* It also requires "[s]ome form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself." *Chase Bank USA, N.A. v. Hess*, 2013 WL 867542, at *4 (D. Del. Mar. 7, 2013).

54. Courts have found allegations of abuse of process to be sufficient in situations similar to the one here. For example, in *Allscripts Healthcare v. Andor Health*, after Allscripts brought an action against him, one of the defendants allegedly filed a false complaint with the police in India "in order to pressure Allscripts to abandon its civil claims here in the United States," pursued an additional criminal complaint for perjury against an individual associated with

Allscripts in India, and filed various affidavits and briefs in the Indian court "all purportedly for the purpose of obtaining a tactical advantage in [the] civil litigation." *Allscripts*, 2021 WL 7209358, at *3. The court held that these actions gave rise to a claim for abuse of process, and noted that Delaware courts have found various actions designed to interfere with a counterparty's business or coerce them in pending litigation to constitute an abuse of process. *Id.* at *4.

55. Similarly, in *Chase Bank v. Hess*, the District Court of Delaware found a claim for abuse of process was stated where the non-moving party filed "baseless suits and assert[ed] frivolous claims" on behalf of customers of Chase Bank against the bank. *Chase*, 2013 WL 867542, at *4. Further, the court found that there was coercion to obtain a collateral advantage because the non-moving party improperly used the litigation to prevent Chase Bank from lawfully collecting on debts owed to it from its customers. *Id.*

56. Similarly, here, the Arbitration Respondents have asserted a multitude of baseless allegations in various venues for the improper purpose of using it as collateral in the ongoing proceedings between themselves and the Debtors. Further, as in *Chase*, the frivolous and vexatious litigation efforts of the Glocal Parties are being used to divert funds away from the various creditors involved in these Chapter 11 Cases.

57. As such, the Debtors respectfully request that this Court impose sanctions under Section 1927—and in the alternative, pursuant to Rule 105(a)—against the Arbitration Respondents and their counsel for the attorneys' fees and expenses the Debtors have incurred in connection with responding to the Arbitration Respondents' improper filing and such other sanctions as the Court deems appropriate to deter the repetition of this conduct.

## NOTICE

58. Notice of this Motion will be provided in accordance with the Local Rules to: (i) the Office of the United States Trustee for Region 3; (ii) counsel to the Committee, (iii) counsel to Wilmington Trust, National Association, as trustee; (iv) counsel to the Debtors' ad hoc group of secured noteholders, (v) the Arbitration Respondents, and (vi) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Proposed Order granting the requested relief in this Motion, and (ii) grant such other and further relief as the Court may deem just and proper.

Dated:  August 9, 2024
        Wilmington, Delaware

**DLA PIPER LLP (US)**

 /s/  Stuart M. Brown
Stuart M. Brown (DE 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@us.dlapiper.com

-and-

Richard A. Chesley, Esq. (admitted *pro hac vice*)
Jamila Justine Willis, Esq. (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email: richard.chesley@us.dlapiper.com
         jamila.willis@us.dlapiper.com

*Counsel to the Debtors*