UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

UPHEALTH HOLDINGS, INC., et al.,          Case No.

          Debtors.                        23-11476-LSS

- - - - - - - - - - - - - - - - - - - -x


              United States Bankruptcy Court

              824 North Market Street

              Wilmington, Delaware


              October 9, 2024

              2:09 PM



B E F O R E:

HON. LAURIE SELBER SILVERSTEIN

U.S. BANKRUPTCY JUDGE


ECR OPERATOR:  ALYCE DOODY

1. Motion of Debtor UpHealth Holdings, Inc. for Entry of Orders
(I) (A) Approving and Authorizing Bidding Procedures in
Connection with the Sale of UpHealth Holdings, Inc.'s Interest
in TTC Healthcare, Inc., (B) Authorizing Procedures to
Designate Stalking Horse Bidder and (C) Granting Related Relief
and (II) (A) Authorizing Sale of UpHealth Holdings, Inc.'s
Interest in TTC Healthcare, Inc. to the Successful Bidder and
(B) Granting Related Relief [D.I. 810; Filed 7/17/2024].

Transcribed by:  River Wolfe

1

2      A P P E A R A N C E S:

3      DLA PIPER LLP (US)

4              Attorneys for Debtors

5      BY:   R. CRAIG MARTIN, ESQ.

6              NICOLE MCLEMORE, ESQ. (ZOOM)

7              DAVID M. RILEY, ESQ.

8              JAMILA J. WILLIS, ESQ.

9

10

11     MORRISON & FOERSTER LLP

12             Special Litigation Counsel for Debtors

13     BY:   DARREN SMOLARSKI, ESQ. (ZOOM)

14

15

16     YOUNG CONAWAY STARGATT & TAYLOR, LLP

17             Attorneys for Glocal Parties

18     BY:   ROBERT F. POPPITI, JR., ESQ.

19

20

21     FAEGRE DRINKER BIDDLE & REATH LLP

22             Attorneys for Official Committee of Unsecured Creditors

23     BY:   JACLYN C. MARASCO, ESQ.

24             BRETT D. FALLON, ESQ.

25

GOODWIN PROCTER LLP

    Attorneys for Official Committee of Unsecured Creditors

BY:   STACY DASARO, ESQ. (ZOOM)

    JAMES LATHROP, ESQ.

    HOWARD S. STEEL, ESQ. (ZOOM)


COLE SCHOTZ P.C.

    Attorneys for Interested Party

BY:   STACY L. NEWMAN, ESQ. (ZOOM)

    PATRICK J. REILLEY, ESQ. (ZOOM)


AKIN GUM STRAUSS HAUER & FELD LLP

    Attorneys for Certain Secured Noteholders

BY:   ANNA KORDAS, ESQ. (ZOOM)

    ARIK PREIS, ESQ. (ZOOM)

    ERICA N. REEVES, ESQ. (ZOOM)


REED SMITH LLP

    Attorneys for Wilmington Trust, N.A.

BY:   JASON D. ANGELO, ESQ. (ZOOM)

U.S. DEPARTMENT OF JUSTICE

      Attorneys for Office of the U.S. Trustee

BY:   RICHARD L. SCHEPACARTER, ESQ.


ALSO PRESENT:

      CHAD CORAZZA (ZOOM)

      CAROLYN B. FOX (ZOOM)

      DAVID MOHAMED (ZOOM)

      JONATHAN RANDLES (ZOOM)

      KENNEDY ROSE (ZOOM)

      DAVID ZUBKIS (ZOOM)

1                     P R O C E E D I N G S

2          THE CLERK:  Please rise.

3          THE COURT:  Please be seated.

4          MR. MARTIN:  Good morning, Your Honor.  Good

5     afternoon.  Sorry.

6          THE COURT:  Good afternoon.

7          MR. MARTIN:  All confused.  Mr. Brown's out of town,

8     so I'm all mixed up.  He asked me to come over and introduce

9     Ms. Willis, who will be handling the single matter on the

10    agenda.  So I will turn it over to her --

11         THE COURT:  Thank you.

12         MR. MARTIN:  -- at this time.

13         MS. WILLIS:  Good afternoon, Your Honor.  For the

14    record, Jamila Justine Willis of DLA Piper LLP (US) on behalf

15    of the debtors, UpHealth Holding, Inc. and certain of its

16    debtor affiliates.

17         So before getting to our agenda, Your Honor, we want

18    to thank the Court for accommodating our request for shortened

19    notice on this matter.  Your Honor, we're here this morning on

20    the supplement to the motion of debtor UpHealth Holding, Inc.

21    for entry of orders approving and authorizing bidding

22    procedures in connection with the sale of UpHealth Holding,

23    Inc.'s interest in TTC Healthcare, Inc., authorizing procedures

24    to designate stalking horse bidder, and granting related relief

25    and authorizing sale of UpHealth Holding, Inc.'s interest in

1    TTC Healthcare to the successful bidder and granting related

2    relief, which is filed at docket number 980 on September 22nd.

3            Before we get started with the motion supplement

4    itself, I'd like to request the acceptance of the declaration

5    of Mr. Michael Krakovsky in support of the supplement to the

6    bidding procedures motion, which was filed at docket number 981

7    into evidence.  Mr. Krakovsky is here in the courtroom today,

8    should anybody be interested in questioning him.

9            THE COURT:  Okay.  Is there any objection to the

10   declaration coming into evidence?

11           UNIDENTIFIED SPEAKER:  No, Your Honor.

12           THE COURT:  I hear none.  It's admitted.

13       (Declaration of Mr. Krakovsky was hereby received into

14   evidence as Debtors' Exhibit --, as of this date.)

15           MS. WILLIS:  Thank you, Your Honor.

16           Your Honor, by the bid procedure supplement, the

17   debtors are seeking approval for this Court to enter into the

18   commitment letter and be bound specifically by the binding

19   provisions of that commitment letter.  Your Honor, while this

20   is not exactly as was contemplated, the debtor's sale process

21   of the TTC interests has been successful in that it resulted in

22   the identification of the purchaser and the execution of the

23   commitment letter.

24           The debtors engaged in a significant marketing process

25   that involved contacting 150 parties, 50 of whom executed NDAs.

1    And that process resulted in the commitment letter, which

2    represents the best actionable proposal available for

3    maximizing the value of TTC's interests.  And the commitment

4    letter is supported by the debtor's key economic stakeholders,

5    including the committee and the ad hoc group of holders of the

6    2025 secured notes.

7            The sole objector is the U.S. Trustee.

8            And at this stage, we are seeking approval of

9    authority to enter into the commitment letter and be bound by

10   its binding provisions.  And of course, there are appropriate

11   fiduciary outs subject to the payment of the bid protections if

12   they are approved following the entry into the SPA.  If Your

13   Honor has any questions, I'm available to answer them.

14   Otherwise, I can concede the podium to the U.S. Trustee.

15           THE COURT:  I don't have questions at this time, but I

16   do have questions.  But I'll ask them after I've heard the

17   objections.  Okay.

18           And first I'd like to ask, Mr. Schepacarter, do you

19   wish to cross-examine Mr. Krakovsky?

20           MR. SCHEPACARTER:  Actually, I do have a couple of

21   questions, though, on his declaration so --

22           THE COURT:  Okay.

23           MR. SCHEPACARTER:  If we want to swear him in now

24   (indiscernible) --

25           THE COURT:  Okay.  Thank you.

1    MR. SCHEPACARTER:  If you want to swear him in, that

2  would be fine, Your Honor.

3    THE COURT:  Okay.  Mr. Krakovsky.

4    If you can remain standing, please --

5    MR. KRAKOVSKY:  I'm sorry.

6    THE CLERK:  Thank you.

7    THE COURT:  -- we'll swear you in.

8    THE CLERK:  Okay.  Please raise your right hand.

9    (Witness sworn)

10    THE CLERK:  Please state your full name and spell your

11  last name for the record.

12    THE WITNESS:  Michael Krakovsky.  Last name is spelled

13  K-R-A-K-O-V-S-K-Y.

14    THE CLERK:  Thank you.  You may be seated.

15  CROSS-EXAMINATION

16  BY MR. SCHEPACARTER:

17  Q.    Afternoon, Mr. Krakovksy.  My name's Richard Schepacarter

18  of the United States Department of Justice, Office of the

19  United States Trustee.  Just have a couple questions based on

20  your declaration.  You don't happen to have a copy of that in

21  front of you, do you?

22  A.    I do not.

23    MR. SCHEPACARTER:  Okay.  See if they have -- counsel

24  may have just a couple.

25    May I, Your Honor?

1          THE COURT:  You may.

2          MR. SCHEPACARTER:  Thanks.

3          THE WITNESS:  Thank you.

4     Q.    From reading your declaration, I understand you were

5     involved in the sale process, correct?

6     A.    Yes.

7     Q.    All right.  Just a couple questions on it.  The big

8     protections that were offered in this case, roughly 750,000

9     dollars for the breakup fee and then another half-a-million

10    dollars for expenses.  Do you know if that half-a-million

11    dollars of expenses matches the actual expenses that were

12    incurred by the prospective purchaser?

13    A.    I don't know for certain.  I am under the impression that

14    a lot of the expenses would be incurred from the date of

15    approval of these bid procedures to the closing.

16    Q.    Do you know if the, we'll call it, prospective purchaser,

17    if he incurred expenses doing any kind of due diligence?

18    A.    Yes, for sure.

19    Q.    Okay.  And explain that if you can.

20    A.    Well, I know for certain that they had counsel that was

21    involved.  So clearly, they were third-party expenses in

22    connection with their analysis of the transaction.  I'm not

23    aware of other financial advisors that may have been retained.

24    They also had -- they visited the facility a few times, so

25    there would have been travel expenses.  I'm not sure if that

1  would be covered, you know, under the out-of-pocket expenses as

2  well.

3  Q.   Okay.  When you say "they", you're talking about the

4  purchaser (indiscernible) --

5  A.   Correct.  The private equity firm.

6  Q.   -- counsel?

7  A.   Correct.

8  Q.   Private equity firm?  Okay.  All right.  And did other

9  purchasers spend time in the -- we'll call it the due diligence

10 room?

11 A.   Yes.

12 Q.   And how much time did they spend?  Less or more than the

13 purchaser that you know?

14 A.   It's hard to know.  A lot of times, buyers will download

15 the full contents of the data room, so it's not as if we

16 monitor, you know, actual time spent in the data room.  That

17 wouldn't really be indicative.  So we know how many parties

18 have accessed the data room, but we don't know their engagement

19 beyond just accessing it and potentially downloading the full

20 contents.

21 Q.   You can't tell how much time they spent in the data

22 room --

23 A.   So it may be --

24 Q.   -- (indiscernible) downloads or --

25 A.   It's possible that's a feature that we could look at.

1    It's just not that meaningful because most parties would

2    download as opposed to dealing with the cumbersome data room.

3    They would download it locally and have access to it.

4    Q.    All right.  Do you know if other purchasers spent time

5    visiting the facility?

6    A.    Yes.

7    Q.    Okay.  More or less than the prospective purchaser?

8    A.    Well, the purchaser had several visits, so that would be

9    more than any other party.  They've spent more time at the

10   facility than other parties.

11   Q.    All right.  All right.  Now, you make a conclusion in your

12   declaration, paragraph 10.  You say, further, I believe that

13   the bid protections are fair and reasonable under the

14   circumstances and are necessary to induce the purchaser to

15   consummate a transaction that will maximize the preserved value

16   of the estate.  And I want to take that in little bits if we

17   can.

18        You say that the bid protections are fair and reasonable

19   under the circumstances.  What does that mean?

20   A.    Well, for one, we believe it is essential for this bidder

21   to proceed is to grant these bid procedures.  That's what's

22   been communicated to us from the buyer, prospective buyer.  And

23   there are -- you know, we're aware of what the typical bid

24   projections would look like.  More typically three percent,

25   plus expense reimbursement.  Under the circumstances, we think

1  that it is still a net positive to the estate of approving

2  these bid protections, you know, relative to what the other

3  options are.

4  Q.    Right.

5  A.    So we think this is the best -- the best outcome.

6  Q.    And you say net positives.  What do you mean by net

7  positives?

8  A.    Considering the likelihood of the bid protections actually

9  being paid out in the context of an over bid.  So we think

10  we're confident this is the best, highest and best, option for

11  the estate.  So with that framework, we think that we're

12  supportive at Stout of granting these bid protections -- bid

13  protections and think it's reasonable under these

14  circumstances.

15  Q.    Okay.  And you say it's the best option.  Is that because

16  of the fact that there weren't any other bids made?

17  A.    There were other bids made.

18  Q.    There were other bids?  Okay.

19  A.    Yes.

20  Q.    But you think this one, in your professional opinion, this

21  is the highest and best offer?

22  A.    That's correct.

23  Q.    You say it was necessary to induce the purchaser to

24  consummate the transaction?  Why is it -- why was it necessary?

25  A.    It's been a heavily negotiated term.  I mean, we have --

1　what you see in the commitment letter reflects negotiations

2　that we've had on those terms.  So the prospective buyer

3　initially requested even higher bid protections than what's in

4　the commitment letter.  And we negotiated those down.  And

5　they've indicated to us that these are essential for them

6　moving forward and incurring the expenses of actually

7　negotiating and signing up to an SBA.

8　Q.　Do you think that these protections encourage fair and

9　open bidding and a fair-market auction price and the like?

10　Fair-value marketing of the process?

11　A.　Well, we -- we've run an exhaustive process, and we're --

12　we're under exclusivity with this buyer right now.  So we think

13　there's a very low likelihood of someone unsolicited coming in

14　at a higher price.  Whether these bid protections were 700 plus

15　500 or something substantially lower.

16　Q.　Now, the exclusivity, let's talk about that one.  The

17　exclusivity, explain that to me what that entails.

18　A.　So I don't have the commitment letter in front of me, but

19　I do know that it's a four-week exclusivity period that

20　terminates October 18th, and it prohibits the debtors from

21　engaging with other third parties during that time frame with

22　respect to this transaction.

23　Q.　All right.  So do you really need bid protections if the

24　shop is closed?

25　A.　Well, we do, because what we've been told is that the

1    prospective buyer is not going to consummate the transaction

2    and incur the legal expenses associated with negotiating the

3    SPA unless these bid protections are approved.

4    Q.    So he has bid protections, plus a closed shop?  Is that

5    what you're --

6    A.    He has a closed shop.  I don't think this is that

7    atypical.  In many scenarios, if you don't have a stalking

8    horse, you may file bid protections -- bidding procedures with

9    bid protections, and prospective buyers would know that if they

10   do the work and sign up to be the stalking horse bidder, that

11   they will have bid protections.

12   Q.    All right.  What was the last time you had a closed shop

13   sale?

14   A.    I can't recall.  It is atypical in a 363 process.

15   Q.    Did you say atypical?

16   A.    Atypical.

17   Q.    Okay.  All right.  And the last part of that is based on

18   what you've told me so far, how does all of that maximize and

19   preserve the value of the estate?

20   A.    Closing with this prospective buyer is value maximizing to

21   the estate.  This prospective buyer has indicated very clearly

22   to us that getting approval of these bid protections are

23   essential to them proceeding in this transaction.  So that's

24   how we maximize this value.  And again, we think there's a very

25   low likelihood that if lower bid protections were granted as

1     opposed to these, that that would impact the likelihood of a

2     prospective overbidder coming in in this time frame.

3     Q.   Right.  Even during the -- you said the shop was closed.

4     Is the shop going to open?  Is that what you're telling me?

5     A.   Well, right now, we're not talking to other buyers.  We're

6     under a four-week exclusivity.

7            MR. SCHEPACARTER:  Okay.  All right.  All right.  Your

8     Honor, I don't have any further questions.  I'll reserve for

9     recross if I need it (indiscernible).

10           THE COURT:  Thank you.

11           Any redirect?

12           MS. WILLIS:  Yes.  Thank you, Your Honor.

13     REDIRECT EXAMINATION

14     BY MS. WILLIS:

15     Q.   Okay.  Hi, Mr. Krakovsky.  Can you repeat when exclusivity

16     expires under this bid?

17     A.   It was a four-week exclusivity.  I believe it expires

18     October 18th -- 18th.  Next Friday.

19     Q.   And are we likely to close before October 18th?

20     A.   We are not.

21     Q.   Thank you.  I'd also like to -- do you have a copy of the

22     commitment letter before you?

23     A.   I do not, no.

24           MS. WILLIS:  Your Honor, the commitment letter is

25     attached to the supplemental motion as exhibit B.  May I

```
 1   approach and bring a copy up?
 2              THE COURT:  You may.
 3   Q.   Do you see on page 3 of the commitment letter, the
 4   paragraph that says, "certain protections"?
 5   A.   Yes, I do.
 6   Q.   Okay.  Are you familiar with that paragraph?
 7   A.   Yes.
 8   Q.   Could you explain what you understood about what happens
 9   after exclusivity expires?
10   A.   Well, I'm not sure that I need to look at the paragraph.
11   My understanding post-exclusivity is we would have the right on
12   behalf of the debtors to engage with other third parties.
13   Q.   Correct.  And does the commitment letter give the debtor
14   as a fiduciary out?
15   A.   It does.
16   Q.   And what does that mean, a "fiduciary out"?
17   A.   If the debtors receive a higher and better offer, we could
18   basically switch paths and go with a different party that
19   maximizes value.
20   Q.   Okay.  And could you read the first sentence of the
21   paragraph "certain protections"?
22   A.   Sure.  If any of the provisions set forth in the paragraph
23   labeled 'exclusivity' or the subparagraph labeled 'bid
24   protections' in the paragraph labeled 'bid considerations' is
25   amended or modified in any way or rejected by the bankruptcy
```

1  court, F3 and Beck shall be entitled to terminate all

2  discussions regarding the transactions at their sole

3  discretion.

4  Q.   And what is your understanding about F3 and Beck's

5  position with respect to exclusivity and the bid protections?

6  A.   That if this isn't granted, they're not going to move

7  forward.

8          MS. WILLIS:  Okay.  Thank you.

9          That's all, Your Honor.

10         THE COURT:  Any redirect?

11         You can step down.

12         MR. KRAKOVSKY:  Okay.

13         THE COURT:  Thank you.

14         Mr. Schepacarter.

15         MR. SCHEPACARTER:  Yes, Your Honor.  Richard

16 Schepacarter for the United States Trustee.

17         Your Honor, I'm not going to belabor our objection.  I

18 think it's pretty straightforward.  The test here is that the

19 movant to prove that the bid protections, bid procedure

20 protections, the breakup fee, the expense reimbursement are

21 expenses that can be allowed under 503(b)(1)(A) basically

22 necessary to preserve the assets of the estate.

23         Problematic here is I'm not going to go into, like,

24 great detail, but the bid protections here are over the

25 customary what we usually do, three-and-a-half percent or

 1  whatever.  It's around eleven percent if you take them all

 2  together.  It's happening at the end of the process, so to

 3  speak.  And this is a former insider.  So I know that we've

 4  argued that necessarily insider.  And we don't have any

 5  testimony at this point, but either today, insiders don't

 6  necessarily have -- I wouldn't say an incentive, but they've

 7  already been on the inside of the data room when they were on

 8  the inside when they were insiders.  So they know, or you would

 9  think they would know, what's going on with respect to the

10  company.

11          The fact that he did testify -- that Mr. Krakovsky did

12  testify with respect to the prospective purchaser being in the

13  data room.  It's a different data room than what used to be a

14  data room, which was actually a room.  Now, you just download

15  everything, and you can look at it, I guess, at your leisure.

16          THE COURT:  I'm fascinated at that because it lets all

17  that confidential, proprietary information be out there in the

18  world with no controls.  But I heard it too.  It surprised me.

19          MR. SCHEPACARTER:  It's, I don't know, twenty-first

20  century.

21          THE COURT:  Um-hum.

22          MR. SCHEPACARTER:  As I indicated to counsel earlier,

23  I struggle with technology, and I somehow struggle with the

24  twenty-first century going forward, but be that as it may.

25          With respect to this purchaser, problematic here and

1   it's funny because I asked the witness when the last time he

2   had a closed shop provision, and I can't remember one.

3           THE COURT:  Long time.

4           MR. SCHEPACARTER:  And I've been doing this since the

5   '90s.  Here, even in Delaware, I've been doing this since 1999.

6   And I can't remember one.  I just can't remember one.  And then

7   my memory bank doesn't go back that far anymore.  But I can't

8   remember one in the recent fifteen years, maybe twenty years

9   closed shop.  I mean, that was kind of -- I thought that went

10  away years ago --

11          THE COURT:  Um-hum.

12          MR. SCHEPACARTER:  -- so that even though the

13  exclusivity will go away so that that opens up eventually it

14  sounds to me like it's the old belt and suspenders.  You need a

15  belt.  That's fine.  You need suspenders.  That's fine.  But

16  you don't need both so to speak.

17          I guess the other part of it is that testimony was

18  that -- bordering on hearsay, but we'll take it at what it's

19  worth -- that the purchaser will walk away, that they're not

20  going to be -- if they don't get bid procedures, they're going

21  to walk away.  And that may be, but that still isn't the test

22  of whether or not that the expense is necessary to preserve the

23  value of the estate because even if the purchaser walks away,

24  this asset can still be marketed.  It's been marketed.  We

25  understood that.  It's been a robust marketing and the like.

1      But even though the purchaser may or may not at its

2  option.  Didn't say he was.  Just, I think it was a testimony,

3  and I could be wrong that they had the option -- that

4  agreement, that letter, said they had the option of walking

5  away, so they had that out, just like the debtor has the

6  fiduciary out.  And I understand that.

7      But I just don't think it meets that test, that

8  O'Brien test, that 503(b)(1)(A) test, necessary value of the

9  estate, like an operating expense to buy inventory to make

10  goods, that type of expense going forward.  Keep the lights on.

11  I don't know that it satisfies that in this case, the bid --

12  and even though it seems like it's crucial, it doesn't satisfy

13  necessarily those aspects of what the admin expense is supposed

14  to be under O'Brien.  So thank you, Your Honor.

15      THE COURT:  Thank you.

16      Ms. Willis.

17      MS. WILLIS:  Thank you, Your Honor.  Jamilla --

18      THE COURT:  Yeah.  Let me tell you what I'm concerned

19  about, in addition to what Mr. Schepacarter has raised.  When I

20  looked at, really, the summary of material terms, I think there

21  are a lot of items in here that are protections --

22      MS. WILLIS:  Um-hum.

23      THE COURT:  -- that you have to consider together and

24  that the debtor is asking me to approve.  But the first thing I

25  note is that due diligence is not complete.  So this

 1  prospective purchaser wants me to approve bid protections and

 2  the context in which he's not committed to this deal.  I don't

 3  think I've done that.

 4         MS. WILLIS:  Yeah.

 5         THE COURT:  Number two, the exclusivity provision, I

 6  can't remember the last time I saw a no shop either, but I'm

 7  guessing late '80s.

 8         And interesting, too, that the prospective purchaser

 9  gets a right of first refusal with respect to any proposed

10  company transaction received during the exclusivity period.  So

11  to the extent that somebody did come forward, the debtors

12  couldn't talk to them.  But if they gave them a higher bid --

13  well, first of all, I'm not sure why they would because there's

14  a right of first refusal here.  So I view that as a

15  disincentive, the exclusivity period and the right of first

16  refusal as a disincentive.

17         Then I've got the breakup fee and expense

18  reimbursement, which are higher than normal.  And then I've

19  got -- I'm not sure what.  An additional expense reimbursement

20  if the purchasers are willing to go forward, but the debtor for

21  some reason isn't.  So it's this entire -- which I don't know

22  exactly what that is, and it wasn't discussed.  But I don't

23  know if that's additive, if it's part of the breakup fee, or

24  what it is.

25         But this entire universe of protections, and I think

1   they're all protections, for the prospective purchaser who is

2   an insider is problematic from a bankruptcy court systemic

3   perspective.  And I need to understand why this package is

4   necessary, other than the fact that the purchaser says it has

5   the option to walk.  Because if I start giving out packages

6   like this, I don't know where it ends.

7         MS. WILLIS:  Your Honor, thank you for your questions.

8   So Your Honor, we've been before you before in front of the

9   protections that are similar.  We understand your concerns.

10  And we did take those concerns into consideration when we

11  negotiated --

12        THE COURT:  What was similar to -- that you've been in

13  front of me that's similar to this combination of a package?

14        MS. WILLIS:  Your Honor, do you remember Rudy's?  I

15  believe it was filed in March of 2020, which is frankly a

16  month.  I would like to forget.

17        THE COURT:  Sure.  But Rudy's probably was -- it was

18  the restaurant -- it was a restaurant?

19        MS. WILLIS:  The hair --

20        THE COURT:  Oh, the hair place.

21        MS. WILLIS:  The barbershop, yes.

22        THE COURT:  Okay.  I had several, and they were all

23  COVID related.

24        MS. WILLIS:  Yes.

25        THE COURT:  And what we did during COVID may be very

1 different than what we're going to do not during COVID. I

2 don't remember that particulars, but no. I mean, there can

3 definitely be a COVID exception.

4       MS. WILLIS: Right. And I appreciate that, Your

5 Honor. So I want to answer all of your points in order. So

6 the first was that you said diligence was not complete and

7 you're being asked to approve bid procedures when the purchaser

8 is not committed.

9       THE COURT: Not committed.

10       MS. WILLIS: Your Honor, the bid protections would not

11 even come into place until the SPA was signed and submitted to

12 the Court. So you're being asked, essentially, similar to what

13 we've requested in the motion itself and similar to what we

14 said we were going to do, which is filing a supplement, you're

15 being asked to really preview those, and they would only be bid

16 protections if the purchaser signed the SPA, which is currently

17 not signed, because as you said they're undergoing diligence,

18 and if that was filed with the Court. So it's a little bit

19 like a naked sail, Your Honor, rather than filing for bid

20 protections when they haven't actually committed to anything.

21       THE COURT: Okay.

22       MS. WILLIS: The second point you made, Your Honor,

23 was as to exclusivity. You said that you haven't seen no-shop

24 provisions recently and also that they have the right of first

25 refusal. I do want to emphasize that they have I think it's

1  ten more days of exclusivity in total.  The exclusivity

2  provision here, Your Honor, we sometimes do see these, but they

3  often happen pre-petition.  Unfortunately, Your Honor, I feel

4  like we're always saying this.  This case is atypical, which it

5  is.

6          You might remember, Your Honor, when we filed, we

7  filed with a naked petition, and we weren't really certain of

8  what was going to happen in the bankruptcy case.  The TTC sale

9  essentially came in as a strategy that we were going to

10  implement to maximize the value of the estate this summer.  So

11  we had not anticipated the sale of TTC and certainly the

12  interest that UpHealth Holdings has in TTC back when we filed

13  this case in October.  Otherwise, that exclusivity provision

14  might have happened pre-petition.

15          So we only have another ten days of exclusivity.  It's

16  unlikely that we'll be in a position to -- first, we're not

17  going to be in a position to close, Your Honor, within that ten

18  days.  So this is something we would typically see prior to the

19  petition date that we wouldn't really be asking the Court to

20  approve.  But here, just because of the nature of this case and

21  when we're doing this sale in this case, that is something that

22  the purchaser asked us to move forward with approving under the

23  commitment letter.

24          THE COURT:  I understand it's something that the

25  purchaser asked for, and maybe it happens outside of

1  bankruptcy.  But we're in bankruptcy.  And any time I see some

2  kind of lockup of the debtor, there's always a fiduciary out,

3  and it doesn't cost anything.  And here it looks to me like the

4  fiduciary out costs something, unless I'm misreading.  I mean,

5  isn't really what the purchaser wants here is for us to fund

6  his diligence?  Isn't that really what's happening?

7          MS. WILLIS:  I wouldn't agree with that, Your Honor.

8  Just because it does require entry into the SPA, the diligence

9  will be done before we enter into the SPA.  And the bid

10  protections only come into place once the SPA is signed.

11          THE COURT:  Okay.  What's this other provision then?

12  And you'll probably get to it.  But I don't understand the

13  provision, although it is part of the bid protections.  Yeah.

14  UpHealth shall reimburse F3C's and Beck's reasonable and

15  documented legal expenses up to such time in pursuit of the

16  transaction.  I guess if the debtor backs out.

17          MS. WILLIS:  Your Honor, you're reading the commitment

18  letter; is that correct?

19          THE COURT:  I'm actually reading --

20          MS. WILLIS:  The summary --

21          THE COURT:  Summary.  Let me find the commitment

22  letter.  It's in certain protections on page 3 of the

23  commitment letter.

24          MS. WILLIS:  Your Honor, just to clarify that.  So

25  that's not an additional expense reimbursement.  That is the

1  expense reimbursement.  So if we were -- if they were ready,

2  willing, and able to consummate the sale post-have entering

3  into an SPA, entering into the purchase agreement, and they're

4  ready to consummate but we're not, then they would get their

5  expenses, which is the expense reimbursement, as opposed to

6  some additional expense reimbursement.

7          THE COURT:  Do they not get the breakup fee in that

8  circumstance?

9          MS. WILLIS:  They do not get the breakup fee in that

10 circumstance.

11         THE COURT:  When do they get the breakup fee?

12         MS. WILLIS:  The breakup fee, they would get when we

13 exercise our fiduciary out, for example.

14         THE COURT:  So there's payment to exercise the

15 fiduciary out?

16         MS. WILLIS:  That's correct.  But Your Honor, I mean,

17 if we were to exercise a fiduciary out, that would be in a

18 situation where, for example, we have another purchaser and the

19 bid that they have submitted is higher and better.  And it

20 would be higher and better and inclusive of the breakup fee and

21 the expense reimbursement.  I mean, frankly, I would love to be

22 in that position.  I'm not sure we're going to get there, but

23 that's not atypical of a 363 sale.

24         THE COURT:  That part may not be.  The backing-out-

25 without-closing-another-deal would be.  The getting-something-

1  when-I-close-another-transaction is not.  So that's why I'm

2  saying.  It seems like -- it seems like the purchaser really

3  wants us to fund the due diligence.

4        MS. WILLIS:  Your Honor, in that situation, it would

5  be that they would just get their expense reimbursement, not

6  their breakup fee, understanding that they have spent some

7  money to get to this point.  And that's similar to other 363

8  sales, where they don't receive a breakup fee because there is

9  no other bid.  I mean, I hope we're not in a position where we

10 would be backing out of the sale because I truly believe that

11 there is no other way to maximize the value of the TTC assets

12 unless until we sell this asset.

13       THE COURT:  Okay.  Do you have anything else you want

14 to add?

15       MS. WILLIS:  Your Honor, I just, I do want to respond

16 to some of Mr. Schepacarter's points.  And one is that he said

17 that the test is if it's necessary to preserve the value of the

18 assets.  And he said, certainly, if the purchaser does not move

19 forward, then these assets can still be marketed.  But I want

20 to make the point that they have been marketed, and the

21 marketing process was robust.  It's detailed in --

22       THE COURT:  Why didn't the debtor take this and go to

23 an auction and just say, here's the deal?  I guess didn't

24 because there's the diligence wasn't done?

25       MS. WILLIS:  Well, Your Honor, a couple of things on

1    that point.  We were expecting to go to an auction, I think you

2    might remember.

3            THE COURT:  Um-hum.

4            MS. WILLIS:  And we did have the bid deadline.  At the

5    bid deadline, we didn't have other qualified bids.  And the

6    bids that we did have before us, the LOIs that we had before

7    us, this was the most actionable and the best that we had

8    before us.  And this requires a private sale.

9            THE COURT:  So the others were more tentative than

10   this?

11           MS. WILLIS:  Yes --

12           THE COURT:  Diligence outs?

13           MS. WILLIS:  -- and not qualified bids for many other

14   reasons.

15           THE COURT:  Okay.

16           MS. WILLIS:  And the other point that I wanted to

17   make, I made this point before, but Mr. Schepacarter talks

18   about the bid protections and having to pay the bid protections

19   with an uncommitted purchaser.  But again, the bid protections

20   only come into place if we have a commitment from the purchaser

21   through the entry into the SPA.

22           THE COURT:  Again, I do not think I've ever approved

23   bid protections prospectively like that, without the commitment

24   by the purchaser that they're going forward.  Because there is

25   no commitment here.

1  MS. WILLIS:  Yeah.  And Your Honor, that's why we

2  liken it a little bit to a naked sale, where a debtor says, if

3  we did have an opportunity to find a stalking horse bidder and

4  enter into a stalking horse purchase agreement, then we would

5  grant these bid protections.

6  THE COURT:  I don't permit those either.  I may have

7  on one occasion if I've missed it, but no, I don't do that.

8  What we say is come back to me.  You can do it on shorten

9  notice when you have the stalking horse bid, and we'll take a

10  look at it at that point in time.  I don't give prospective

11  you-can-offer-three-percent, four-percent, whatever because I

12  don't think that meets a standard.  I think we do have to find

13  that it meets a standard.

14  MS. WILLIS:  Yeah.

15  THE COURT:  And prospective approval doesn't do it.

16  And I guess I also just really not understanding,

17  given the situation we're in, where we went through an entire

18  process and no one else came forward with an actionable bid and

19  this is the only bid that came forward during the process.  Why

20  the protections are needed, against whom, and when this

21  prospective purchaser boxed other parties out for a period of

22  time.

23  I think they did a lot of things that you have to take

24  a look at in a package.  And they still have a right of first

25  refusal.  If somebody came in tomorrow and said, here's thirty-

1 million dollars, they'd still have a right of first refusal on

2 that. So that entire package is -- I don't think it's -- when

3 I look at that package, I can't see how it is value enhancing.

4 You want me to get to the end and say, well, because he'll walk

5 away, or this is the only offer we have, that's sufficient.

6 But I don't think that's the standard.

7 How does this encourage other people to come in and

8 bid? How does this encourage drafting an agreement that can

9 serve as the floor that other people glom onto? It's not doing

10 any of that. In fact, it's doing the opposite of that. He's

11 locking things in so that only he, this purchaser, can be the

12 prospective purchaser, certainly for a period of time, and that

13 purchaser is not committed yet. It's difficult to approve

14 something in this context.

15 MS. WILLIS: Your Honor, I agree that they obviously

16 have the exclusivity provision that's only for another ten

17 days. And in the event that we were able to not enter into the

18 SPA, then they would not have those bid protections. So there

19 wouldn't be a floor bid because there would be no purchase

20 agreement. And you're right. They wouldn't have bid

21 protections to protect them against anyone else in that

22 situation. Once we (indiscernible) the SPA then --

23 THE COURT: Right, but then -- like, how I'm reading

24 this --

25 (Pause)

1 　　　　MS. WILLIS:  Your Honor, if I may, my colleague has

2 reminded me that the right of first refusal also expires on the

3 18th, so that expires in ten days as well.

4 　　　　THE COURT:  For anything that comes -- it doesn't

5 apply to anything that comes in afterwards.  It doesn't expire

6 for anything that the debtor has gotten in the exclusivity

7 period.  That's how I read it.

8 　　　　If something came in tomorrow, that right of first

9 refusal applies to it.  It doesn't expire.  If something comes

10 in three weeks from now, it doesn't apply to it, as I read the

11 contract.

12 　　　　MS. WILLIS:  That's correct.

13 　　　　THE COURT:  So it's not that it goes away.  There may

14 or may not be anything for it to attach to.

15 　　　　MS. WILLIS:  Right.

16 　　　　THE COURT:  But that's how I read it.

17 　　　　MS. WILLIS:  And ultimately, Your Honor, if the

18 commitment letter isn't approved, or at least the binding

19 provisions of the commitment letter aren't approved today, then

20 the debtor faces real risk here, and we would lose very likely

21 the best actionable proposal that we have.  So it's currently

22 the highest and best.  It's currently the only actionable one

23 we have, or the best actionable proposal we have, for a value

24 of eleven-million dollars.  And that is value maximizing to the

25 estate.

1        THE COURT:  Only if there's a commitment.  If he's

2   committed, I'd say it may be, may be, value maximizing.  Okay.

3   If we were past the exclusivity period, if it was committed,

4   even in those circumstances, I still wonder why it's necessary

5   because this has been fully shopped.

6        So if it's been fully shopped, guess there's two ways

7   to argue that.  One is the way that that you have argued it,

8   which, from a logic perspective, I guess makes sense, though

9   from a bankruptcy and a standard section may not, but --

10  perspective.  But you say, okay, well, nobody else is going to

11  come forward, so what's the likelihood that we're actually ever

12  going to have to pay this out because we've already fully

13  marketed it.

14        MS. WILLIS:  That's correct.

15        THE COURT:  The flip side of that is it's already been

16  fully marketed, so why is this necessary?  So it's a flip side.

17  Okay.

18        Without the commitment, I don't know that this

19  purchaser is serious.  And I will take at face value what is in

20  the papers and the testimony, certainly, that I heard that this

21  purchaser has been doing diligence and feels that it needs

22  diligence, notwithstanding that it was an insider.  So I don't

23  know how long ago that was.  And maybe things have changed.

24  And they need an update.  And I'll take all of that at face

25  value that this insider needs to due diligence.

1       MS. WILLIS:  Your Honor, can I just make a point on

2  the insider point?  So Mr. Beck is a former insider of the

3  debtors.  That is true.  But Mr. Beck is working with Freedom 3

4  Capital.  And Freedom 3 Capital is not an insider of the

5  debtors.  They are a completely separate private equity shop

6  they still have investors that they have to answer to, and

7  that's where diligence is necessary.

8       In addition, for this specific asset, because it's in

9  some ways cyclical, there's new information that's sort of

10 coming to bear every month.  Mr. Beck resigned in the early

11 part of summer.  I believe it was mid-June.  We're now in

12 October.

13      THE COURT:  Of this year?

14      MS. WILLIS:  Of this year.

15      THE COURT:  Okay.

16      MS. WILLIS:  Yeah.  We're now in October.  And so the

17 ability of this company of TTC and what they've been able to do

18 financially is completely different than where it was in June.

19 That's sort of why we're here where we are, versus in January,

20 when we were talking about TTC was a very different -- a very

21 different discussion so --

22      THE COURT:  Well, if it's different, then maybe they

23 need to run the marketing process again and not be -- and not

24 be confined by an exclusivity period and a no shop and a right

25 of first refusal.  I'm not comfortable with this in this state.

1 There is no commitment from this purchaser. That's actually

2 the biggest factor, I think, for me. And then I think the

3 package is too rich when you look at everything in the package,

4 which is not just the breakup fee and the expense reimbursement

5      I recognize that in smaller deals, and I would

6 consider this, on that relative scale, a smaller deal,

7 sometimes the expense reimbursement, at least, could be

8 disproportional to what we normally look at because the

9 expenses are what they are. I recognize that.

10      MS. WILLIS: Correct, Your Honor.

11      THE COURT: The breakup fee, I think, doesn't need to

12 be disproportional. I understand a larger expense side than

13 one would hope for.

14      But I think you have to look at the entire package of

15 what this prospective purchaser wanted and in the context of a

16 lack of commitment. And I just can't approve it in this form.

17      Now, they want to continue their diligence, come back

18 with a commitment. Consider what I have said here. There

19 might be, might be, a package that might be appropriate. I

20 still might have an objection from the U.S. Trustee on meeting

21 the standard, but we'll see.

22      I've also had circumstances in which I did not approve

23 the bid protections, and by that, I mean the breakup fee and

24 the expense reimbursement solely, not the entire package we

25 have here. But I've had situations where I didn't think the

1  debtor made its case at this level. But I said, if you want to

2  come back to me after. There's been the debtor has closed a

3  transaction with somebody else and convinced me that you meet

4  the standard now, I would consider that. And at least one

5  instance, I have granted bid protections after the fact when

6  they were warranted when they closed with someone else.

7           So there are opportunities for this purchaser, to the

8  extent it makes an appropriate contribution to the case under

9  the relevant Third Circuit standards, to come back. But in

10 this uncommitted scenario, I don't think it's appropriate. I'm

11 not going to approve it at this time.

12          MS. WILLIS: Thank you, Your Honor. I did take part

13 of what you said to mean that we could come back once the SPA

14 was signed?

15          THE COURT: If you have a commitment, that makes a

16 difference, and it may make a difference to the Office of the

17 United States Trustee. I would also consider the other

18 comments in terms of what that package is. And if, at that

19 point, the exclusivity period has ended. And I don't know what

20 I do about the right of first refusal. Maybe it will be moot

21 because maybe there wouldn't have been anything in the

22 meantime. Then we can consider the protections in that

23 context. At least we'd be in a more typical context.

24          MS. WILLIS: Understood, Your Honor. Thank you very

25 much.

1          THE COURT:  Thank you.

2          Was that our only matter for today?

3          MR. MARTIN:  That is the agenda, Your Honor.  Just as

4    a matter of housekeeping, do you want to have anything from us

5    to mark that denial and order, or do you want to just mark it

6    on the docket as denied?  Happy to do whatever the Court

7    prefers.  I know you --

8          THE COURT:  Why don't you do an order that says denied

9    without prejudice so that if, in fact, the purchaser wants to

10   come back, either after a commitment or in the event that there

11   is an alternative transaction, that that is not foreclosed.  So

12   a without prejudice.

13         MR. MARTIN:  We'll draft a quick order.  Should be

14   easy.  We'll run it by Mr. Schepacarter and the committee and

15   submit it under certification of counsel to ensure that the

16   records are accurate that this was disposed of.

17         THE COURT:  Let me ask this one question I probably

18   should have asked.  I know the testimony was that the debtor

19   wouldn't expect the transaction to close within the next two

20   weeks or whatever.  Is there any sense of when, if, in fact, an

21   actual agreement is signed, it could close?

22         MR. RILEY:  Yeah.  I think the answer to that is we

23   don't have a sense because we have regulatory approvals --

24         THE COURT:  Regulatory approval?

25         MR. RILEY:  -- that would do the end of November at

1  the earliest.

2          MR. MARTIN:  You may not have heard Mr. Riley.  He

3  says there are regulatory issues that even at the earliest that

4  would not be before the end of November.  Obviously, we have to

5  enter into an SPA with buyer and then submit those.  So that, I

6  believe, is --

7          THE COURT:  I was going to say that requires a

8  committed agreement, right?

9          MR. MARTIN:  Yeah.

10         THE COURT:  Okay.

11         MR. MARTIN:  So I don't know if there's a target end

12  date, but it doesn't look like before the end of November is

13  today's answer to that question, Your Honor.

14         THE COURT:  Okay.  I appreciate that.  Thank you.

15  Okay.  We're adjourned.

16         IN UNISON:  Thank you, Your Honor.

17      (Whereupon these proceedings were concluded at 2:58 PM)

18

19

20

21

22

23

24

25

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Michael Krakovsky | Mr. Schepacarter | 9 |
| Michael Krakovsky | Ms. Willis | 16 |

E X H I B I T S

| DEBTORS'S | DESCRIPTION | PAGE |
|---|---|---|
| -- | Declaration of Mr. Krakovsky | 7 |

RULINGS

| | Page | Line |
|---|---|---|
| Debtors' bid procedures motion is denied without prejudice | 36 | 9 |

C E R T I F I C A T I O N

I, River Wolfe, certify that the foregoing transcript is a true and accurate record of the proceedings.

October 10, 2024

_____     _____

RIVER WOLFE (CDLT-265)                 DATE

TTA-Certified Digital Legal Transcriber CDLT-265

eScribers, LLC

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020

(602) 623-0885

operations@escribers.net

## A

**ability (1)**
34:17
**able (3)**
27:2;31:17;34:17
**acceptance (1)**
7:4
**access (1)**
12:3
**accessed (1)**
11:18
**accessing (1)**
11:19
**accommodating (1)**
6:18
**accurate (1)**
37:16
**actionable (6)**
8:2;29:7;30:18;
32:21,22,23
**actual (3)**
10:11;11:16;37:21
**Actually (8)**
8:20;13:8;14:6;
19:14;24:20;26:19;
33:11;35:1
**ad (1)**
8:5
**add (1)**
28:14
**addition (2)**
21:19;34:8
**additional (3)**
22:19;26:25;27:6
**additive (1)**
22:23
**adjourned (1)**
38:15
**admin (1)**
21:13
**admitted (1)**
7:12
**advisors (1)**
10:23
**affiliates (1)**
6:16
**afternoon (4)**
6:5,6,13;9:17
**afterwards (1)**
32:5
**again (4)**
15:24;29:19,22;
34:23
**against (2)**
30:20;31:21
**agenda (3)**
6:10,17;37:3
**ago (2)**
20:10;33:23
**agree (2)**
26:7;31:15

**agreement (7)**
21:4;27:3;30:4;
31:8,20;37:21;38:8
**AKIN (1)**
4:15
**allowed (1)**
18:21
**alternative (1)**
37:11
**although (1)**
26:13
**always (2)**
25:4;26:2
**amended (1)**
17:25
**analysis (1)**
10:22
**ANGELO (1)**
4:24
**ANNA (1)**
4:17
**anticipated (1)**
25:11
**anymore (1)**
20:7
**applies (1)**
32:9
**apply (2)**
32:5,10
**appreciate (2)**
24:4;38:14
**approach (1)**
17:1
**appropriate (4)**
8:10;35:19;36:8,10
**approval (6)**
7:17;8:8;10:15;
15:22;30:15;37:24
**approvals (1)**
37:23
**approve (8)**
21:24;22:1;24:7;
25:20;31:13;35:16,
22;36:11
**approved (5)**
8:12;15:3;29:22;
32:18,19
**approving (3)**
6:21;13:1;25:22
**argue (1)**
33:7
**argued (2)**
19:4;33:7
**ARIK (1)**
4:18
**around (1)**
19:1
**aspects (1)**
21:13
**asset (3)**
20:24;28:12;34:8
**assets (4)**
18:22;28:11,18,19

**associated (1)**
15:2
**attach (1)**
32:14
**attached (1)**
16:25
**Attorneys (5)**
4:3,10,16,23;5:3
**atypical (6)**
15:7,14,15,16;25:4;
27:23
**auction (3)**
14:9;28:23;29:1
**authority (1)**
8:9
**authorizing (3)**
6:21,23,25
**available (2)**
8:2,13
**aware (2)**
10:23;12:23
**away (8)**
20:10,13,19,21,23;
21:5;31:5;32:13

## B

**back (8)**
20:7;25:12;30:8;
35:17;36:2,9,13;
37:10
**backing (1)**
28:10
**backing-out- (1)**
27:24
**backs (1)**
26:16
**bank (1)**
20:7
**bankruptcy (6)**
17:25;23:2;25:8;
26:1,1,1;33:9
**barbershop (1)**
23:21
**based (2)**
9:19;15:17
**basically (2)**
17:18;18:21
**bear (1)**
34:10
**Beck (4)**
18:1;34:2,3,10
**Beck's (2)**
18:4;26:14
**behalf (2)**
6:14;17:12
**belabor (1)**
18:17
**belt (2)**
20:14,15
**best (11)**
8:2;13:5,5,10,10,15,
21;29:7;32:21,22,23

**better (3)**
17:17;27:19,20
**beyond (1)**
11:19
**bid (57)**
7:16;8:11;10:15;
12:13,18,21,23;13:2,
8,9,12,12;14:3,14,23;
15:3,4,8,9,11,22,25;
16:16;17:23,24;18:5,
19,19,24;20:20;
21:11;22:1,12;24:7,
10,15,19;26:9,13;
27:19;28:9;29:4,5,18,
18,19,23;30:5,9,18,
19;31:8,18,19,20;
35:23;36:5
**bidder (5)**
6:24;7:1;12:20;
15:10;30:3
**bidding (4)**
6:21;7:6;14:9;15:8
**bids (6)**
13:16,17,18;29:5,6,
13
**big (1)**
10:7
**biggest (1)**
35:2
**binding (3)**
7:18;8:10;32:18
**bit (2)**
24:18;30:2
**bits (1)**
12:16
**bordering (1)**
20:18
**both (1)**
20:16
**bound (2)**
7:18;8:9
**boxed (1)**
30:21
**breakup (14)**
10:9;18:20;22:17,
23;27:7,9,11,12,20;
28:6,8;35:4,11,23
**bring (1)**
17:1
**Brown's (1)**
6:7
**buy (1)**
21:9
**buyer (8)**
12:22,22;14:2,12;
15:1,20,21;38:5
**buyers (3)**
11:14;15:9;16:5

## C

**call (2)**
10:16;11:9

**came (5)**
25:9;30:18,19,25;
32:8
**can (16)**
8:14;9:4;10:19;
12:17;16:15;18:11,
21;19:15;20:24;24:2;
28:19;30:8;31:8,11;
34:1;36:22
**Capital (2)**
34:4,4
**CAROLYN (1)**
5:9
**case (9)**
10:8;21:11;25:4,8,
13,20,21;36:1,8
**century (2)**
19:20,24
**Certain (8)**
4:16;6:15;10:13,20;
17:4,21;25:7;26:22
**certainly (4)**
25:11;28:18;31:12;
33:20
**certification (1)**
37:15
**CHAD (1)**
5:8
**changed (1)**
33:23
**Circuit (1)**
36:9
**circumstance (2)**
27:8,10
**circumstances (6)**
12:14,19,25;13:14;
33:4;35:22
**clarify (1)**
26:24
**clearly (2)**
10:21;15:21
**CLERK (5)**
6:2;9:6,8,10,14
**close (4)**
16:19;25:17;37:19,
21
**closed (9)**
14:24;15:4,6,12;
16:3;20:2,9;36:2,6
**closing (2)**
10:15;15:20
**COLE (1)**
4:9
**colleague (1)**
32:1
**combination (1)**
23:13
**comfortable (1)**
34:25
**coming (4)**
7:10;14:13;16:2;
34:10
**comments (1)**

36:18
**commitment (29)**
7:18,19,23;8:1,3,9;
14:1,4,18;16:22,24;
17:3,13;25:23;26:17,
21,23;29:20,23,25;
32:18,19;33:1,18;
35:1,16,18;36:15;
37:10
**committed (8)**
22:2;24:8,9,20;
31:13;33:2,3;38:8
**Committee (3)**
4:3;8:5;37:14
**communicated (1)**
12:22
**company (3)**
19:10;22:10;34:17
**complete (2)**
21:25;24:6
**completely (2)**
34:5,18
**concede (1)**
8:14
**concerned (1)**
21:18
**concerns (2)**
23:9,10
**concluded (1)**
38:17
**conclusion (1)**
12:11
**confident (1)**
13:10
**confidential (1)**
19:17
**confined (1)**
34:24
**confused (1)**
6:7
**connection (2)**
6:22;10:22
**consider (6)**
21:23;35:6,18;36:4,
17,22
**consideration (1)**
23:10
**considerations' (1)**
17:24
**Considering (1)**
13:8
**consummate (5)**
12:15;13:24;15:1;
27:2,4
**contacting (1)**
7:25
**contemplated (1)**
7:20
**contents (2)**
11:15,20
**context (6)**
13:9;22:2;31:14;
35:15;36:23,23

**continue (1)**
35:17
**contract (1)**
32:11
**contribution (1)**
36:8
**controls (1)**
19:18
**convinced (1)**
36:3
**copy (3)**
9:20;16:21;17:1
**CORAZZA (1)**
5:8
**cost (1)**
26:3
**costs (1)**
26:4
**counsel (5)**
9:23;10:20;11:6;
19:22;37:15
**couple (5)**
8:20;9:19,24;10:7;
28:25
**course (1)**
8:10
**COURT (73)**
6:3,6,11,18;7:9,12,
17;8:15,22,25;9:3,7;
10:1;16:10;17:2;18:1,
10,13;19:16,21;20:3,
11;21:15,18,23;22:5;
23:2,12,17,20,22,25;
24:9,12,18,21;25:19,
24;26:11,19,21;27:7,
11,14,24;28:13,22;
29:3,9,12,15,22;30:6,
15;31:23;32:4,13,16;
33:1,15;34:13,15,22;
35:11;36:15;37:1,6,8,
17,24;38:7,10,14
**courtroom (1)**
7:7
**covered (1)**
11:1
**COVID (4)**
23:23,25;24:1,3
**Creditors (1)**
4:3
CROSS-EXAMINATION (1)
9:15
**cross-examine (1)**
8:19
**crucial (1)**
21:12
**cumbersome (1)**
12:2
**currently (3)**
24:16;32:21,22
**customary (1)**
18:25
**cyclical (1)**
34:9

**D**

**DASARO (1)**
4:4
**data (9)**
11:15,16,18,21;
12:2;19:7,13,13,14
**date (4)**
7:14;10:14;25:19;
38:12
**DAVID (2)**
5:10,13
**days (5)**
25:1,15,18;31:17;
32:3
**deadline (2)**
29:4,5
**deal (3)**
22:2;28:23;35:6
**dealing (1)**
12:2
**deals (1)**
35:5
**debtor (15)**
6:16,20;17:13;21:5,
24;22:20;26:2,16;
28:22;30:2;32:6,20;
36:1,2;37:18
**debtors (9)**
6:15;7:17,24;14:20;
17:12,17;22:11;34:3,
5
**Debtors' (1)**
7:14
**debtor's (2)**
7:20;8:4
**declaration (7)**
7:4,10,13;8:21;
9:20;10:4;12:12
**definitely (1)**
24:3
**Delaware (1)**
20:5
**denial (1)**
37:5
**denied (2)**
37:6,8
**DEPARTMENT (2)**
5:2;9:18
**designate (1)**
6:24
**detail (1)**
18:24
**detailed (1)**
28:21
**difference (2)**
36:16,16
**different (7)**
17:18;19:13;24:1;
34:18,20,21,22
**difficult (1)**
31:13

**diligence (15)**
10:17;11:9;21:25;
24:6,17;26:6,8;28:3,
24;29:12;33:21,22,
25;34:7;35:17
**discretion (1)**
18:3
**discussed (1)**
22:22
**discussion (1)**
34:21
**discussions (1)**
18:2
**disincentive (2)**
22:15,16
**disposed (1)**
37:16
**disproportional (2)**
35:8,12
**DLA (1)**
6:14
**docket (3)**
7:2,6;37:6
**documented (1)**
26:15
**dollars (5)**
10:9,10,11;31:1;
32:24
**done (3)**
22:3;26:9;28:24
**down (2)**
14:4;18:11
**download (4)**
11:14;12:2,3;19:14
**downloading (1)**
11:19
**downloads (1)**
11:24
**draft (1)**
37:13
**drafting (1)**
31:8
**due (5)**
10:17;11:9;21:25;
28:3;33:25
**during (6)**
14:21;16:3;22:10;
23:25;24:1;30:19

**E**

**earlier (1)**
19:22
**earliest (2)**
38:1,3
**early (1)**
34:10
**easy (1)**
37:14
**economic (1)**
8:4
**either (4)**
19:5;22:6;30:6;

37:10
**eleven (1)**
19:1
**eleven-million (1)**
32:24
**else (6)**
28:13;30:18;31:21;
33:10;36:3,6
**emphasize (1)**
24:25
**encourage (3)**
14:8;31:7,8
**end (6)**
19:2;31:4;37:25;
38:4,11,12
**ended (1)**
36:19
**ends (1)**
23:6
**engage (1)**
17:12
**engaged (1)**
7:24
**engagement (1)**
11:18
**engaging (1)**
14:21
**enhancing (1)**
31:3
**ensure (1)**
37:15
**entails (1)**
14:17
**enter (6)**
7:17;8:9;26:9;30:4;
31:17;38:5
**entering (1)**
27:2,3
**entire (6)**
22:21,25;30:17;
31:2;35:14,24
**entitled (1)**
18:1
**entry (4)**
6:21;8:12;26:8;
29:21
**equity (3)**
11:5,8;34:5
**ERICA (1)**
4:19
**ESQ (10)**
4:4,5,6,11,12,17,18,
19,24;5:4
**essential (3)**
12:20;14:5;15:23
**essentially (2)**
24:12;25:9
**estate (10)**
12:16;13:1,11;
15:19,21;18:22;
20:23;21:9;25:10;
32:25
**even (10)**

14:3;16:3;20:5,12,
23;21:1,12;24:11;
33:4;38:3
**event (2)**
31:17;37:10
**eventually (1)**
20:13
**evidence (3)**
7:7,10,14
**exactly (2)**
7:20;22:22
**EXAMINATION (1)**
16:13
**example (2)**
27:13,18
**exception (1)**
24:3
**exclusivity (23)**
14:12,16,17,19;
16:6,15,17;17:9;18:5;
20:13;22:5,10,15;
24:23;25:1,1,13,15;
31:16;32:6;33:3;
34:24;36:19
**exclusivity' (1)**
17:23
**executed (1)**
7:25
**execution (1)**
7:22
**exercise (3)**
27:13,14,17
**exhaustive (1)**
14:11
**Exhibit (2)**
7:14;16:25
**expect (1)**
37:19
**expecting (1)**
29:1
**expense (18)**
12:25;18:20;20:22;
21:9,10,13;22:17,19;
26:25;27:1,5,6,21;
28:5;35:4,7,12,24
**expenses (14)**
10:10,11,11,14,17,
21,25;11:1;14:6;15:2;
18:21;26:15;27:5;
35:9
**expire (2)**
32:5,9
**expires (5)**
16:16,17;17:9;32:2,
3
**explain (3)**
10:19;14:17;17:8
**extent (2)**
22:11;36:8

### F

**F3 (2)**

18:1,4
**F3C's (1)**
26:14
**face (2)**
33:19,24
**faces (1)**
32:20
**facility (3)**
10:24;12:5,10
**fact (7)**
13:16;19:11;23:4;
31:10;36:5;37:9,20
**factor (1)**
35:2
**fair (3)**
12:13,18;14:8
**fair-market (1)**
14:9
**Fair-value (1)**
14:10
**familiar (1)**
17:6
**far (2)**
15:18;20:7
**fascinated (1)**
19:16
**feature (1)**
11:25
**fee (14)**
10:9;18:20;22:17,
23;27:7,9,11,12,20;
28:6,8;35:4,11,23
**feel (1)**
25:3
**feels (1)**
33:21
**FELD (1)**
4:15
**few (1)**
10:24
**fiduciary (9)**
8:11;17:14,16;21:6;
26:2,4;27:13,15,17
**fifteen (1)**
20:8
**file (1)**
15:8
**filed (7)**
7:2,6;23:15;24:18;
25:6,7,12
**filing (2)**
24:14,19
**financial (1)**
10:23
**financially (1)**
34:18
**find (3)**
26:21;30:3,12
**fine (3)**
9:2;20:15,15
**firm (2)**
11:5,8
**first (16)**

8:18;17:20;21:24;
22:9,13,14,15;24:6,
24;25:16;30:24;31:1;
32:2,8;34:25;36:20
**flip (2)**
33:15,16
**floor (2)**
31:9,19
**following (1)**
8:12
**foreclosed (1)**
37:11
**forget (1)**
23:16
**form (1)**
35:16
**former (2)**
19:3;34:2
**forth (1)**
17:22
**forward (12)**
14:6;18:7;19:24;
21:10;22:11,20;
25:22;28:19;29:24;
30:18,19;33:11
**four-percent (1)**
30:11
**four-week (3)**
14:19;16:6,17
**FOX (1)**
5:9
**frame (2)**
14:21;16:2
**framework (1)**
13:11
**frankly (2)**
23:15;27:21
**Freedom (2)**
34:3,4
**Friday (1)**
16:18
**front (4)**
9:21;14:18;23:8,13
**full (3)**
9:10;11:15,19
**fully (4)**
33:5,6,12,16
**fund (2)**
26:5;28:3
**funny (1)**
20:1
**further (2)**
12:12;16:8

### G

**gave (1)**
22:12
**gets (1)**
22:9
**getting-something- (1)**
27:25
**given (1)**

30:17
**giving (1)**
23:5
**glom (1)**
31:9
**goes (1)**
32:13
**Good (4)**
6:4,4,6,13
**goods (1)**
21:10
**GOODWIN (1)**
4:2
**grant (2)**
12:21;30:5
**granted (3)**
15:25;18:6;36:5
**granting (3)**
6:24;7:1;13:12
**great (1)**
18:24
**group (1)**
8:5
**guess (7)**
19:15;20:17;26:16;
28:23;30:16;33:6,8
**guessing (1)**
22:7
**GUM (1)**
4:15

### H

**hair (2)**
23:19,20
**half-a-million (2)**
10:9,10
**hand (1)**
9:8
**handling (1)**
6:9
**happen (3)**
9:20;25:3,8
**happened (1)**
25:14
**happening (2)**
19:2;26:6
**happens (2)**
17:8;25:25
**Happy (1)**
37:6
**hard (1)**
11:14
**HAUER (1)**
4:15
**Healthcare (2)**
6:23;7:1
**hear (1)**
7:12
**heard (4)**
8:16;19:18;33:20;
38:2
**hearsay (1)**

20:18
**heavily (1)**
13:25
**hereby (1)**
7:13
**here's (2)**
28:23;30:25
**Hi (1)**
16:15
**higher (7)**
14:3,14;17:17;
22:12,18;27:19,20
**highest (3)**
13:10,21;32:22
**hoc (1)**
8:5
**holders (1)**
8:5
**Holding (4)**
6:15,20,22,25
**Holdings (1)**
25:12
**Honor (48)**
6:4,13,17,19;7:11,
15,16,19;8:13;9:2,25;
16:8,12,24;18:9,15,
17;21:14,17;23:7,8,
14;24:5,10,19,22;
25:2,3,6,17;26:7,17,
24;27:16;28:4,15,25;
30:1;31:15;32:1,17;
34:1;35:10;36:12,24;
37:3;38:13,16
**hope (2)**
28:9;35:13
**horse (6)**
6:24;15:8,10;30:3,
4,9
**housekeeping (1)**
37:4
**HOWARD (1)**
4:6

### I

**identification (1)**
7:22
**impact (1)**
16:1
**implement (1)**
25:10
**impression (1)**
10:13
**Inc (3)**
6:15,20,23
**incentive (1)**
19:6
**including (1)**
8:5
**inclusive (1)**
27:20
**Inc's (2)**
6:23,25

**incur (1)**
15:2
**incurred (3)**
10:12,14,17
**incurring (1)**
14:6
**indicated (3)**
14:5;15:21;19:22
**indicative (1)**
11:17
**indiscernible (5)**
8:24;11:4,24;16:9;
31:22
**induce (2)**
12:14;13:23
**information (2)**
19:17;34:9
**initially (1)**
14:3
**inside (2)**
19:7,8
**insider (8)**
19:3,4;23:2;33:22,
25;34:2,2,4
**insiders (2)**
19:5,8
**instance (1)**
36:5
**interest (3)**
6:23,25;25:12
**Interested (2)**
4:10;7:8
**interesting (1)**
22:8
**interests (2)**
7:21;8:3
**into (19)**
7:7,10,13,17;8:9,
12;18:23;23:10;
24:11;26:8,9,10;27:3,
3;29:20,21;30:4;
31:17;38:5
**introduce (1)**
6:8
**inventory (1)**
21:9
**investors (1)**
34:6
**involved (3)**
7:25;10:5,21
**issues (1)**
38:3
**items (1)**
21:21

**J**

**JAMES (1)**
4:5
**Jamila (1)**
6:14
**Jamilla (1)**
21:17

**January (1)**
34:19
**JASON (1)**
4:24
**JONATHAN (1)**
5:11
**June (1)**
34:18
**JUSTICE (2)**
5:2;9:18
**Justine (1)**
6:14

**K**

**Keep (1)**
21:10
**KENNEDY (1)**
5:12
**key (1)**
8:4
**kind (3)**
10:17;20:9;26:2
**KORDAS (1)**
4:17
**Krakovksy (1)**
9:17
**Krakovsky (10)**
7:5,7,13;8:19;9:3,5,
12;16:15;18:12;19:11
**K-R-A-K-O-V-S-K-Y (1)**
9:13

**L**

**labeled (3)**
17:23,23,24
**lack (1)**
35:16
**larger (1)**
35:12
**last (6)**
9:11,12;15:12,17;
20:1;22:6
**late (1)**
22:7
**LATHROP (1)**
4:5
**least (4)**
32:18;35:7;36:4,23
**legal (2)**
15:2;26:15
**leisure (1)**
19:15
**Less (2)**
11:12;12:7
**lets (1)**
19:16
**letter (20)**
7:18,19,23;8:1,4,9;
14:1,4,18;16:22,24;
17:3,13;21:4;25:23;
26:18,22,23;32:18,19

**level (1)**
36:1
**lights (1)**
21:10
**likelihood (5)**
13:8;14:13;15:25;
16:1;33:11
**likely (2)**
16:19;32:20
**liken (1)**
30:2
**little (3)**
12:16;24:18;30:2
**LLP (4)**
4:2,15,22;6:14
**locally (1)**
12:3
**locking (1)**
31:11
**lockup (1)**
26:2
**logic (1)**
33:8
**LOIs (1)**
29:6
**Long (2)**
20:3;33:23
**look (11)**
11:25;12:24;17:10;
19:15;30:10,24;31:3;
35:3,8,14;38:12
**looked (1)**
21:20
**looks (1)**
26:3
**lose (1)**
32:20
**lot (4)**
10:14;11:14;21:21;
30:23
**love (1)**
27:21
**low (2)**
14:13;15:25
**lower (2)**
14:15;15:25

**M**

**makes (3)**
33:8;36:8,15
**many (3)**
11:17;15:7;29:13
**March (1)**
23:15
**mark (2)**
37:5,5
**marketed (6)**
20:24,24;28:19,20;
33:13,16
**marketing (5)**
7:24;14:10;20:25;
28:21;34:23

**MARTIN (8)**
6:4,7,12;37:3,13;
38:2,9,11
**matches (1)**
10:11
**material (1)**
21:20
**matter (4)**
6:9,19;37:2,4
**maximize (5)**
12:15;15:18,24;
25:10;28:11
**maximizes (1)**
17:19
**maximizing (4)**
8:3;15:20;32:24;
33:2
**may (24)**
9:14,24,25;10:1,23;
11:23;15:8;16:25;
17:2;19:24;20:21;
21:1,1;23:25;27:24;
30:6;32:1,13,14;33:2,
2,9;36:16;38:2
**maybe (6)**
20:8;25:25;33:23;
34:22;36:20,21
**mean (12)**
12:19;13:6,25;
17:16;20:9;24:2;26:4;
27:16,21;28:9;35:23;
36:13
**meaningful (1)**
12:1
**meantime (1)**
36:22
**meet (1)**
36:3
**meeting (1)**
35:20
**meets (3)**
21:7;30:12,13
**memory (1)**
20:7
**Michael (2)**
7:5;9:12
**mid-June (1)**
34:11
**might (7)**
25:6,14;29:2;35:19,
19,19,20
**million (1)**
31:1
**misreading (1)**
26:4
**missed (1)**
30:7
**mixed (1)**
6:8
**modified (1)**
17:25
**MOHAMED (1)**
5:10

**money (1)**
28:7
**monitor (1)**
11:16
**month (2)**
23:16;34:10
**moot (1)**
36:20
**more (8)**
11:12;12:7,9,9,24;
25:1;29:9;36:23
**morning (2)**
6:4,19
**most (2)**
12:1;29:7
**motion (5)**
6:20;7:3,6;16:25;
24:13
**movant (1)**
18:19
**move (3)**
18:6;25:22;28:18
**moving (1)**
14:6
**much (3)**
11:12,21;36:25

**N**

**NA (1)**
4:23
**naked (3)**
24:19;25:7;30:2
**name (3)**
9:10,11,12
**name's (1)**
9:17
**nature (1)**
25:20
**NDAs (1)**
7:25
**necessarily (3)**
19:4,6;21:13
**necessary (11)**
12:14;13:23,24;
18:22;20:22;21:8;
23:4;28:17;33:4,16;
34:7
**need (10)**
14:23;16:9;17:10;
20:14,15,16;23:3;
33:24;34:23;35:11
**needed (1)**
30:20
**needs (2)**
33:21,25
**negotiated (3)**
13:25;14:4;23:11
**negotiating (2)**
14:7;15:2
**negotiations (1)**
14:1
**net (3)**

13:1,6,6
**new (1)**
34:9
**NEWMAN (1)**
4:11
**Next (2)**
16:18;37:19
**nobody (1)**
33:10
**none (1)**
7:12
**normal (1)**
22:18
**normally (1)**
35:8
**no-shop (1)**
24:23
**note (1)**
21:25
**Noteholders (1)**
4:16
**notes (1)**
8:6
**notice (2)**
6:19;30:9
**notwithstanding (1)**
33:22
**November (3)**
37:25;38:4,12
**number (3)**
7:2,6;22:5

**O**

**objection (3)**
7:9;18:17;35:20
**objections (1)**
8:17
**objector (1)**
8:7
**O'Brien (2)**
21:8,14
**obviously (2)**
31:15;38:4
**occasion (1)**
30:7
**October (6)**
14:20;16:18,19;
25:13;34:12,16
**offer (3)**
13:21;17:17;31:5
**offered (1)**
10:8
**Office (3)**
5:3;9:18;36:16
**Official (1)**
4:3
**often (1)**
25:3
**old (1)**
20:14
**once (3)**
26:10;31:22;36:13

**one (15)**
12:20;13:20;14:16;
20:2,6,6,8;28:16;30:7,
18;32:22;33:7;35:13;
36:4;37:17
**only (11)**
24:15;25:15;26:10;
29:20;30:19;31:5,11,
16;32:22;33:1;37:2
**onto (1)**
31:9
**open (2)**
14:9;16:4
**opens (1)**
20:13
**operating (1)**
21:9
**opinion (1)**
13:20
**opportunities (1)**
36:7
**opportunity (1)**
30:3
**opposed (3)**
12:2;16:1;27:5
**opposite (1)**
31:10
**option (6)**
13:10,15;21:2,3,4;
23:5
**options (1)**
13:3
**order (4)**
24:5;37:5,8,13
**orders (1)**
6:21
**others (1)**
29:9
**Otherwise (2)**
8:14;25:13
**out (8)**
6:7;13:9;17:14,16;
19:17;21:5,6;23:5;
26:2,4,16;27:13,15,
17;28:10;30:21;33:12
**outcome (1)**
13:5
**out-of-pocket (1)**
11:1
**outs (2)**
8:11;29:12
**outside (1)**
25:25
**over (4)**
6:8,10;13:9;18:24
**overbidder (1)**
16:2

**P**

**package (11)**
23:3,13;30:24;31:2,
3;35:3,3,14,19,24;

36:18
**packages (1)**
23:5
**page (2)**
17:3;26:22
**paid (1)**
13:9
**papers (1)**
33:20
**paragraph (7)**
12:12;17:4,6,10,21,
22,24
**part (7)**
15:17;20:17;22:23;
26:13;27:24;34:11;
36:12
**particulars (1)**
24:2
**parties (7)**
7:25;11:17;12:1,10;
14:21;17:12;30:21
**Party (3)**
4:10;12:9;17:18
**past (1)**
33:3
**paths (1)**
17:18
**PATRICK (1)**
4:12
**Pause (1)**
31:25
**pay (2)**
29:18;33:12
**payment (2)**
8:11;27:14
**PC (1)**
4:9
**people (2)**
31:7,9
**percent (3)**
12:24;18:25;19:1
**period (9)**
14:19;22:10,15;
30:21;31:12;32:7;
33:3;34:24;36:19
**permit (1)**
30:6
**perspective (3)**
23:3;33:8,10
**petition (2)**
25:7,19
**Piper (1)**
6:14
**place (4)**
23:20;24:11;26:10;
29:20
**Please (5)**
6:2,3;9:4,8,10
**plus (3)**
12:25;14:14;15:4
**PM (1)**
38:17
**podium (1)**

8:14
**point (11)**
19:5;24:22;28:7,20;
29:1,16,17;30:10;
34:1,2;36:19
**points (2)**
24:5;28:16
**position (5)**
18:5;25:16,17;
27:22;28:9
**positive (1)**
13:1
**positives (2)**
13:6,7
**possible (1)**
11:25
**post-exclusivity (1)**
17:11
**post-have (1)**
27:2
**potentially (1)**
11:19
**prefers (1)**
37:7
**PREIS (1)**
4:18
**prejudice (2)**
37:9,12
**pre-petition (2)**
25:3,14
**PRESENT (1)**
5:7
**preserve (4)**
15:19;18:22;20:22;
28:17
**preserved (1)**
12:15
**pretty (1)**
18:18
**preview (1)**
24:15
**price (2)**
14:9,14
**prior (1)**
25:18
**private (4)**
11:5,8;29:8;34:5
**probably (3)**
23:17;26:12;37:17
**Problematic (3)**
18:23;19:25;23:2
**procedure (2)**
7:16;18:19
**procedures (8)**
6:22,23;7:6;10:15;
12:21;15:8;20:20;
24:7
**proceed (1)**
12:21
**proceeding (1)**
15:23
**proceedings (1)**
38:17

**process (12)**
7:20,24;8:1;10:5;
14:10,11;15:14;19:2;
28:21;30:18,19;34:23
**PROCTER (1)**
4:2
**professional (1)**
13:20
**prohibits (1)**
14:20
**projections (1)**
12:24
**proposal (3)**
8:2;32:21,23
**proposed (1)**
22:9
**proprietary (1)**
19:17
**prospective (19)**
10:12,16;12:7,22;
14:2;15:1,9,20,21;
16:2;19:12;22:2;1,8;
23:1;30:10,15,21;
31:12;35:15
**prospectively (1)**
29:23
**protect (1)**
31:21
**protections (47)**
8:11;10:8;12:13,18;
13:2,8,12,13;14:3,8,
14,23;15:3,4,8,9,11,
22,25;17:4,21;18:5,
19,20,24;21:21;22:1,
25;23:1,9;24:10,16,
20;26:10,13,22;29:18,
18,19,23;30:5,20;
31:18,21;35:23;36:5,
22
**protections' (1)**
17:24
**prove (1)**
18:19
**provision (7)**
20:2;22:5;25:2,13;
26:11,13;31:16
**provisions (5)**
7:19;8:10;17:22;
24:24;32:19
**purchase (3)**
27:3;30:4;31:19
**purchaser (39)**
7:22;10:12,16;11:4,
13;12:7,8,14;13:23;
19:12,25;20:19,23;
21:1;22:1,8;23:1,4;
24:7,16;25:22,25;
26:5;27:18;28:2,18;
29:19,20,24;30:21;
31:11,12,13;33:19,21;
35:1,15;36:7;37:9
**purchasers (3)**
11:9;12:4;22:20

**pursuit (1)**
26:15

## Q

**qualified (2)**
29:5,13
**quick (1)**
37:13

## R

**raise (1)**
9:8
**raised (1)**
21:19
**RANDLES (1)**
5:11
**rather (1)**
24:19
**read (4)**
17:20;32:7,10,16
**reading (4)**
10:4;26:17,19;
31:23
**ready (2)**
27:1,4
**real (1)**
32:20
**really (10)**
11:17;14:23;21:20;
24:15;25:7,19;26:5,6;
28:2;30:16
**reason (1)**
22:21
**reasonable (4)**
12:13,18;13:13;
26:14
**reasons (1)**
29:14
**recall (1)**
15:14
**receive (2)**
17:17;28:8
**received (2)**
7:13;22:10
**recent (1)**
20:8
**recently (1)**
24:24
**recognize (2)**
35:5,9
**record (2)**
6:14;9:11
**records (1)**
37:16
**recross (1)**
16:9
**redirect (3)**
16:11,13;18:10
**REED (1)**
4:22
**REEVES (1)**

4:19
**reflects (1)**
14:1
**refusal (10)**
22:9,14,16;24:25;
30:25;31:1;32:2,9;
34:25;36:20
**regarding (1)**
18:2
**regulatory (3)**
37:23,24;38:3
**REILLEY (1)**
4:12
**reimburse (1)**
26:14
**reimbursement (13)**
12:25;18:20;22:18,
19;26:25;27:1,5,6,21;
28:5;35:4,7,24
**rejected (1)**
17:25
**related (3)**
6:24;7:1;23:23
**relative (1)**
13:2;35:6
**relevant (1)**
36:9
**relief (2)**
6:24;7:2
**remain (1)**
9:4
**remember (9)**
20:2,6,6,8;22:6;
23:14;24:2;25:6;29:2
**reminded (1)**
32:2
**repeat (1)**
16:15
**represents (1)**
8:2
**request (2)**
6:18;7:4
**requested (2)**
14:3;24:13
**require (1)**
26:8
**requires (2)**
29:8;38:7
**reserve (1)**
16:8
**resigned (1)**
34:10
**respect (6)**
14:22;18:5;19:9,12,
25;22:9
**respond (1)**
28:15
**restaurant (2)**
23:18,18
**resulted (2)**
7:21;8:1
**retained (1)**
10:23

**rich (1)**
35:3
**RICHARD (3)**
5:4;9:17;18:15
**right (31)**
9:8;10:7;11:8;12:4,
11,11;13:4;14:12,23;
15:12,17;16:3,5,7,7;
17:11;22:9,14,15;
24:4,24;30:24;31:1,
20,23;32:2,8,15;
34:24;36:20;38:8
**RILEY (3)**
37:22,25;38:2
**rise (1)**
6:2
**risk (1)**
32:20
**robust (2)**
20:25;28:21
**room (11)**
11:10,15,16,18,22;
12:2;19:7,13,13,14,14
**ROSE (1)**
5:12
**roughly (1)**
10:8
**Rudy's (2)**
23:14,17
**run (3)**
14:11;34:23;37:14

## S

**sail (1)**
24:19
**sale (13)**
6:22,25;7:20;10:5;
15:13;25:8,11,21;
27:2,23;28:10;29:8;
30:2
**sales (1)**
28:8
**satisfies (1)**
21:11
**satisfy (1)**
21:12
**saw (1)**
22:6
**saying (2)**
25:4;28:2
**SBA (1)**
14:7
**scale (1)**
35:6
**scenario (1)**
36:10
**scenarios (1)**
15:7
**SCHEPACARTER (20)**
5:4;8:18,20,23;9:1,
16,17,23;10:2;16:7;
18:14,15,16;19:19,22;

20:4,12;21:19;29:17;
37:14
**Schepacarter's (1)**
28:16
**SCHOTZ (1)**
4:9
**seated (2)**
6:3;9:14
**second (1)**
24:22
**section (1)**
33:9
**Secured (2)**
4:16;8:6
**seeking (2)**
7:17;8:8
**seems (3)**
21:12;28:2,2
**sell (1)**
28:12
**sense (3)**
33:8;37:20,23
**sentence (1)**
17:20
**separate (1)**
34:5
**September (1)**
7:2
**serious (1)**
33:19
**serve (1)**
31:9
**set (1)**
17:22
**several (2)**
12:8;23:22
**shall (2)**
18:1;26:14
**shop (11)**
14:24;15:4,6,12;
16:3,4;20:2,9;22:6;
34:5,24
**shopped (2)**
33:5,6
**shorten (1)**
30:8
**shortened (1)**
6:18
**side (3)**
33:15,16;35:12
**sign (1)**
15:10
**signed (6)**
24:11,16,17;26:10;
36:14;37:21
**significant (1)**
7:24
**signing (1)**
7:24
**similar (6)**
23:9,12,13;24:12,
13;28:7
**single (1)**

6:9
**situation (4)**
27:18;28:4;30:17;
31:22
**situations (1)**
35:25
**smaller (2)**
35:5,6
**SMITH (1)**
4:22
**sole (2)**
8:7;18:2
**solely (1)**
35:24
**somebody (3)**
22:11;30:25;36:3
**somehow (1)**
19:23
**someone (2)**
14:13;36:6
**sometimes (1)**
25:2;35:7
**Sorry (2)**
6:5;9:5
**sort (2)**
34:9,19
**sounds (1)**
20:14
**SPA (13)**
8:12;15:3;24:11,16;
26:8,9,10;27:3;29:21;
31:18,22;36:13;38:5
**speak (2)**
19:3;20:16
**SPEAKER (1)**
7:11
**specific (1)**
34:8
**specifically (1)**
7:18
**spell (1)**
9:10
**spelled (1)**
9:12
**spend (2)**
11:9;12
**spent (5)**
11:16,21;12:4,9;
28:6
**STACY (2)**
4:4,11
**stage (1)**
8:8
**stakeholders (1)**
8:4
**stalking (6)**
6:24;15:7,10;30:3,
4,9
**standard (6)**
30:12,13;31:6;33:9;
35:21;36:4
**standards (1)**
36:9

**standing (1)**
9:4
**start (1)**
23:5
**started (1)**
7:3
**state (2)**
9:10;34:25
**States (4)**
9:18,19;18:16;
36:17
**STEEL (1)**
4:6
**step (1)**
18:11
**still (9)**
13:1;20:21,24;
28:19;30:24;31:1;
33:4;34:6;35:20
**Stout (1)**
13:12
**straightforward (1)**
18:18
**strategy (1)**
25:9
**STRAUSS (1)**
4:15
**struggle (2)**
19:23,23
**subject (1)**
8:11
**submit (2)**
37:15;38:5
**submitted (2)**
24:11;27:19
**subparagraph (1)**
17:23
**substantially (1)**
14:15
**successful (2)**
7:1,21
**sufficient (1)**
31:5
**summary (3)**
21:20;26:20,21
**summer (2)**
25:10;34:11
**supplement (5)**
6:20;7:3,5,16;24:14
**supplemental (1)**
16:25
**support (1)**
7:5
**supported (1)**
8:4
**supportive (1)**
13:12
**supposed (1)**
21:13
**sure (8)**
10:18,25;17:10,22;
22:13,19;23:17;27:22
**surprised (1)**

19:18
**suspenders (2)**
20:14,15
**swear (3)**
8:23;9:1,7
**switch (1)**
17:18
**sworn (1)**
9:9
**systemic (1)**
23:2

**T**

**talk (2)**
14:16;22:12
**talking (3)**
11:3;16:5;34:20
**talks (1)**
29:17
**target (1)**
38:11
**technology (1)**
19:23
**telling (1)**
16:4
**ten (5)**
25:1,15,17;31:16;
32:3
**tentative (1)**
29:9
**term (1)**
13:25
**terminate (1)**
18:1
**terminates (1)**
14:20
**terms (3)**
14:2;21:20;36:18
**test (6)**
18:18;20:21;21:7,8,
8;28:17
**testify (2)**
19:11,12
**testimony (5)**
19:5;20:17;21:2;
33:20;37:18
**Thanks (1)**
10:2
**third (3)**
14:21;17:12;36:9
**third-party (1)**
10:21
**thirty- (1)**
30:25
**though (5)**
8:21;20:12;21:1,12;
33:8
**thought (1)**
20:9
**three (2)**
12:24;32:10
**three-and-a-half (1)**

18:25
**times (2)**
10:24;11:14
**today (4)**
7:7;19:5;32:19;
37:2
**today's (1)**
38:13
**together (2)**
19:2;21:23
**told (2)**
14:25;15:18
**tomorrow (2)**
30:25;32:8
**total (1)**
25:1
**town (1)**
6:7
**transaction (11)**
10:22;12:15;13:24;
14:22;15:1,23;22:10;
26:16;36:3;37:11,19
**transactions (1)**
18:2
**travel (1)**
10:25
**true (1)**
34:3
**truly (1)**
28:10
**Trust (1)**
4:23
**Trustee (7)**
5:3;8:7,14;9:19;
18:16;35:20;36:17
**TTC (9)**
6:23;7:1,21;25:8,
11,12;28:11;34:17,20
**TTC's (1)**
8:3
**turn (1)**
6:10
**twenty (1)**
20:8
**twenty-first (2)**
19:19,24
**two (3)**
22:5;33:6;37:19
**type (1)**
21:10
**typical (2)**
12:23;36:23
**typically (2)**
12:24;25:18

**U**

**ultimately (1)**
32:17
**Um-hum (4)**
19:21;20:11;21:22;
29:3
**uncommitted (2)**

29:19;36:10
**under (14)**
10:13;11:1;12:13,
19,25;13:13;14:12;
16:6,16;18:21;21:14;
25:22;36:8;37:15
**undergoing (1)**
24:17
**understood (3)**
17:8;20:25;36:24
**Unfortunately (1)**
25:3
**UNIDENTIFIED (1)**
7:11
**UNISON (1)**
38:16
**United (4)**
9:18,19;18:16;
36:17
**universe (1)**
22:25
**unless (3)**
15:3;26:4;28:12
**unlikely (1)**
25:16
**Unsecured (1)**
4:3
**unsolicited (1)**
14:13
**up (6)**
6:8;14:7;15:10;
17:1;20:13;26:15
**update (1)**
33:24
**UpHealth (6)**
6:15,20,22,25;
25:12;26:14
**used (1)**
19:13
**usually (1)**
18:25

**V**

**value (17)**
8:3;12:15;15:19,20,
24;17:19;20:23;21:8;
25:10;28:11,17;31:3;
32:23,24;33:2,19,25
**versus (1)**
34:19
**view (1)**
22:14
**visited (1)**
10:24
**visiting (1)**
12:5
**visits (1)**
12:8

**W**

**walk (4)**

20:19,21;23:5;31:4
**walking (1)**
21:4
**walks (1)**
20:23
**wants (4)**
22:1;26:5;28:3;
37:9
**warranted (1)**
36:6
**way (3)**
17:25;28:11;33:7
**ways (2)**
33:6;34:9
**weeks (2)**
32:10;37:20
**weren't (2)**
13:16;25:7
**what's (6)**
12:21;14:3;19:9;
26:6,11;33:11
**when-I-close-another-transaction (1)**
28:1
**Whereupon (1)**
38:17
**willing (1)**
22:20;27:2
**Willis (48)**
6:9,13,14;7:15;
16:12,14,24;18:8;
21:16,17,22;22:4;
23:7,14,19,21,24;
24:4,10,22;26:7,17,
20,24;27:9,12,16;
28:4,15,25;29:4,11,
13,16;30:1,14;31:15;
32:1,12,15,17;33:14;
34:1,14,16;35:10;
36:12,24
**Wilmington (1)**
4:23
**wish (1)**
8:19
**within (2)**
25:17;37:19
**without (4)**
29:23;33:18;37:9,
12
**without-closing-another-deal (1)**
27:25
**Witness (2)**
9:9,12;10:3;20:1
**wonder (1)**
33:4
**work (1)**
15:10
**working (1)**
34:3
**world (1)**
19:18
**worth (1)**
20:19
**wrong (1)**

21:3

## Y

**year (2)**
 34:13,14
**years (3)**
 20:8,8,10
**you-can-offer-three-percent (1)**
 30:11

## Z

**ZOOM (14)**
 4:4,6,11,12,17,18,
 19,24;5:8,9,10,11,12,
 13
**ZUBKIS (1)**
 5:13

## 1

**10 (1)**
 12:12
**150 (1)**
 7:25
**18th (5)**
 14:20;16:18,18,19;
 32:3
**1999 (1)**
 20:5

## 2

**2:58 (1)**
 38:17
**2020 (1)**
 23:15
**2025 (1)**
 8:6
**22nd (1)**
 7:2

## 3

**3 (4)**
 17:3;26:22;34:3,4
**363 (3)**
 15:14;27:23;28:7

## 5

**50 (1)**
 7:25
**500 (1)**
 14:15
**503b1A (2)**
 18:21;21:8

## 7

**700 (1)**
 14:14

**750,000 (1)**
 10:8

## 8

**80s (1)**
 22:7

## 9

**90s (1)**
 20:5
**980 (1)**
 7:2
**981 (1)**
 7:6